1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    BLACKFEET TRIBE OF THE        )

5    BLACKFEET INDIAN RESERVATION, )

6           Plaintiff,             ) Case No. 12-429L

7       vs.                        )

8    THE UNITED STATES OF AMERICA, )

9           Defendant.             )

10

11

12                 U.S. Bankruptcy Court

13             Russell E. Smith Federal Building

14                 201 East Broadway Street

15                   Missoula, Montana

16                Tuesday, August 23, 2016

17                      9:30 a.m.

18                    Trial Volume 6

19

20

21           BEFORE:  THE HONORABLE THOMAS C. WHEELER

22

23

24

25   Reported by:  Rick Sanborn, CER, Digital Reporter

Trial

Blackfeet Tribe v. USA                                           8/23/2016

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3           LAWRENCE A. ANDERSON, ESQ.

 4           Attorney at Law

 5           Post Office Box 2608

 6           300 4th Street North

 7           Great Falls, Montana  59403-2608

 8           (406) 727-8466

 9           laalaw@mc.com

10           BENJAMIN R. GRAYBILL, ESQ.

11           Graybill Law Firm PC

12           Post Office Box 3586

13           Great Falls, Montana  59403-3586

14           (406) 452-8566

15           brg@silverstatelaw.net

16

17   ON BEHALF OF THE DEFENDANT:

18           TYSON BAIR, ESQ.

19           CAROL DRAPER, ESQ.

20           MARISSA PIROPATO, ESQ.

21           U.S. Department of Justice (ENRD)

22           Post Office Box 7611

23           Washington, DC  20044-7611

24           (202) 307-3316

25           tyler.bair@usdojgov
```

Trial

Blackfeet Tribe v. USA                                    8/23/2016

```
 1   ALSO PRESENT:
 2           Tyson Running Wolf, Treacie Burback
 3           Megan Moore, Kristin Nam
 4           Dondrae Maiden, Kristen Kokinos
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Trial

Blackfeet Tribe v. USA                                          8/23/2016

```
 1                              I N D E X
 2    WITNESS:          DIRECT      CROSS      REDIRECT      RECROSS
 3    FINNEY                        1263       1318         1340
 4    DROESSLER         1350        1395       1401         1402
 5    MONTGOMERY        1403        1446       1471         1478
 6    WENTE             1484
 7
 8    EXHIBITS:                     ID         RECVD
 9    PLAINTIFF
10    140                           1273       1275
11
12    DEFENDANT
13    187                                      1334
14    DEFENDANT
15    DEMONSTRATIVE
16    3                             1350
17
18
19
20
21
22
23
24
25
```

Trial

Blackfeet Tribe v. USA                                              8/23/2016

```
1                     P R O C E E D I N G S
2                     -    -    -    -    -
3            (Proceedings called to order, 9:30 a.m.)
4            THE COURT:  Good morning.
5            COUNSEL:  Good morning, Your Honor.
6            THE COURT:  Please be seated.
7            We're on the record for Trial Day Number 6 in the
8    case of the Blackfeet Tribe vs. The United States.
9            Good morning, Dr. Finney.
10           THE WITNESS:  Good morning.
11           THE COURT:  Do you understand that you're still
12   under oath in these proceedings?
13           THE WITNESS:  Yes.
14           THE COURT:  All right.
15           Let's go ahead, Mr. Graybill.
16           MR. GRAYBILL:  Thank you, Your Honor.
17   Whereupon,
18                     MARK FINNEY, Ph.D.
19   called as a witness, having been previously duly sworn, was
20   further examined and testified as follows:
21                CROSS EXAMINATION (Continued)
22           BY MR. GRAYBILL:
23      Q.   Good morning, Dr. Finney.
24      A.   Good morning.
25      Q.   So, where we left yesterday, we were -- when we
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

1  left yesterday, we were just about to start going through

2  your models, and they are identified as Case 1 through 6, I

3  believe, correct?

4          A.    I think 0 through 6.

5          Q.    Zero through 6.

6          A.    Correct

7          Q.    Okay.  And each case represents a model fire; is

8  that correct?

9          A.    Each case represents a simulated fire, all based on

10  variations of Case Zero.

11         Q.    Okay.  I want to start with Case 1, and I just want

12  to reiterate that with regard to Case 1, and this is at your

13  report.  It's 94-12, and it's page 11 of your report.

14  There's a description of it there.  And I want to reiterate

15  something that I think we touched on yesterday, and that is

16  that with regard to Case 1 through 6, you used Mr. Schulte's

17  data and modifications that you decided were necessary.  Is

18  that correct, what we talked about yesterday?

19         A.    Yes, what Case 1 represents is modifications to the

20  starting configuration for the Black Eagle -- or the Red

21  Eagle Fire, but using Mr. Schulte's data, his spatial data

22  and his weather data in this case.

23         Q.    His spatial data and his weather data.  But you

24  made modifications to Case 1 that we talked about yesterday

25  that are described on page 10 and 11 of your report, correct?

Trial

1    A.    Yes, that's right.

2    Q.    Okay.  And those modifications that you made

3    regarding start date and 1 percent spotting and crown fire,

4    those are included in all of your Cases 1 through 6, correct?

5    A.    Yes, they should be identical.

6    Q.    Okay.  So, going to Case 1, this is a proposed fuel

7    treatment that -- this was Mr. Schulte's proposed fuel

8    treatment, where all of the land cover was converted to an FM

9    10 to an FM 8, correct?

10    A.    All of the land covered was converted to an 8, yes,

11    irrespective of what it started at.

12    Q.    To a Fuel Model 8, correct?

13    A.    That's right.

14    Q.    All right.  And that's what Mr. Schulte called for

15    in his report, correct?

16    A.    That was the nature of the landscape file.  As

17    we've discussed, Mr. Schulte stated it was a conversion of

18    Fuel Model 10 to an 8, but in this case, it's all cover types

19    to an 8.

20    Q.    But there isn't any difference, is there, what

21    you're doing here with Case 1, other than the modifications

22    that you made from Mr. Schulte's modeling where he converts

23    from a Fuel Model 10 to a Fuel Model 8.

24    A.    He converts Fuel Model 10 to an 8, but he also

25    converts 1 to an 8 and 5 to an 8 and rock to an 8 and other

Trial

1    things.  So, yes, all of his changes are in this particular

2    example.  That's correct.

3         Q.   Yeah, you're doing the same thing he did here.

4         A.   Yes.

5         Q.   That's all I'm trying to get at.

6         A.   Yeah.

7         Q.   Okay.  And, so, isn't it true, then, that the

8    result of your Case 1 is -- and this is -- we can go to page

9    13 of your report.  It's 94-14.  There's a description of the

10   results of Case 1 on this page, correct?

11        A.   Yes.

12        Q.   And the result is that there was a dramatic slowing

13   of the fire progress as a consequence of the fuel treatment;

14   isn't that correct?

15        A.   Yes.

16        Q.   Okay.  And, in fact, it's the purpose of fuel

17   treatments to do just this, to dramatically slow a fire in

18   order to allow suppression forces to try to control it, if

19   possible.

20        A.   If possible.

21        Q.   And isn't it true that the flame lengths where this

22   conversion from FM 10 to FM 8 occurred were two feet?

23        A.   Yes.

24        Q.   And you report that in your report, correct?

25        A.   Yes.

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1      Q.    All right.  So, with regard to Case 1, this is
2    essentially a confirmation that Mr. Schulte's fuel treatments
3    work, assuming that you are able to convert FM 10 forest to
4    an FM 8 forest, correct?  And we'll get into your other cases
5    here in a second.
6      a.    Well --
7      A.    Assuming that that's what you're doing, converting
8    FM 10 forest to FM 8, they work, correct?
9      A.    Well, to be more clear, what this case, Case 1 in
10   my report, shows is if you make the same assumptions, all of
11   which include conversion of everything in that proposed fuel
12   break to a Fuel Model 8, then you get results that are
13   similar to Mr. Schulte's.  That's what this says, not just
14   converting 10 to an 8.
15     Q.    And to be clear, those results show two-foot flame
16   lengths and a dramatic slowing of the fire, correct?
17     A.    Yes.
18     Q.    And those results would allow suppression forces to
19   potentially control the fire.
20     A.    If they were there, potentially.
21     Q.    So, let's move to Case 3.  We're going to come back
22   to Case 2, but let's move to Cases 3 through 6.  And Case 3
23   is again described on page 11 of your report, 94-12.  And,
24   so, Case 3, as I understand it, is a simulation that you did
25   where you converted the FM 10 areas of the proposed treatment

Trial

Blackfeet Tribe v. USA                                      8/23/2016

```
 1   to FM 8, but you did not convert the other cover types, which
 2   included FM 1 grass, FM 5 and 6 brush, and FM 12 slash,
 3   correct?
 4          A.    That's correct.
 5          Q.    And these are cover types that you contend are in
 6   the treatment areas that Mr. Schulte has proposed?
 7          A.    They are in there.
 8          Q.    Okay.  And, so, this approach was then repeated
 9   in Cases 4, 5, and 6, correct?  In other words, you left
10   those -- or you made sure that those fuel models -- 1, 5, 6,
11   and 12 -- were not converted to FM 8.
12          A.    Yes.
13          Q.    Okay.  And that's what it means, for example, in
14   Case 4, where you say same as Case 3.  Do you see that?
15          A.    Yes.
16          Q.    Okay.  Because yesterday it was my understanding
17   you were saying that Case 4 was another FM 10 to an FM 8,
18   but, in fact, it does not convert these other fuels, correct
19   -- these other fuel types?
20          A.    Yes, I think that's correct.
21          Q.    All right.
22          A.    So, when you left these other fuel types, the
23   grass, the brush, and the slash, you didn't treat them in
24   your model, did you?
25          A.    No.
```

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1        Q.    And, so, if you don't treat these other cover

2   types, they do, in fact, become corridors for fire spread

3   through the treated areas.   Isn't that right?

4        A.    Yes.

5        Q.    And wouldn't you agree that any prudent forest

6   manager who was undertaking a fuel treatment reduction

7   project to reduce or convert Fuel Model 10 forest to a Fuel

8   Model 8 forest would, if he or she encountered other cover

9   types like slash or brush or grass, treat those as well?

10        A.    Well, the purpose of my report, as it says, is to

11   simply evaluate what Mr. Schulte said he was doing exactly.

12        Q.    So, let me stop you.

13        A.    So, that's what -- that's what I did.

14        Q.    Let me interrupt and just say that's not my

15   question.   My question is different than that.   Wouldn't you

16   agree that any prudent forest manager who is converting from

17   an FM 10 to an FM 8 who encounters other cover types that

18   could cause a risk of fire spread would, in fact, treat those

19   other cover types?

20        A.    Well, to be clear, I don't think a prudent forest

21   manager would be converting a Fuel Model 10 to an 8 in this

22   case to begin with, so I'd question their prudence to begin

23   with.   And -- but if you're doing a blanket treatment across

24   this -- this swath proposed for fuel treatment using the

25   techniques of prescribed fire, et cetera, then it would have

Trial
Blackfeet Tribe v. USA                                          8/23/2016

```
 1    some impact on these other types.  Exactly how they would be
 2    converted and what they would be converted to depends on the
 3    local site characteristics.
 4         Q.   Okay.  I'm going to try my question again, because
 5    it's a little more -- it's a little simpler than that.  If
 6    you're a fuels manager or a forest manager and you're engaged
 7    in a fuels reduction project, you're going to treat all the
 8    hazardous fuels in the area, not just some; isn't that true.
 9         A.   If you can.
10         Q.   Now, isn't it true that what Mr. Schulte recommends
11    is that the fuel break or fuel treatment be designed so that
12    the existing fuels would be modified to mimic the fire
13    behavior characteristics of a Fuel Model 8.  Isn't that what
14    he says?
15         A.   That's his intent in his modeling, that's right.
16         Q.   Okay.  And, so, that means what he's intending is
17    to treat all fuels in order to generate a slow-burning, low-
18    intensity fire.
19         A.   Well, he only says Fuel Model 10 to an 8, so we
20    have to take him at his word.  That's what it says.
21         Q.   Let's go to Plaintiff's Exhibit 87-16.  I think you
22    should have it there.
23         A.   88 -- 87-16.
24         Q.   Do you have it there?
25         A.   Yeah.
```

Trial

1      Q.   All right.  And below Figure 9 -- in the paragraph

2    below Figure 9, the third line down, it says, "This fuel

3    break should be designed so that the existing fuels."  Do you

4    -- I'm going to wait until you --

5      A.   Yeah, just wait until I catch up.

6      Q.   Yep.

7      A.   This -- oh, yeah, there it is.

8      Q.   "This fuel break should be designed so that the

9    existing fuels would be modified to mimic the fire behavior

10   characteristics of a fuel model 8."  Do you see that?

11     A.   I see that.

12     Q.   It doesn't say Fuel Model 10 to Fuel Model 8 there.

13   It says that the existing fuels would be modified to mimic a

14   Fuel Model 8, correct?

15     A.   That's right.

16     Q.   Okay.

17     A.   And the next sentence clarifies that it would be

18   achieved by thinning from below, selective cutting of the

19   timbered resource with resulting slash fuels.  Well, if there

20   isn't a timber there, then thinning from below doesn't make

21   sense; and if it's grass, then you can't thin from below.

22   So, this is the point.

23     Q.   Well, we're going to talk about what fuels are in

24   these areas in just a minute.

25     A.   Okay.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1        Q.    Okay, so, you agree with me that you must treat all
2   surface fuels in the treatment area in order to change fire
3   behavior; isn't that right?
4        A.    If you can.
5        Q.    Okay.  It would be an egregious error not to treat
6   all surface fuels if it's possible to do so, correct?
7        A.    True.
8             (Plaintiff Exhibit Number 140 was marked for
9   identification.)
10            BY MR. GRAYBILL:
11       Q.    Okay.  So, you should have there the bear-clip on
12  it a document that's been marked as Plaintiff's Exhibit 140.
13  This is not in evidence.  This is for identification purposes
14  at this point.  Do you see that document, sir?
15       A.    I'm sorry, where are we looking now?
16       Q.    I'm sorry, this is Plaintiff Exhibit 140.  It would
17  be Impeachment 140.
18       A.    Oh, one -- okay, okay.
19       Q.    And it's --
20       A.    It's in this packet.  Yeah.  Yes.
21       Q.    Do you recognize this article?
22       A.    Yes.
23       Q.    Okay, this is an article you wrote?
24       A.    That's right.
25       Q.    It's called computational method for optimizing

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1   fuel treatment locations?

2       A.   Right.

3       Q.   Okay.  And if you would turn to page 109 of the

4   article, it's Plaintiff's 140-3.

5       A.   There.

6       Q.   In the paragraph there below the Figure 1, second

7   line, it says, "Managing the condition of the landscape and

8   the spatial fuel structure, therefore, offers the only

9   possible means to resist the growth of fires under such

10  conditions, reducing the spread rate and ultimate size of the

11  fires."  Do you see that?

12      A.   Yes.

13           MR. BAIR:  Objection, Your Honor.  As Mr. Graybill

14  noted, this document has not been admitted into evidence, and

15  we would object to its admission.

16           MR. GRAYBILL:  Now that it's been identified, Your

17  Honor, we'll move for its admission into evidence.

18           THE COURT:  Okay.  Any objection?

19           MR. BAIR:  We do, Your Honor.  As with this other

20  academic article yesterday, the Plaintiff could have

21  disclosed this at any time over the many months since Dr.

22  Finney submitted his reports.  Instead, they chose to just

23  disclose it today, and we're prejudiced by not having a

24  chance to review it, Your Honor.

25           THE COURT:  Well, I'm going to overrule the

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1    objection.  I think in accordance with the pretrial order,

2    it's permissible to use documents like this during cross

3    examination.

4              MR. BAIR:  Thank you, Your Honor.

5              (Plaintiff Exhibit Number 140 was admitted into

6    evidence.)

7              BY MR. GRAYBILL:

8         Q.   And then the last line of that paragraph says,

9    "Fuel is the only element of fire behavior that is

10   manageable, since weather and topography are beyond human

11   control."  You agree with that, sir?

12        A.   Of course.

13        Q.   Yes.  And if you turn the page to -- this is 140-4.

14   It's page 110 of the article.  At the bottom of the page, a

15   little more than halfway down, there's a sentence that

16   begins, "Although any prescription can be applied, field

17   evidence consistently suggests that fuel treatment

18   prescriptions achieve reductions in wildfire spread rate and

19   intensity by removing surface fuels through prescribed

20   burning and decreasing the continuity between surface and

21   canopy fuel strata through low thinning."  Do you see that?

22        A.   Yes.

23        Q.   And do you still agree with that statement?

24        A.   Yes.

25        Q.   And then it goes on to say, "Mechanical treatments

Trial

1    that leave slash or don't remove preexisting surface fuels

2    may not change fire behavior sufficiently or even exacerbate

3    fuel hazards.  Lands excluded from treatment consideration

4    retain the identical fuel descriptions in both landscapes or

5    involve prescriptions that increase the fire rate -- spread

6    rate."  Do you see that?

7         A.   Yes.

8         Q.   And do you still agree with that?

9         A.   Let's just be clear that sentence begins with

10   "Lands excluded."  That's describing two separate landscapes

11   that are used in this computational method that I'm

12   describing in the paper.

13        Q.   Do you agree that if you don't treat all of the

14   fuels fire behavior may not be sufficiently changed to allow

15   suppression.

16        A.   Oh, I agree.

17        Q.   Now, we're going to get into the fuels that were in

18   these treatment areas, but one of the fuels that you suggest

19   was there was a slash model.  I think that was the FM 12; is

20   that right?

21        A.   Or 11.  I'm not sure.  Is it 12?

22        Q.   Well, in your report it's 12.

23        A.   Okay, then that's right.

24        Q.   Okay.  That's slash from harvesting or thinning

25   projects?

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1     A.    Right.

2     Q.    That can be removed, can't it?

3     A.    Yes, absolutely.

4     Q.    And then I think you indicated that there was an FM

5    5 and 6, which are two different brush models, correct?

6     A.    That's right.

7     Q.    FM 6 is a more combustible model that burns more

8    intensely; is that right?

9     A.    Yes.

10     Q.    Okay.  Brush can be treated and removed from a

11    landscape, isn't that true?

12     A.    Temporarily, until it sprouts back, yes.

13     Q.    Well, it can be removed over and over again from a

14    landscape; isn't that right?

15     A.    Yes.

16     Q.    And grass is also something that can be treated to

17    reduce fire spread; isn't that right?

18     A.    Temporarily.

19     Q.    It can be treated over and over again to reduce

20    fire spread; isn't that right?

21     A.    Yes.

22     Q.    Okay, now, I understand that you claim that these

23    fuel models are in the treatment areas, but what I'd like to

24    do is go to the Red Eagle Fire Final Narrative.  It's

25    Plaintiff's Exhibit 57.  You should have it in your binder

Trial

1    there.

2            You see the first page is the Red Eagle Fire Final

3    Narrative?

4         A.   Yes.

5         Q.   And you turn to -- it's page 24 of the Final

6    Narrative.  It's Plaintiff's Exhibit 57-25.

7         A.   Yes.

8         Q.   And there is a section there called Fuels.  Do you

9    see that?

10        A.   Yes.

11        Q.   First paragraph, it says, "fuel model 1 best

12   represents the taller grass component found within the aspen

13   inclusions, predominantly on the east side of the fire."  Do

14   you see that?

15        A.   Yes.

16        Q.   So, the final fire narrative is written by the

17   people who actually fought the fire, correct?

18        A.   Correct.

19        Q.   And they're the people who were on the ground and

20   who witnessed what the conditions were, correct?

21        A.   Yes.

22        Q.   And, so, they are saying here in the Final

23   Narrative that, in fact, Fuel Model 1, which you say is in

24   the treatment areas, is predominantly on the east side of the

25   fire.  So, if it's on the east side of the fire, that's not

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    in the treatment areas, correct?

2         A.   That's correct, but if you look in the polygon

3    designated by Mr. Schulte, there is Fuel Model 1 within that

4    polygon in his fuel model map.  And that's what I'm referring

5    to.

6         Q.   Okay.  And, so, the fact that you and/or Mr.

7    Schulte have a Fuel Model 1 in your fuel models is because

8    the GIS vegetation layer says that there's Fuel Model 1 in

9    the treatment area; is that right?

10        A.   Yes, and it's in the landscape file that Mr.

11   Schulte chose to use for his simulations.

12        Q.   Okay.  But it would come from a GIS -- a GIS file;

13   isn't that right?

14        A.   In this case, it came from the LANDFIRE data, which

15   are based on satellite imagery and then put into a GIS to

16   manage those data sets, yes.

17        Q.   And I think that when you were answering some

18   questions by Mr. Bair you indicated that GIS data can -- is

19   notoriously error-prone in the sense that it could be old or

20   things could have changed from the time that the aerial

21   photography was interpreted.  Do you remember saying that?

22        A.   Oh, yes.

23        Q.   Okay.  And, so, in any event, according to the

24   people who were on the ground, the grass model is on the east

25   side of the fire, correct?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    A.    There is grass there, but that's also in Mr.

2    Schulte's polygon.

3    Q.    Okay.  But I'm just talking about what the people

4    who were there are saying.  They're saying that Fuel Model 1

5    is in the east side of the fire, which wouldn't be in the

6    treatments areas, correct?

7    A.    There is that there and there's elsewhere, too.

8    Q.    Predominantly, grass was on the east side; isn't

9    that right?

10   A.    I don't know.

11   Q.    Okay.  And let me ask you this, did you review this

12   final fire narrative to do any of your modeling?

13   A.    I looked at just a few sections of it.

14   Q.    Did you look at this section?

15   A.    No.

16   Q.    All right.  Let's move on, then, to Fuel Model 6,

17   which you say is a brush model that was in the treatment

18   areas proposed by Mr. Schulte.

19   A.    Yes.

20   Q.    Okay.  Fuel Model 6 is not mentioned by -- in the

21   final fire narrative, by the people who were actually there.

22   They don't report that there was any Fuel Model 6.  Isn't

23   that right?  You can take a minute and look at it.

24   A.    It doesn't appear to be here.

25   Q.    Okay.  So, Fuel Model 6 wasn't there in the

1281

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    treatment areas?

2         A.    How would you know after it burned?

3         Q.    Well --

4         A.    They were only there after it burned.  This

5    narrative was written after the fire spread through the

6    proposed treatment area.  They were -- even being on the

7    ground wouldn't have been able to identify preexisting fuel

8    models.  They would have to look at GIS data in order to

9    determine that.

10        Q.    Well, sir, why is there a fuel section, if you

11   know, in the final fire narrative describing the fuels that

12   were present in the fire?

13        A.    I don't know.  I didn't write the report.

14        Q.    Do you see there at the top it says a variety of

15   fuels were represented across the fire area?

16        A.    Yes.

17        Q.    Okay.  Fuel Model 6 is not included in this

18   description of what was in the fire, correct?

19        A.    Correct.

20        Q.    All right.  That's also true with regard to the

21   Fuel Model 12 that you have in your modeling. It's not

22   represented here either, is it?

23        A.    That's right.

24        Q.    Okay.  Fuel Model 5 is identified here.  Do you see

25   that?

Trial

Blackfeet Tribe v. USA                                           8/23/2016

1       A.    I do.

2       Q.    And it says, "A Fuel Model 5 represents the brush

3    component (willow, alder" -- you can pronounce that next word

4    for me.

5       A.    Ceanothus.

6       Q.    "Ceanothus) found with the plantations along the

7    creek bottoms.  These species typically retain their live

8    fuel moistures longer than other brush species, this change

9    in fuel composition and moisture content helped minimize fire

10   spread."  Do you see that?

11      A.    I do.

12      Q.    So, the people who are fighting the fire in

13   remarking on the Fuel Model 5 brush type that was in the fire

14   actually indicated or indicate here that it minimized spread.

15   Correct?

16      A.    That's what they say.

17      Q.    So, if the fuel models that are -- excuse me -- the

18   cover types, the grass and the shrub and the slash cover

19   types that are in your models and were untreated in your

20   models are, in fact, not present in the fuel areas -- the

21   proposed fuel treatment areas that Mr. Schulte is proposing,

22   then they wouldn't provide these corridors for fire that

23   could diminish the effectiveness of those proposed treatment

24   areas.  Isn't that right?

25      A.    Are you talking hypothetically?  I mean, I can show

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

1   you in the landscape file data within the proposed treatment

2   area, those fuel models exist in that map.  And that map was

3   chosen by Mr. Schulte.  I'm just simply stating what's in the

4   legend of the map.

5        Q.   Well, they may have been chosen by Mr. Schulte, but

6   I'm actually not talking in hypotheticals.  I'm talking about

7   reality.  The reality appears to be, doesn't it, sir, that

8   the people on the ground are reporting that these fuel models

9   that you have modeled and have not treated in your models,

10  actually weren't present in the treatment areas.  Isn't that

11  true?

12       A.   I don't know what exactly -- where the source of

13  information is, and that's what they're saying in there,

14  but --

15       Q.   Well --

16       A.   -- that's not what the GIS map shows, and that's

17  what I based my interpretation on.

18       Q.   Okay.  Up at the top of page 57-25 of the Final

19  Narrative, it says Field Observers.  Do you see that?

20       A.   Yes.

21       Q.   So, they're basing their information here based on

22  their observations as they fought the fire; isn't that right?

23       A.   And were they in the fuel break?  The proposed fuel

24  break zone when the fire burned through on the 29th?

25       Q.   Well --

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1     A.    And if not, then they have no direct knowledge of

2    what burned during the fire.

3     Q.    Well, it's clear that what knowledge they have

4    based on their observations is that these fuel types that are

5    in your models weren't, in fact, in the fire area.

6     A.    I disagree.

7     Q.    Okay.  In any event, let's assume that the fuel

8    types that you have placed or that are in your models are

9    there.  They could have been treated, isn't that right?

10    A.    Some of them could be.

11    Q.    Which ones couldn't be?

12    A.    Well, grass is going to come back to grass, and

13    that's a meadow.

14    Q.    When you say "come back" --

15    A.    Right.

16    Q.    -- you mean after it's been treated, right?

17    A.    Right.

18    Q.    So, it can be treated, can't it?

19    A.    Yes.

20    Q.    All right.  Yesterday, you testified that you

21    didn't think that these treatment areas could actually be

22    converted to a Fuel Model 8.  Do you remember that?

23    A.    Yes.

24    Q.    And that's because of the fact that prescribed fire

25    -- a broadcast burn fire is inappropriate for this -- for

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1    this area and these kinds of trees, and the only way to get

2    rid of the duff and the litter is to have that kind of a

3    broadcast burn.  Is that correct?

4         A.   No, sir.

5         Q.   All right.  Well, you say -- I thought you had

6    testified -- let's just go back.  I thought you testified

7    that it couldn't be -- these treatment areas couldn't be

8    converted to a Fuel Model 8 because you couldn't deal with

9    the duff and the litter.

10        A.   No.  No.  In fact, what I stated yesterday was that

11   Fuel Model 8 is an inappropriate characterization of post-

12   treatment fuels because the natural recovery following

13   treatment is to grass and resprouting brush, not to a compact

14   needle litter layer.  So, that's the point, is that the

15   vegetation recovery does not comport with the description of

16   Fuel Model 8.

17        Q.   Okay, let me see if I can break that answer down a

18   little bit.  So, are you saying that you can convert to a

19   Fuel Model 8 but that what happens after you've converted to

20   a Fuel Model 8 is that grass and shrub regenerate and,

21   therefore, it doesn't stay a Fuel Model 8.

22        A.   No, it doesn't even go to a Fuel Model 8.  It goes

23   to a grass and brush-dominated system, with small tree

24   reproduction.  And, so, post-treatment, I would not

25   characterize a treatment as producing a Fuel Model 8.  I

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    would characterize the treatment as producing grass and

2    brush.

3        Q.    Okay.  So, if the -- would you agree with me that

4    the majority of the treatment areas are Fuel Model 10?  I

5    mean, I understand you say that there is some grass and brush

6    in it, but the vast majority of the treatment areas are Fuel

7    Model 10 forest, correct?

8        A.    Yes.

9        Q.    Okay.  So, I want to make sure I understand what

10   you're saying.  Are you saying that you cannot convert those

11   Fuel Model 10 forests to a Fuel Model 8?

12       A.    Right.

13       Q.    And you're saying that because by reducing the

14   dead-down material on the forest floor, reducing the small

15   trees in the understory, changing the composition to a Fuel

16   Model 8 forest causes grass and shrubs to generate.

17       A.    Okay, let's back up just a little bit.  What I'm

18   saying is that a treatment that you would perform here,

19   whether you thin the forest out or not, but by using

20   prescribed fire you will remove all the duff and the litter,

21   as you're saying, and you will -- this is with a prescribed

22   fire.

23       Q.    Okay, let me back up because I don't want to be

24   missing each other.

25       A.    Okay.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      Q.    I'm not talking about using prescribed fire.   I

2   thought yesterday -- and I just want to make sure I'm clear.

3   I thought yesterday you testified that prescribed fire, other

4   than just using it for activity fuels that are piled, but a

5   broadcast burn prescribed fire is not appropriate for this

6   kind of a forest.   Is that right?   Was that your testimony

7   yesterday?

8      A.    No, my testimony was a prescribed fire will kill

9   all of the trees in the stand, but it is, as in all of these

10   documents that you've shown me, identified as being the most

11   effective surface fuel reduction tool that we have in the

12   arsenal.   So, if you don't do that, you are not going to get

13   much of a fuel treatment.

14      Q.    So, you're saying that mechanical treatments, going

15   in and removing or piling the dead-down material is simply

16   ineffective.

17      A.    Yes.

18      Q.    And why is that?

19      A.    Because you're leaving all of the material on the

20   ground, the preexisting material that's not merchantable.

21   You're not going through there with a rake and raking up all

22   the duff and the litter.   You're not removing all the rotten

23   material and piling it.   That's completely impractical over

24   large areas.

25      Q.    Okay, let me stop you, because now I'm to the point

Trial

Blackfeet Tribe v. USA                                     8/23/2016

1    where I thought I was yesterday in understanding you.  So,

2    let's just back up.  You can mechanically treat an FM 10

3    forest, can't you?

4         A.    Sure.

5         Q.    You can go in and you can remove the smaller trees

6    and you can remove dead-down material.  You can do that

7    through mechanical treatments, correct?

8         A.    Yes.

9         Q.    Okay.  And, so, what's left -- I think what you're

10   saying, then, is what's left is the duff and the litter on

11   the forest floor, correct?

12        A.    That's right, and rotten wood and all that.

13        Q.    And that's -- I'm sorry to interrupt.

14        A.    And rotten wood and other material that's not --

15   not accessible to mechanical treatment, yes.

16        Q.    Okay.  Well, rotten wood that is sufficiently large

17   enough that, you know, it can be removed and burned in a

18   prescribed burn.  I mean, it can be piled.

19        A.    Well, yeah, I --

20        Q.    But you're talking about the smaller stuff.

21        A.    The smaller stuff, which catches embers and helps

22   propagate the fire under wildfire conditions through there,

23   yeah.

24        Q.    Okay.  So, let's turn to Plaintiff's Exhibit 5,

25   which is the Aids -- the Anderson Aids to Determining Fuel

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1   Models.

2        A.    Yes.

3        Q.    And you should have it there.  Now, let's go to

4   page 11 of that.  It's 5-13.  And this is the description --

5   Dr. Anderson's, I'm sure, description of Fuel Model 8,

6   correct?

7        A.    Yes.

8        Q.    And we look at the photographs that he says

9   illustrates Fuel Model 8.  If you look at the bottom

10  photograph, it looks to me as a layperson like there's a lot

11  of litter and duff on that forest floor.  Is that right?

12       A.    Yes.  Yes.

13       Q.    That hasn't been removed.

14       A.    The very bottom photograph is -- yes, birch-aspen

15  forest with leaf litter.

16       Q.    And there -- in the second photograph, the middle

17  photograph, there seems to be, you know, vegetation and other

18  organic materials on the forest floor.  In fact, both of the

19  other photographs show that; isn't that right?

20       A.    Yes.

21       Q.    All right.  Are you saying that in an FM 8 --

22  converting to an FM 8 forest in the treatment areas that Mr.

23  Schulte is proposing the kind of forest floors that we're

24  seeing here would have to be removed?  In other words --

25       A.    No, no.  I'm saying that you can't achieve

Trial
Blackfeet Tribe v. USA                                8/23/2016

1    conditions that are depicted in those photographs by treating

2    fuels in a subalpine forest of Glacier National Park or the

3    Blackfeet Reservation.  That's what I'm saying.

4         Q.   And that's because the litter that we see in these

5    photographs that's on the forest floors in these proposed

6    areas needs to be removed and simply can't be.  Is that what

7    you're saying, or you're saying that there's some sort of

8    regeneration after you've opened the canopy up and allowed

9    sunlight to come in?

10        A.   There is that, but no fuel treatment stays static

11   for very long, and that's part of the problem with any fuel

12   treatment is scheduling maintenance or the addition of other

13   units into a landscape in order to maintain overall

14   effectiveness of the treatment design.

15        Q.   All right.  And I don't want to get bogged down.

16   I'm going to move on in just a minute here, but I just want

17   to try to understand.  It seems to me, just looking at these

18   photographs, that there's a lot of duff and litter on the

19   floors of --

20        A.   There is.

21        Q.   -- these forests.

22        A.   That's right.

23        Q.   And, clearly, if you convert the treatment areas

24   that Mr. Schulte is proposing to an FM 8, there's still going

25   to be some litter and duff on the forest floors, correct?

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1      A.   Yes, but the point is that in these subalpine

2   forests grasses and shrubs are dominating in the understory.

3   And if you look at pictures from the forest inventory plots

4   there, it demonstrates that quite clearly.  So, what I'm

5   saying is it's not achievable to convert these 10s to an 8.

6   That's not just a one-way kind of a street.

7      Q.   Okay.  And, so -- and I'm about to move on, but I

8   want to make sure I'm clear.

9      A.   Yeah.

10      Q.   You're saying that it's the grasses and the shrubs

11   that are the problem in the treatment areas that Mr. Schulte

12   is proposing.  Is that right?

13      A.   Well, that's what recovers naturally following some

14   kind of disturbance such as a treatment, yes.

15      Q.   And I think we've established that it's possible to

16   treat both of those cover types, correct?

17      A.   Yes, and how are you proposing to treat those?

18   With prescribed fire?  If so, you're going to kill all the

19   overstory trees, let more light in, and stimulate more grass

20   and brush recovery.

21      Q.   Okay, so --

22      A.   So, this is the problem we're having here in

23   communicating, I think.

24      Q.   Okay.  And, so, let me see if I can work it out.

25   It's possible to treat brush cover through mechanical means.

1292

Trial

1    Isn't that right?

2         A.    Yes, if it's brush field, sure.

3         Q.    Yeah.  And, so, the brush can be treated

4    mechanically, can't it?

5         A.    Sure.

6         Q.    And those treatments can be repeated, can't they?

7         A.    Yes.

8         Q.    Grass --

9         A.    And they may not be effective at changing fire

10   behavior.

11        Q.    The grass is probably much more difficult to treat

12   mechanically.  Can we agree on that?

13        A.    You'd have to mow it, I guess.

14        Q.    Well, do you remember -- were you in the courtroom

15   when Mr. LaPlant testified yesterday?

16        A.    No.

17        Q.    Okay.

18        A.    Well, maybe.  I can't remember.

19        Q.    Do you remember he testified that he saw cattle --

20        A.    Oh, yes.

21        Q.    -- grazing in the forest?

22        A.    Sure, I was there.

23        Q.    In fact, this forest is a forest where cattle and

24   sheep graze.  Isn't that right?

25        A.    I don't now.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1      Q.    Well, cattle and sheep are one means of controlling
2   grass, of treating grass.  Isn't that true?
3      A.    Yes.  In the national park?
4      Q.    Are you asking me --
5      A.    Well, is --
6      Q.    -- well, first of all, let me ask the questions.
7      A.    Yeah.
8      Q.    But are you suggesting that in Glacier National
9   Park that wouldn't be possible?
10     A.    Adding grazing to the national park is a whole
11  different challenge.
12     Q.    Well, my question is -- okay.  And is that because
13  of the way you understand the Park to be managed?
14     A.    It's the way the Park is managed, yes.
15     Q.    You're not a legal expert?
16     A.    No.
17     Q.    You're not here offering a legal opinion regarding
18  the relationship between management policies in Glacier
19  National Park and trust responsibilities on Indian
20  reservations.
21     A.    No.
22     Q.    Okay.  Now, let's go to your Case Number 2, which I
23  think is at Plaintiff's Exhibit 94.  It's described at, I
24  think, 94-11.  Excuse me, 94-12.  It's page 11 of your
25  report.  Tell me when you're there.

1294

Trial

1      A.    I'm there.

2      Q.    Okay.  So, Case Number 2 is a -- is your model in

3   which you convert as Mr. Schulte did from an FM 10 to an FM

4   8, correct?

5      A.    Yes.

6      Q.    And you don't include these other cover types that

7   we've just been talking about, correct?

8      A.    That's right.

9      Q.    But you do reduce the canopy by 90 percent.

10     A.    No, I reduce it to a value of 10 percent.

11     Q.    What does that mean?

12     A.    So, the difference between what your question was

13  and my answer is that it started off at a canopy cover of 50

14  percent or 75 percent.  Those were categories in the LANDFIRE

15  data.  And the -- according to Mr. Schulte's recommendations,

16  the canopy cover would then modify to a inter-crown spacing

17  of 14 to 20 feet.  So, that is the end point of following all

18  of the treatment.  And that means that it would be reduced to

19  a level of approximately 10 percent.

20     Q.    Okay, from 75 percent to 10 percent.

21     A.    That's right.

22     Q.    All right.  And, so, first of all, I think you

23  testified that Mr. Schulte -- well, strike that because I'm

24  not remembering your testimony exactly.  What Mr. Schulte did

25  in his modeling is he chose not to change the canopy from --

1295

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    he chose to leave the canopy intact, is that fair?

2         A.   Well, whether he chose to or whether he did, that's

3    what occurred.

4         Q.   Well, he left the canopy intact in his modeling.

5         A.   Yes.

6         Q.   And you reduced it from 75 percent to 10 percent,

7    correct?

8         A.   I reduced it from whatever it started at to 10

9    percent.

10        Q.   Okay.  And your numbers today were -- it was 50 or

11   75 percent; is that right?

12        A.   I believe there were two categories of canopy cover

13   in the initial LANDFIRE data.  One indicated canopy cover of

14   50 percent; and one indicated 75 percent.  So, yes.

15        Q.   And I think you testified yesterday that you did

16   that -- you made your mathematical calculation regarding the

17   14 to 20-feet spacings by making an assumption that the

18   canopy spacing that existed there was ten feet.

19        A.   No, the crown diameter was ten feet.

20        Q.   You made an assumption that the crown diameters

21   were ten feet, correct?

22        A.   I made it very explicit, that's right.

23        Q.   Okay.  You didn't have any evidence -- documentary

24   evidence of that; you made that assumption.  Correct?

25        A.   Yes.

1296

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1    Q.    Okay.  And, so, you introduced that subjective
2  decision into your modeling.
3    A.    Well, it's my judgment that 10 feet is an
4  appropriate -- approximate diameter for crowns of the species
5  in subalpine forest.
6    Q.    You did not report any source for that judgment.
7    A.    No.
8    Q.    So, you opened up the canopy quite substantially,
9  then, isn't that right?
10    A.    According to Mr. Schulte's specifications, yes.
11    Q.    Well, according to his specifications based on your
12  assumption of the crown spacing.
13    A.    Well, we could do some calculations right now to
14  examine sensitivity of my assumption to Mr. Schulte's
15  specifications if you'd like.
16    Q.    Those weren't reported in your report, correct?
17  These calculations that you just mentioned.
18    A.    Yes, it is.
19    Q.    Well, I'm talking about the -- well, there was no
20  source reported in your report --
21    A.    I did not cite a source.  That's right.
22    Q.    Okay.  You found in Case 2 that by opening up the
23  canopy very substantially it created additional wind flow
24  that promoted fire spread.  Isn't that right?
25    A.    Yes.

1297

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1     Q.   So, if all of this work that has been done in this
2   case to think about this problem of protecting the Blackfeet
3   Forest had been done back in 1995, and a forest manager
4   looked at what you found in your modeling, that opening up
5   the canopy actually produced or generated fire spread,
6   wouldn't you agree that that forest manager would make a
7   decision not to include that in the treatment prescription,
8   not to include --
9     A.   So, totally hypothetical --
10          MR. BAIR:   Objection, Your Honor.  This calls for
11   speculation.
12          THE COURT:   I'll sustain the objection.
13          BY MR. GRAYBILL:
14     Q.   Okay.  Sir, I think you've testified that you're an
15   expert on fire behavior, correct?
16     A.   Yes.
17     Q.   And you've consulted with agencies with regard to
18   their needs in trying to protect assets from wildland fire,
19   correct?
20     A.   That's correct.
21     Q.   So, if in consulting with one of these agencies you
22   found that opening up the canopy generated more fire spread
23   based on your modeling, wouldn't you tell your client, the
24   person you're consulting with, maybe we oughtn't to open up
25   the canopy in this way with regard to this particular fuel

1298

Trial

1   reduction treatment.

2       A.   I certainly would in ponderosa pine, mixed conifer

3   ecosystems where that is entirely appropriate and surface

4   fuel modification can be conducted routinely with prescribed

5   fire, but I would not be giving that same kind of a

6   recommendation for subalpine forest.

7       Q.   Okay.  In any event, if you found that something in

8   your modeling promoted fire spread, you would not want to

9   include that in your prescription, correct?

10       A.   If possible.

11       Q.   And, in fact, engaging in this sort of management

12   process, trying to protect assets from wildland fire, I mean,

13   that's a trial-and-error process, isn't it?  You're trying to

14   figure out what works.

15       A.   Yes.

16       Q.   Okay.  Let's talk about some of the errors that you

17   claim Mr. Schulte made.  Let's start with the notion that he

18   started the fire on the wrong date.  Have you heard the

19   testimony that, in fact, there were reports -- I mean, I can

20   pull out the investigative report -- but there were reports

21   of smoke on the 26th and the 27th?

22       A.   I've heard people mention it.  I've not read that

23   in anything.

24       Q.   Do you doubt that that is true that there were

25   reports of smoke?

1299

Trial

1    A.   I don't doubt it.  I don't know what to think of

2  it, but I don't doubt it.

3    Q.   Well, in fact, if there was -- if there were -- a

4  number of witnesses reported smelling smoke in the forest two

5  days before a fire was actually reported, isn't it likely,

6  given the fact that campfires aren't allowed in the Red Eagle

7  Lake area, isn't it likely that the smoke they were smelling

8  was the smoke from the beginning of the Red Eagle Fire?

9         MR. BAIR:  Objection, Your Honor.  This again calls

10  for speculation.  Furthermore, there's a foundational issue.

11  Dr. Finney has already testified that he has no familiarity

12  with these reports except for overhearing some testimony in

13  court.

14         THE COURT:  I'll sustain the objection.

15         BY MR. GRAYBILL:

16    Q.   Okay.  Well, let's turn to Exhibit 96, Plaintiff's

17  Exhibit 96.  Do you have that, Dr. Finney?

18    A.   It looks like it.

19    Q.   Excuse me.  It's Defendant's Exhibit 96.

20    A.   Oh, yeah.

21    Q.   It should have a little D in front of it.  And do

22  you see that that's a National Park Service Investigative

23  Services Branch investigation?  Up at the top?

24    A.   Yes.  I have a different sheet than what's

25  displayed here, but that's it.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Blackfeet Tribe v. USA                                        8/23/2016

1       Q.    Okay.   And it's entitled Red Eagle Fire
2   Investigation?
3       A.    Yes.
4       Q.    And in the Summary section of this page, it says
5   the fire was first observed as a column of smoke on July
6   28th?
7       A.    Yes, I see that.
8       Q.    And the fact that it says it's first observed on
9   the 28th doesn't mean that it started on the 28th; would you
10  agree with that?
11      A.    Yes.
12      Q.    All right.   And if you'd turn to page 3 of the
13  report, which is 96-3, whoever the investigator was who
14  authored this report in the last paragraph of this report
15  felt that it was important to include the following:
16  "Several witnesses stated they smelled an odor of smoke south
17  of Red Eagle Lake sometime before the reported initial
18  sightings of the fire.   None of these witnesses could confirm
19  any specific origin of the odor.   The reports of the odor of
20  smoke occurred between July 26th and the evening of the 27th.
21  One witness described a smoldering smoke smell."   Do you see
22  that?
23      A.    I do.
24      Q.    All right.   Given that information, if you know, do
25  you have an opinion about whether or not since two days later

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1   there was an observed fire, this could have been the Red

2   Eagle Fire before it was observed, causing this smoke.  If

3   you know?

4        A.   Oh, I don't know.

5        Q.   Okay.  If it were the Red Eagle Fire, it's clear

6   that it hadn't been observed yet.

7        A.   Yes.

8        Q.   And since it hadn't been observed yet, it's not

9   known whether it was spreading or simply smoldering in one

10  location; isn't that true -- if this were the Red Eagle Fire?

11       A.   I guess so, yes.

12       Q.   Is it true that the reason that the start date is

13  important to you is because you want to in simulating a fire

14  like the Red Eagle Fire, you want to make sure that the

15  weather data in particular coincides with the movement of the

16  fire across the landscape?

17       A.   Yes.

18       Q.   Okay.  And, so, isn't it important, then, to know

19  when the fire comes into contact with the treatments?

20       A.   Yes.

21       Q.   All right, I mean, there's been a lot of discussion

22  about when it crossed the border with the -- with the

23  Reservation, but isn't the important issue with regard to

24  determining the efficacy of the treatments knowing when the

25  fire crossed or encountered -- first encountered the

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1    treatments?  Isn't that true?

2         A.   I think there are two issues.  One is in the

3    calibration phase, we have a benchmark of the fire crossing

4    the boundary at a certain time.  And since that was an

5    observation that places the fire at a specific point, that's

6    something that we can evaluate a simulation against.  And so,

7    that is a fact in the case, right?  It's got some imprecision

8    in it, but it's a fact.  So, that's one purpose of trying to

9    establish the arrival time of the fire at a given point.

10        The other point that you're making, I think, is

11   that what we're interested in here is evaluating from the

12   model standpoint whether or not a treatment encountered by

13   the fire at a particular time would have had a particular

14   effect.

15        Q.   Right.

16        A.   Okay.

17        Q.   And it's true, isn't it, that with regard to

18   evaluating the treatment, you want to know what time the fire

19   encounters the treatment, right?

20        A.   Yes.

21        Q.   And do you know what time Mr. Schulte -- Mr.

22   Schulte's simulated fire encountered the treatments he

23   proposed?

24        A.   Which one of his simulations?  Which one of his

25   treatments?

1303

Trial

Blackfeet Tribe v. USA                                                8/23/2016

1     Q.    In the supplemental report.

2     A.    In the supplemental.  Well, he testified that it

3   arrived at the treatment boundary -- was it 1600 hours on the

4   29th.

5     Q.    And, so, do you know when the winds died down with

6   regard to the Red Eagle Fire?

7     A.    Just from the weather station record at St. Mary,

8   and that was -- there was a lull early morning hours on the

9   30th, but then after the 30th was over is when the winds

10  died.

11    Q.    Okay.  And, so, the point is that Mr. Schulte's

12  simulated fire encounters the treatment areas at 1600 on the

13  29th.  The wind doesn't die down until 2:00 a.m. on the 30th.

14  Isn't that right?

15    A.    Fair enough.

16    Q.    You contended that Mr. Schulte erred about -- with

17  regard to the ignition location.  In fact, isn't it true that

18  there was no cause determined for the Red Eagle Fire?

19    A.    As far as I know.

20    Q.    And isn't it true that there was no actual ignition

21  point determined for the Red Eagle Fire?

22    A.    I think there was a lat/long specified by the

23  forces that responded on initial attack.

24    Q.    But there's no specific ignition point that was

25  identified; isn't that right?  If you know.

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1          A.    Well, the lat/longitude -- latitude/longitude

2     reported there would indicate that there was a point that was

3     identified.

4          Q.    Could you turn to page 9.  It's 96-11.  It's

5     Exhibit 96.  It's the one you have open.  It's the

6     investigative report.

7          A.    Okay.

8          Q.    And under the section called Conclusion, about five

9     lines down, it says in referencing the state fire marshal's

10    report, "no specific point of origin was located."

11         A.    Yes.

12         Q.    Okay.  Isn't it true that with regard to the

13    location of the fire start in your simulations and in Mr.

14    Schulte's simulations that again when the fire encountered

15    the treatment is what's important with regard to determining

16    the effectiveness of the treatment?

17         A.    Partly.

18         Q.    You criticized Mr. Schulte for not calibrating for

19    spotting.  And he criticized himself for that.  Ultimately,

20    he did calibrate for spotting in his supplemental models;

21    isn't that correct?

22         A.    Well, he enabled spotting, so...

23         Q.    He enabled spotting?

24         A.    Yes.

25         Q.    Have you made mistakes when you have modeled in

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    FARSITE?

2        A.    To deny mistakes is to deny being human, yes.

3        Q.    You criticized him, as I understand your testimony

4    yesterday, for using the suppression function in FARSITE.  Do

5    you remember -- and the suppression function is the function

6    that allows applying suppression forces to a fire, correct?

7        A.    Yes.

8        Q.    And you criticized him for that, correct?

9        A.    Well, I just don't think that it's reliable.  It's

10   -- everybody would do it a little differently.

11       Q.    Do you remember the exhibit that was marked

12   yesterday as Defendant's Exhibit 186?  I don't know if you

13   have that in front of you.

14       A.    I don't anymore, but --

15       Q.    This is the Defendant's Exhibit entitled Overview

16   of FARSITE Process.

17       A.    Yes.

18             MR. GRAYBILL:  May I approach, Your Honor?

19             THE COURT:  Yes.

20             THE WITNESS:   Thank you.

21             BY MR. GRAYBILL:

22       Q.    This is a document that, as I understand it, is on

23   the FARSITE website, correct?

24       A.    It's with the online help that comes with the

25   program.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1      Q.    Okay.  And it basically is a -- you know, an

2    instructional guide helping the user use FARSITE effectively,

3    correct?

4      A.    Right.

5      Q.    Where does it say in that document not to use the

6    suppression function?

7      A.    It doesn't.

8      Q.    You also yesterday seemed to criticize FARSITE

9    itself.  Let me just ask you this question.  Isn't it true

10   that fire behavior analysts from all of the five federal land

11   management agencies use FARSITE?

12     A.    Yes.

13     Q.    You use FARSITE yourself, I take it.

14     A.    Yes.

15     Q.    And you do so in your research?

16     A.    Not recently, but, yes, I have.

17     Q.    You were critical, I think, of Mr. -- of the size

18   of Mr. Schulte's proposed fuel reduction treatments, is that

19   correct?

20     A.    In a number of ways, yes.

21     Q.    Well, let's turn to Plaintiff's Exhibit 30.  You

22   should have that.

23           This is the article that I think was used in your

24   direct examination yesterday called The Use of Shaded Land --

25   of Shaded Fuel Breaks in Landscape Fire Management.

Trial

1       A.    Yes.

2       Q.    And you are a coauthor of this article?

3       A.    Yes.

4       Q.    And this is an article that was published, it looks

5    like, in 1999.

6       A.    2000.

7       Q.    In 2000, okay.  If you turn to page 30-9, which is

8    page 63 of the article, it says there that fuel management

9    can be done on a landscape level.  Isn't that correct?  That

10   first column?

11      A.    Well, in general, I agree with that.

12      Q.    Okay.

13      A.    But I don't find exactly that statement, but --

14      Q.    If you'll look in the first column there, about

15   four lines down, it says, "A landscape-level approach to

16   fuels looks at the large areas as a whole, in an attempt to

17   fragment the existing continuous heavy fuel and high-risk

18   areas."

19      A.    Yes.

20      Q.    And it says fuel breaks may be a part of that

21   strategy.

22      A.    Right.

23      Q.    Okay.  And, so, would you agree that fuels

24   management can be done on a landscape level?

25      A.    Absolutely.

Trial

1          Q.    All right.  Area-wide -- well, strike that.

2                If you turn to page 30-10, the next page.

3          A.    I'm there.

4          Q.    In the second column, first full paragraph, the

5    first line, it says "Area treatments, rather than being an

6    alternative to fuelbreaks, are an expansion of the fuelbreak

7    concept to wider areas of the landscape."  Do you see that?

8          A.    I'm trying to find it.

9          Q.    I'm sorry.  This is the second column on page 30-

10   10.  It's page 64.

11         A.    I don't have 30-10.

12         Q.    Oh, you don't have it?

13         A.    No.  I can look on the screen.  It's okay.

14         Q.    You can see it on the screen.  All right.  So,

15   there in the second column, the first full paragraph, "Area

16   treatments, rather than being an alternative to fuelbreaks,

17   are an expansion of the fuelbreak concept to wider areas of

18   the landscape."  Correct?

19         A.    That's what it says.

20         Q.    And do you agree with that?

21         A.    I think that could be worded a little bit more

22   carefully, because --

23         Q.    Isn't it true that there's no absolute standard for

24   the width of fuel breaks or fuel treatments?

25         A.    That's true.  I mean, fuel break has a very

Trial
Blackfeet Tribe v. USA                                          8/23/2016

 1    specific implementation of fuel treatment, so --

 2         Q.   Well, isn't it, then, also true that there's no

 3    absolute standard for the width of landscape-level fuel

 4    treatments?

 5         A.   No, that's right.

 6         Q.   Isn't it true that wider fuel breaks are more

 7    effective than narrow ones?

 8         A.   Are you talking about fuel breaks or fuel

 9    treatments in general?

10         Q.   Fuel breaks.

11         A.   Probably.

12         Q.   Okay.  Well, what about fuel treatments on a

13    landscape level, wouldn't it be true that wider landscape-

14    level treatments would be more effective than narrow ones?

15         A.   Not necessarily because the objective -- the

16    performance objective for fuel treatments on an area basis is

17    different than a fuel break.  The intent is not to -- or the

18    intention is not to stop fires using them; it's to change

19    behavior in the movement of large fires.  A fuel break is

20    specifically intended to be used by suppression forces to

21    stop fire.  So, it goes to what is the objective for doing

22    the fuel treatments.

23         Q.   In doing landscape-level fuel reductions

24    treatments, isn't the objective to change fire behavior in

25    order to make it more susceptible to control?

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1      A.    Not necessarily at all.

2      Q.    Is that one possible objective of landscape --

3      A.    Yes.

4      Q.    Well, let me finish my question.  Isn't that one

5  objective -- one potential objective of landscape-level

6  treatments?

7      A.    Yes.

8      Q.    And isn't it true that the size of fuel reduction

9  treatments, whether they're landscape-level or fuel breaks,

10  one of the factors that determines their size is the values

11  at risk?

12      A.    Perhaps.  Another main factor is spotting

13  distances.

14      Q.    Okay.  If you could go back to Exhibit 140,

15  Plaintiff's Exhibit 140 that's now been introduced.  And I'm

16  not sure I understand this, so I may be completely -- I may

17  be going down the wrong road here, but if you could turn to

18  140-12 of that exhibit.

19      A.    Okay, I'm there.

20      Q.    And as I understand it, this is an article about

21  modeling fuel treatment patterns and how they influence large

22  fires; is that correct?

23      A.    Yes.

24      Q.    And you say there in the last paragraph, "Maximum

25  treatment unit dimension was varied from 800 to 2500m."  It

1   looks like .5 to 1.5 miles in diameter, or up to 160 to 960
2   acres if the units were square.  Do you see that?
3        A.   Yes.
4        Q.   Now, is the unit then -- the treatment unit -- is
5   that a treatment unit that you're modeling?
6        A.   Yes.
7        Q.   And is that a treatment unit that is up to a mile
8   and a half long or a mile and a half wide?
9        A.   It's hard to say in this program.  It's hard to be
10  specific.  It has a maximum dimension in any dimension.
11       Q.   If you square it, it's 960 acres, correct?
12       A.   Yeah.
13       Q.   And if you put two of these units side by side,
14  you're over the number of acres that Mr. Schulte is
15  recommending for at least one side of the border.
16       A.   Perhaps, yeah.  But this is talking about area
17  treatments, not about fuel breaks, and that's a critical
18  distinction.
19       Q.   Well, I understand -- well, let me just ask.  Let
20  me ask the question.  Is what Mr. Schulte is proposing in
21  doing a five-mile-long -- well, let me withdraw that and ask
22  this.
23            I think we established yesterday that Mr. Schulte
24  is proposing a series of fuel breaks along the border where
25  FM 10 forest is located on the tribal side.  The area of the

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1   Red Eagle Fire, that would mean a one-half-mile-wide and up

2   to five-mile-long fuel treatment.  Is that a landscape-level

3   or landscape-area-size fuel treatment?

4        A.   In area, but not in -- not in its intended purpose.

5   So, as I'm trying to make clear here, this paper is about

6   optimizing fuel treatment locations across an entire

7   landscape to change the behavior of fires moving in and among

8   those units, not with the express intent of stopping a fire

9   at any one of them.  There is a difference.

10       Q.   And I thought your testimony yesterday was that

11  whether it's a fuel break of a fuel treatment, you don't stop

12  fires; you change the intensity or reduce the intensity of

13  fires potentially in order to hopefully achieve control.

14  Wasn't that right?

15       A.   For a fuel break, that's correct, not necessarily

16  for an area treatment, because there's many reasons to do

17  treatments, not just to stop fires or to facilitate

18  suppression.

19       Q.   But we've established that one potential reason to

20  do a landscape-level treatment is to change behavior to make

21  it more susceptible to treatment -- I mean to control,

22  correct?

23       A.   That's one.

24       Q.   Were you present for Mr. Gladstone's testimony when

25  he was talking about that photograph that he had taken that

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      showed the clearcut area -- 30-year-old clearcut area in the

2      Red Eagle Fire perimeter that survived the fire?

3           A.   No, I wasn't.

4           Q.   Could we go to Plaintiff's Exhibit 67-20.  This is

5      from a history of the Blackfeet Forest management.  And --

6           A.   Sorry, what was the number?  Is it -- do I have it

7      here?

8           Q.   I may have the wrong number, because that's not the

9      photo.  Let me just pull out the ...

10               I'm sorry, it's -- you know what, you may not have

11     it.  You may need to look on the screen.  It's 67-26.  And if

12     we could just, yeah, show that photograph with its caption.

13     And this is a photograph that Mr. Gladstone took and

14     testified about.  And do you see there it says, "Healthy 30-

15     Year Old Timber Stand from Clearcut on North Side of Divide

16     Mountain, Which Survived Red Eagle Fire Because Hazardous

17     Fuel Load Was Removed."  Do you see that?

18          A.   Yes.

19          Q.   So, isn't this an example of a stand that survives

20     a highly intense fire as a result of reducing a fuel load?

21          A.   Not necessarily.

22          Q.   It certainly is not paved, is it?  I mean, there's

23     vegetation there in that photograph, correct?

24          A.   That's right.

25          Q.   And according to the forest manager, who was there

1314

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    at the time of the Red Eagle Fire and who took this

2    photograph, this is an area of the forest that survived the

3    Red Eagle Fire.

4         A.   That's what he says.

5         Q.   Do you dispute that?

6         A.   No, but I've been involved in many post-fire

7    investigations looking at fuel treatment performance, and

8    it's always difficult to attribute survival of one stand or

9    another to one particular factor.  There -- because it

10   involves a spatial arrangement of various fuels and timing of

11   fire behavior and other factors, there's usually a more

12   complex story there than just the site properties

13   contributing to the success or failure.  So, I'm just --

14        Q.   Go right ahead.  I don't mean to interrupt you.

15        A.   Oh, I thought someone was talking.  So, I'm just --

16   I'm just leery of interpreting at face value site

17   characteristics and then as being the cause or savior,

18   because in many places on the Blackfeet Reservation that look

19   just like this, they didn't turn out like this after the

20   fire.

21        Q.   Okay.  Well, the fact of the matter is isn't it

22   true that most of the fire consumed Fuel Model 10 forest?

23        A.   In areas that were not subject to harvest, that's

24   probably true.

25        Q.   Okay.  But this is an area that was subject to

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    harvest and did have a reduced fuel load, correct, at least

2    according to the caption.

3        A.    According to the caption, but there was lots of

4    other places there, as well.

5        Q.    So -- and I think we may have touched on this

6    yesterday, assuming that what we're seeing here in this

7    photograph is an anomaly and this forest really could not be

8    protected with a landscape area fuel reduction treatment that

9    Mr. Schulte has proposed, would you agree with me that that

10   then would need to be communicated to the owner of the forest

11   by the manager of the forest so that the owner could make

12   appropriate decisions regarding how the forest should be

13   managed?

14             MR. BAIR:  Objection, Your Honor.  This falls

15   outside the scope of both Mr. Schulte's direct testimony and

16   also his expert reports.

17             MR. GRAYBILL:  Well, I think he testified that he

18   does, in fact, consult on these very issues with land

19   management agencies, Your Honor.

20             THE COURT:  I'll sustain the objection.

21             MR. GRAYBILL:  Okay.  Your Honor, those are all the

22   questions I have at this time.

23             THE COURT:  All right.  I have a question for Dr.

24   Finney, and if it raises any new questions that you all have,

25   that's going to be fine.  But in an effort to cut through

Trial

1   some of this and get to the heart of the matter, my question

2   is this.  What recommendations, if any, would you propose to

3   protect the Blackfeet Tribal Forest from a fire such as the

4   Red Eagle Fire originating in Glacier National Park?

5               THE WITNESS:  Well, Your Honor, that is a difficult

6   proposition because of the nature of the fire regime in those

7   forest types.  And that's something that, very much like

8   Chapparell in Southern California or other stand-destroying

9   fire regimes, is difficult to modify.  My recommendations

10  would be, if I were in a position to make those, is that to

11  manage the entire Blackfeet Forest as best it can be and

12  anticipate that at some point the timber harvest scheduling

13  will be disrupted by a fire, either starting within the

14  Reservation or on the Park side of it.

15              And at least then the forest is under a broad scale

16  management and values -- timber values and other values are

17  being managed with full recognition of the potential threat.

18  So, it's not something that just like an earthquake or a

19  flood that even if we recognize the imminent possibility of

20  that that we can necessarily alter course or protect

21  ourselves against some unwanted outcome.  It's just -- we're

22  going to have to live with that kind of peril.

23              THE COURT:  Knowing what you do from the evidence

24  and circumstances of this case, are there any reasonable

25  steps that could have been taken to keep the Red Eagle Fire

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    out of the Blackfeet Tribal Forest?

2              THE WITNESS:  No, sir, not in my opinion.

3              THE COURT:  Would you recommend the use of fuel

4    breaks in any respect as being a reasonable step to protect

5    the forest?

6              THE WITNESS:  I have difficulty recommending fuel

7    breaks, even in ecosystems where those fuel breaks are in

8    concert with the fire ecology in there, and for example,

9    ponderosa pine as we have discussed, simply because they

10   require -- the fuel break, just to make clear what I'm

11   referring to -- a fuel break that has the intention of

12   stopping a fire with the use of suppression forces, that's a

13   specific implementation, specific objective for fuel

14   treatments in general.

15             But I have a hard time recommending a fuel break

16   with that objective because it requires the presence of

17   suppression resources to make it effective.  If that doesn't

18   occur, and we have a number of fires here burning in the

19   region at the moment, which -- and suppression resources are

20   limited or their accessibility is limited or the fire is

21   burning too quickly and impinges on the break before they can

22   get there, essentially the entire strategy becomes untenable

23   and the fire burns through the break eventually and moves

24   off.

25             The alternative, Your Honor, to a fuel break as a

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    means of protection of either the forest or a community is to

2    manage the forest itself, especially and particularly if it's

3    in a forest type, such as ponderosa pine or mixed conifer,

4    where you can maintain that with prescribed burning.  And,

5    so, what you're doing is you're bringing in a natural regime

6    of disturbance that is compatible with the ecology there and

7    no matter where a fire starts, the behavior is well modified

8    and suppression actions can then adapt to whatever kinds of

9    reduced behavior would then occur.

10            Is that clear?

11            THE COURT:  Yeah.  Thank you very much.

12            THE WITNESS:  You're welcome.

13            THE COURT:  Redirect?

14            MR. BAIR:  Thank you, Your Honor.

15                    REDIRECT EXAMINATION

16            BY MR. BAIR:

17    Q.    Good morning, Dr. Finney.

18            Let's start by clearing up a definitional issue.

19    As you testified yesterday, can the term "mixed conifer"

20    simply mean a mixture of conifer species?

21    A.    Apparently it can.

22    Q.    That would be a sort of colloquial definition?

23    A.    I would guess.  Or maybe it's just a practical

24    definition used by some people, but it does not comport with

25    the definition in ecological texts.

Trial

1   Q.   So, as that term is used as a term of art in
2   ecological texts, what does it mean?
3   A.   Well, mixed conifer forests generally are the upper
4   reaches of the lowest elevation forest type you have.  And in
5   most cases in the West, it is ponderosa pine.  So, as
6   ponderosa pine forests generally give way to other species at
7   the upper elevation or on more moist sites, there becomes a
8   mixture of other conifer species there.  But they tend to
9   retain similar kinds of attributes with respect to being
10  resistant to fire.
11       And, so, we're talking about Douglas fir in this
12  part of the world and western larch, all of which are quite
13  resistant to surface fire when they become mature in size or
14  in age.  And in other parts of the country, there are
15  different conifers that constitute a mixed conifer stand.
16  Q.   And how does that compare to the term of art
17  "subalpine forest"?
18  A.   Subalpine forest is comprised of species below the
19  alpine.  Alpine is an area without trees.  So, it goes all
20  the way up to tree line.  Subalpine forest in this part of --
21  or on the east side of Glacier would be comprised of species
22  of lodgepole pine, Engelmann spruce, and subalpine fir; also
23  in some stands at the highest elevation, whitebark pine.  And
24  even in the definitions that I disagree with or the
25  description of these stands as mixed conifer that I disagree

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1   with, the species composition they're describing is exactly

2   the same.

3        Q.   So, let me ask two more questions about this, then.

4   First, do you continue to believe that the forests burned by

5   the Red Eagle Fire are fairly classified as subalpine

6   forests?

7        A.   Yes.

8        Q.   Okay.  And, second, regardless of whether we call

9   it mixed conifer or subalpine, are the species that were

10  actually present here consistent with your conclusions about

11  fire ecology?

12       A.   Absolutely.  That's actually the basis for my

13  conclusion.

14       Q.   Okay.  Let's move on and discuss how to actually

15  implement Mr. Schulte's proposed fuel treatment.  Would

16  mechanical treatments alone be effective in implementing the

17  fuel changes that Mr. Schulte describes?

18       A.   No.

19       Q.   Why not?

20       A.   Well, mechanical treatments, as we've seen in many

21  of the research papers, achieve certain effects on the canopy

22  stratum, the canopy fuels, and the ladder fuels.  That's

23  where they're particularly effective.  Basically, you're

24  cutting trees out of the stand, and you're thinning out the

25  canopy.  But the preexisting surface fuels and those that

Trial

```
1    would be encouraged to grow following the opening of the
2    canopy need to be modified with a surface fuel treatment such
3    as prescribed burning.
4         Q.   Are you aware of any way to implement these surface
5    fuel changes except for prescribed burning?
6         A.   I'm not aware on a practical basis for a large
7    area.  Like I said, for somebody's -- somebody's lot around
8    their house, sure there are many alternatives available, but
9    for a large area in a, you know, wildland setting, no, I'm
10   not aware.
11        Q.   Would that include cows and sheep?
12        A.   Right.  I mean, grazing has a place in managing
13   fine herbaceous material, and it has demonstrated that to a
14   certain extent.
15        Q.   And just to sum this issue up, does Mr. Schulte
16   make any conclusions about what method or mechanism would be
17   appropriate to implement this fuel break?
18        A.   I don't recall any.
19        Q.   Okay.  And your opinion is that there would be no
20   way to implement the fuel changes on the surface level except
21   for prescribed burning?
22        A.   Right.
23        Q.   Okay.  And you've already discussed some of the
24   concerns you have about that, so we won't belabor them.
25   Let's talk about when you ignited the prescribed -- I'm
```

1322

Trial

1    sorry, the modeled simulated fire.  Does FARSITE have any way

2    of modeling smoldering fires?

3         A.   No.

4         Q.   Are there sometimes issues with determining exactly

5    when a fire ignited?

6         A.   Oh, yes, of course.

7         Q.   So, what is the best practice to ignite a fire in a

8    FARSITE simulation?

9         A.   The best and standard practice is to use the last

10   known location, use an observation of where it was, even if

11   that is a polygon.  And very often in operational settings,

12   that is when we're using modeling to project the growth of

13   active fires, as is going on in the region at the moment, we

14   don't start the simulation off at the earliest known

15   location.  We start it off at the most recent known location.

16   So, we initialize it with -- the simulation with the most

17   current information and then let it run from there out into

18   the future.

19        Q.   Let's move on to canopy cover issues.  Is your 10

20   percent canopy cover used in some of your simulations

21   mathematically derived from a ten-foot crown diameter?

22        A.   Yes.

23        Q.   Is there any subjectivity in that mathematical

24   derivation?

25        A.   Not in the math, but in the assumption of the ten-

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    foot diameter, yes.

2        Q.   And in your experience, is a ten-foot crown

3    diameter consistent with the kind of trees and the conditions

4    present here?

5        A.   Yes.   It's a round number.   If it's 11, if it's 12,

6    you know, like I said, I wouldn't argue that.   I don't have

7    any direct knowledge there, but ten feet is an appropriate

8    approximation.

9        Q.   Do you believe that your 10 percent canopy cover

10   modeling is consistent with Mr. Schulte's proposal for a 14

11   to 20-foot crown spacing?

12       A.   Yes.

13       Q.   Okay.   Mr. Graybill asked you yesterday about your

14   decision to model spotting at 1 percent.   Could you tell us

15   why you did that?

16       A.   I did that because it's common practice when you're

17   beginning a FARSITE simulation to make it run quickly and

18   start getting some feedback from the simulation on how well

19   all of your data and your settings are producing a known

20   result.   This is the calibration phase.   And in that

21   calibration phase, I observed that 1 percent spotting was

22   sufficient to produce the -- a close approximation of the

23   actual observed fire.

24            These simulations take a little bit of time, and I

25   had no reason to change it once I thought that it calibrated

Trial

1    well at 1 percent.

2        Q.    Can you offer some insight into how the simulation

3    might have changed if you'd used, for instance, a 5 percent

4    spotting rate?

5        A.    In general, what happens because you are initiating

6    a lot more fires from the stochastic processes in there, what

7    happens is the fire spread rate tends to go up some because

8    by randomly selecting more embers to simulate the growth of,

9    what's happening is sometimes you get -- you have a higher

10   probability of actually sampling embers that travel a long

11   distance.  They may be rare, but you have a higher chance of

12   getting those.  And, so, in general, the fire spread rate

13   tends to go up.

14       Q.    So, is it fair to say that you were being

15   conservative in using a 1 percent rate?

16       A.    That's the consequence of using 1 percent versus 5

17   percent.

18       Q.    I see.  So, let's talk about the conversion of fuel

19   types within FARSITE.  Within the polygon that Mr. Schulte

20   used in his modeling, what did he actually do in terms of

21   converting fuel types?

22       A.    As I understand it, he used the tool called

23   Landscape Editor, to draw a polygon, defining the boundaries

24   of a proposed fuel break, and then selected the changes to

25   the fuel components that would -- he wanted to have

Trial

Blackfeet Tribe v. USA                                              8/23/2016

1    implemented there.  And in this case, it was just to change

2    all surface fuel types in there to a Fuel Model 8.

3         Q.    Now, could that ever be done in reality?

4         A.    What?

5         Q.    What he's modeled?

6         A.    Well, there's heterogeneity, and in any landscape.

7    And I don't think that -- as I've already said a number of

8    times, I don't think that treatments in these subalpine

9    forests would produce a Fuel Model 8.

10        Q.    So, let's take a look at what Mr. Schulte said he

11   was doing.  Could we pull up Plaintiff's Exhibit 87 at page

12   5, please.

13             Was it your understanding, Dr. Finney, that Mr.

14   Schulte's prescription was to change Fuel Model 10 to Fuel

15   Model 8?

16        A.    Yes.

17        Q.    Okay.  Now, if we look at that third full paragraph

18   -- right there.  The second sentence states, "Prudent forest

19   managers systematically would have converted Model 10 areas

20   to Model 8 areas in fuel breaks designed to stop crowning

21   fires from sweeping out of the Park."  This is Mr. Schulte's

22   report.  Does this comport with your understanding of what

23   Mr. Schulte was proposing?

24        A.    Yes.

25        Q.    Let's move on to page 10 of this document.  Right

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    where the magnifying glass is.  Down a little, Megan.  That

2    small paragraph states -- again, Mr. Schulte says, "I used

3    the Landscape Editor tool in Farsite to change the fuel types

4    that fell roughly east of the Blackfeet Nation's boundary

5    from a model 10 to a fuel model 8."  Does that comport with

6    your understanding of what Mr. Schulte said he was doing, Dr.

7    Finney?

8         A.   Well, there is some ambiguity here because he's

9    converting all fuel models to a Fuel Model 8, not just the 10

10   to an 8.  Ten to an 8 would occur, but so would all the other

11   changes, using that tool in that way.

12        Q.   But he does say from a Model 10 to a Fuel Model 8,

13   doesn't he?

14        A.   Yes.  Yes.

15        Q.   And does that comport with your understanding about

16   what he meant to do?

17        A.   I think that's what he meant to do is convert Fuel

18   Model 10 to a Fuel Model 8.

19        Q.   So, in reviewing Mr. Schulte's written materials,

20   did you have any reason to believe that his prescription was

21   to change all fuel types to a Fuel Model 8?

22        A.   No.  I thought that was an oversight.

23        Q.   Okay.  Let's move on to discussing your Case 1.  If

24   we could look at Plaintiff's Exhibit 94, which is Dr.

25   Finney's --

Trial

```
 1              THE COURT:  Mr. Bair, let's take a morning break.
 2    Let's reconvene at 11:15.
 3              MR. BAIR:  Thank you, Your Honor.
 4              (Court in recess.)
 5              THE COURT:  Please be seated.  You may go ahead,
 6    Mr. Bair.
 7              MR. BAIR:  Thank you, Your Honor.
 8              BY MR. BAIR:
 9         Q.   Dr. Finney, let's look at your supplemental
10    rebuttal report, Plaintiff's Exhibit 94, at page 13.  In this
11    report, you state, "To be absolutely clear, this scenario" --
12    your Case 1 -- "does not condone the assumptions concerning
13    fuel treatment appropriateness or representativeness of
14    actual fuel conditions, but simply evaluates the fire
15    behavior consequences of Mr. Schulte's assumption."
16              First, do you condone the assumptions that Mr.
17    Schulte made that are reflected in your Case 1 in any way?
18         A.   No.
19         Q.   Do you believe that Case 1 in any way supports a
20    conclusion that Mr. Schulte's fuel break would be successful?
21         A.   No.
22         Q.   Let's move on and talk about some of the questions
23    Mr. Graybill asked you about vegetation types in this area.
24    Did you rely on Mr. Schulte's landscape files to determine
25    the vegetation types in the fire area for the purpose of your
```

1328

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    FARSITE simulations?

2        A.    Yes.

3        Q.    If those landscape files misrepresent the

4    vegetation types in the burn area, would that also affect Mr.

5    Schulte's modeling?

6        A.    Yes.

7        Q.    Mr. Graybill pointed out that the Final Narrative's

8    description of those fuel types differs somewhat from those

9    vegetation maps.  Are narratives like that one typically

10   written after the fire has burned?

11       A.    Yes.

12       Q.    And is it possible that the vegetation maps you and

13   Mr. Schulte used could be more accurate than the Final

14   Narrative?

15       A.    They could be.

16       Q.    Okay.  You stated yesterday that it's not possible

17   to simulate any specific fire.  Does Mr. Schulte's modeling

18   reflect conditions substantially similar to how his fuel

19   break would have performed in the Red Eagle Fire?

20       A.    I'm sorry, I don't understand.

21       Q.    Do you believe that Mr. Schulte's modeling is an

22   accurate reflection of how his fuel break would actually

23   perform?

24       A.    Oh, actually perform.

25       Q.    Yes.

1329

Trial

1       A.    No, I don't.

2       Q.    Do you believe that your simulations are a more

3    accurate simulation of how that fuel break would have

4    performed in the Red Eagle Fire?

5       A.    In Cases 5 and 6 in particular, yes.

6       Q.    Okay.  I think we can leave the FARSITE modeling

7    behind.  Let's move on and talk about some of the science.

8    If you'd refer to Plaintiff's Exhibit 140, if we can pull

9    that up.  I'd like to ask you just a couple of clarifying

10   questions.

11            Mr. Graybill pointed out that some of your analyses

12   in this document use diameters, if I understand, of .5 to 1.5

13   miles.  Is that right?

14      A.    Yes.

15      Q.    What was the purpose of this article?

16      A.    This article's purpose was to describe a method --

17   a computational routine that optimizes the location of fuel

18   treatments across a given landscape.  And one of the

19   variables that is selectable by the user is the size of that

20   created area.  That's a -- it's a maximum dimension that the

21   optimization program can put in place for each treatment

22   unit.

23      Q.    So, let me ask you first, was this article meant in

24   any way to advocate for 1.5-mile-wide fuel breaks?

25      A.    No, not any size in particular.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

```
1        Q.    Okay.  And was this article specific to fuel
2   breaks?
3        A.    Not at all.  Not pertaining to fuel breaks.  I
4   mean, that specific -- with that specific intention to be
5   used by suppression resources in stopping fires, no.  These
6   are area treatments across a landscape designed to change
7   fire behavior.
8        Q.    And is that an important distinction?
9        A.    It's a very important distinction.
10        Q.    Why is that?
11        A.    Well, it goes to what is the objective of the fuel
12   treatment itself.  And the same fuel treatment prescription
13   can be used, but with different objectives.  And in one case,
14   the same prescription can succeed, and in another, it can
15   fail.  If its intended to only modify behavior such that the
16   forest survives in good condition following the wildfire,
17   then that can be a success.  If it's intent is to be used by
18   suppression resources to stop a fire there, then that same
19   prescription, even though it modifies fire behavior, can fail
20   in its objective.  So, the objective of the treatment is very
21   important to be clear about.
22        Q.    So, even if you would agree that a fuel treatment
23   might succeed by modeling -- I'm sorry, modifying fire
24   behavior, does that mean that it would also succeed as a fuel
25   break?
```

Trial
Blackfeet Tribe v. USA                                        8/23/2016

1      A.    No.

2      Q.    For those reasons you just stated.

3      A.    Correct.

4      Q.    Okay.  Now, if we could move on to Plaintiff's

5    Exhibit 146 at page 10, and this is another academic article

6    that the Plaintiff put before you yesterday.  Do you have

7    that?  Oh, my apologies.  If you just turn to 146-10, Dr.

8    Finney.  In the third paragraph, toward the middle of the

9    paragraph, there's a sentence that Mr. Graybill asked you to

10   focus on yesterday, which states, "For high-severity fire

11   regimes in brushland and forest ecosystems, fuel management

12   objectives can change fire behavior, slowing overall fire

13   growth and improving fire suppression."  Now, does that mean

14   that fuel treatments or fuel breaks can be effective in all

15   high-severity fire regimes?

16     A.    Well, it depends on a number of factors, as we've

17   discussed:  the layout of the unit, the size of the unit,

18   whether it's maintained or can be maintained, whether

19   suppression resources are available.  There's many factors

20   that determine -- that go into that.

21     Q.    Toward the bottom of this page, the very last

22   sentence, it states, "Fuel conditions change over time as a

23   result of fuel accretion, regrowth of understory vegetation,

24   and ingrowth of young trees."  Are those issues that are

25   relevant to maintenance?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1     A.    Yes, in every -- in every vegetation type, in every
2     forest type, those are factors that go to the longevity of
3     the effects of the treatment.
4     Q.    And can those effects also decrease the efficacy of
5     a treatment?
6     A.    Oh, they do decrease the efficacy over time, at
7     different rates, depending on the ecosystem and how
8     productive it is.
9     Q.    If we can move ahead two pages to page 146-12.  At
10    page -12 and the subsequent two pages, there are discussions
11    of how much treatment is necessary as a proportion of the
12    landscape in order to be effective.  Are you familiar with
13    this material, Dr. Finney?
14    A.    Yes.
15    Q.    And generally speaking, what does the article say
16    about these issues?
17    A.    Generally speaking, the spatial pattern of the fuel
18    treatments across the landscape has a critical role,
19    especially at low amounts of area treated.  So, the article
20    summarizes some results from other papers, comparing and
21    contrasting the effective random patterns of treatments
22    compared to more strategic patterns of treatments,
23    demonstrating that there is quite a difference in expected
24    aggregate effect in slowing fire movement across a landscape
25    based on just the pattern alone.  Even for the same amount

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    treated, the pattern makes a difference.

2         Q.   So, even an optimal pattern, can you say with

3    certainty what proportion of the landscape would have to be

4    treated in order to be effective?

5         A.   No, it's a variable.  It goes from 0 to 100

6    percent, and the more you treat, the more you get.

7         Q.   And is that a case-by-case analysis?

8         A.   Yes.

9              MR. BAIR:  May I approach, Your Honor?

10             THE COURT:  Yes.

11             BY MR. BAIR:

12        Q.   Do you recognize this document, Dr. Finney?

13        A.   Yes, I do.

14        Q.   What is this?

15        A.   This is a paper that I wrote with my coauthor Jack

16   Cohen, talking about fuel treatments and community

17   protection.

18        Q.   And does this appear to be a complete and accurate

19   copy of that paper?

20        A.   I'll count the -- I'm pretty sure it is.  It looks

21   right.

22             MR. BAIR:  Your Honor, we would move to admit this

23   document as Defendant's Exhibit 187.

24             MR. GRAYBILL:  We won't object, Your Honor.

25             THE COURT:  All right.  Defendant's Exhibit 187 is

Trial

Blackfeet Tribe v. USA                                   8/23/2016

1     admitted.

2              (Defendant's Exhibit Number 187 was admitted into

3     evidence.)

4              BY MR. BAIR:

5        Q.   Now, this is going to be a little awkward to work

6     through, Dr. Finney, because when we printed this, we lost

7     the page-by-page pagination.  So, I hope you'll be patient

8     with me.

9              Could we pull that document up, Megan?

10             (Brief pause.)

11             BY MR. BAIR:

12       Q.   Thank you.  And if we could go to the next page,

13    which is the first full page of the article, this article

14    states, "Large fires burning under extreme conditions of high

15    winds and low humidity are difficult, if not impossible, to

16    suppress."  Do you agree with that statement, Dr. Finney?

17       A.   Yes.

18       Q.   And, so, does that apply even if a fuel treatment

19    is in place?

20       A.   Yes.

21       Q.   And does it apply even if a fuel break is in place?

22       A.   Yes.

23       Q.   And is that a consideration in determining whether

24    a fuel break is likely to be effective?

25       A.   Yes.

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1      Q.   If we move ahead two pages from here, there's a
2    table marked Table 1.  What does this table represent, Dr.
3    Finney?
4      A.   This table is a -- kind of a summarization of some
5    -- at the time some common expectations for fuel treatments
6    and then some clarifying perspective on really what is more
7    in line with reality and experience.
8      Q.   Let's talk about a couple of specific elements of
9    this.  First, the fourth column states the expectation "Fuel
10   treatments will stop wildland fires."  Is that a realistic
11   expectation?
12     A.   No.
13     Q.   What is more realistic?
14     A.   Well, as has been brought out many times here in my
15   testimony that fuel treatments have in some vegetation types,
16   some forest types, have an excellent record of changing fire
17   behavior, but fires will not stop automatically, even though
18   the behavior is changed.
19     Q.   And if we look at the next row, it states the
20   expectation, "Fuel management can be equally successful for
21   all vegetation and fire regimes."  Is that an accurate
22   expectation?
23     A.   No, that's not.
24     Q.   What is more accurate, briefly?
25     A.   Well, very briefly, as it goes into here, ponderosa

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    pine and mixed conifer forests that have a high-frequency,

2    low-intensity fire regime allow for the effective fuel

3    treatment and maintenance that's entirely ecologically

4    compatible.  High-elevation subalpine forests, as it says

5    right here, stand-destroying fire regimes don't have this --

6    afford the same opportunities.

7         Q.   So, let's move on to discuss some specific

8    ecological issues with the proposal in this case.  Just to

9    clear up the record, if Mr. Schulte's proposal to reduce Fuel

10   Model 10 forests to a lower fuel loading were implemented

11   across the entire boundary between the Park and the

12   Reservation, ecologically speaking, what would the result be?

13        A.   Let me try to understand your question.  Maybe you

14   could rephrase it.  I'm not sure whether we're talking about

15   modeling or in reality.

16        Q.   In reality, ecologically, what would be the end

17   result?

18        A.   Well, in reality, a compatible treatment program --

19   let's say that we were going to implement a fuel break with

20   the intention of being used by suppression forces to stop

21   fire, the ecologically compatible technique would be

22   harvesting and prescribed burning once, and then follow --

23   having the effect of that in fuel reduction diminish over

24   time, say within a decade it would be a much different case.

25   And so, it may be more effective at the beginning of that

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    treatment than it would be just within a few short years.

2        Q.   And could you be certain that a fire would burn

3    through in those few short years?

4        A.   Under the conditions of the Red Eagle Fire, yes.

5        Q.   But if you were trying to do this a priori,

6    building a fuel break, could you know whether a fire would

7    burn through in a few years?

8        A.   Well, I would say without having a specific

9    knowledge of a specific fire timing or location, chances are

10   that it would be occurring later, after the fuel treatment

11   benefits would expire.

12       Q.   I see.

13       A.   And, so, I would expect very little effect of the

14   fuel treatment in general.

15       Q.   Now, that ecological result that you just

16   described, do you believe, based on your experience and

17   knowledge, that would be consistent with NEPA?

18       A.   I --

19            MR. GRAYBILL:  I'm going to object.  I don't think

20   he's been designated as an expert on NEPA, Your Honor.

21            MR. BAIR:  Dr. Finney has stated that he consults

22   with federal land management agencies on fuel management

23   issues.  This is an impediment those management agencies

24   face, and we believe it's within the scope of his testimony.

25            MR. GRAYBILL:  It's not been disclosed, Your Honor,

1  in the disclosures, no opinions regarding NEPA.

2          THE COURT:  Well, this is rebuttal, though.  I'll

3  overrule the objection.

4          MR. BAIR:  Thank you, Your Honor.

5          THE WITNESS:  Could you restate the question now?

6          BY MR. BAIR:

7      Q.  Do you believe that the outcome you just described

8  ecologically would be consistent with federal agencies' NEPA

9  obligations?

10     A.  I think it would be a difficult and a very

11  challenging argument to make given the multiple objectives

12  that lands are managed for because the fuel treatment

13  prescription here is quite specific to hazard fuel reduction

14  and changes in behavior that are temporary and that would

15  conflict with a lot of other management objectives.  And I

16  think that through the NEPA process, through the appeals and

17  the review by the interested public, I think you would have a

18  great deal of litigation.

19     Q.  Okay.  You just mentioned multiple objectives.  Do

20  you believe that this outcome would be consistent with

21  multiple-use policies?

22     A.  In general, no.

23     Q.  And do you believe that it would be consistent with

24  wilderness management policies inside the Park?

25     A.  Well, definitely no.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1339

Trial

1    Q.    Okay.  Now, yesterday, Mr. Graybill asked you a

2    series of hypothetical questions about a one-mile-wide

3    clearcut.  Let's end by talking about that a little.  Mr.

4    Schulte didn't propose a clearcut in any of his reports, did

5    he?

6    A.    No.

7    Q.    Okay.  During his testimony last week, did you hear

8    him propose a clearcut?

9    A.    I don't think so.

10   Q.    Would a one-mile-wide clearcut along the boundary

11   between Glacier National Park and the Blackfeet Reservation

12   be consistent with the ecology of these forests?

13   A.    A one-mile-wide clearcut?  Well, more consistent,

14   yes, it would actually be consistent with the ecological

15   dynamics, as long as there was no attempt to maintain the

16   fuel conditions in there.  The initial cutting and

17   regeneration would be consistent with the fire that just

18   happened.

19   Q.    And what would happen during the course of that

20   regeneration?

21   A.    Well, initially, it would be grass and shrub-

22   dominated, and that would diminish the fuel treatment effect

23   very rapidly within a few years.  Tree reproduction would

24   begin developing in there, and after a period of a decade or

25   two, a sapling-size stand would be developed, and it would be

Trial

1    capable of carrying crown fire again.

2        Q.   So, have you specifically studied whether a one-

3    mile-wide fuel break would have been effective -- a one-mile-

4    wide clearcut fuel break would have been effective in

5    stopping the Red Eagle Fire with the aid of suppression

6    forces?

7        A.   I didn't examine that case, no.

8        Q.   Okay.  Do you believe a prudent forest manager

9    would have implemented a one-mile-wide clearcut along the

10   boundary between the Park and Reservation?

11       A.   I don't think so without foreknowledge of a

12   specific fire event that they were protecting from because

13   the benefits to the fuel hazard reduction would lapse quick

14   enough that the fuel break would be ineffective in a short

15   period of time against some unknown future peril.

16       Q.   Did those forest managers have that specific

17   foreknowledge?

18       A.   I don't think so.

19       Q.   Could any forest manager ever have that specific

20   foreknowledge?

21       A.   I have never met one, no.

22            MR. BAIR:  No more questions.  Thank you.

23            THE COURT:  Okay.  Any recross?

24            MR. GRAYBILL:  Yes.

25                     RECROSS EXAMINATION

Trial

Blackfeet Tribe v. USA                                          8/23/2016

```
 1              BY MR. GRAYBILL:

 2         Q.   Dr. Finney, forest managers have known for decades

 3    that large, intense, fast-moving fires can move across the

 4    landscape; isn't that right?

 5         A.   Yes.

 6         Q.   And that there can be crowning behavior with those

 7    fires?

 8         A.   Yes.

 9         Q.   And spotting behavior with those fires?

10         A.   Yes.

11         Q.   And forest managers for decades have had to try to

12    prepare their forests to withstand if possible the effects --

13    the damaging effects of those fires, wouldn't you agree?

14         A.    It's so site-specific.  I would say that many

15    forest managers do not prepare for that kind of event.

16         Q.    Well, my question is that forest managers who are

17    charged with the responsibility of protecting a forest from

18    wildland fire have to manage as best they can to protect the

19    forest against fire.  Isn't that true?

20         A.    They follow the standards and guidelines in the

21    state or on the ground that they're working on, but we have

22    many examples here from Western Montana where timber

23    companies have followed all the required guidelines and in

24    checkerboard units, alternating every other section between

25    private and federal land, there's been no effect of their
```

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1    harvesting operations on the movement of large fires.

2           So -- well, I'll just leave it at that.

3    Q.    Okay.  Well, but the fact is that with regard to

4    managing a commercial forest, there is an effort by forest

5    managers to protect forests from large, intense fires; isn't

6    that true?

7    A.    Yes, usually through suppression activities.

8    Q.    That's part of responsible management, isn't that

9    correct?

10   A.    Through suppression activities and following the

11   standards for activity fuel disposal.

12   Q.    You said that a harvest and then prescribed burn

13   would be ecologically appropriate for the forest types that

14   we're talking about in this case; is that right?

15   A.    Yes.

16   Q.    Okay.  And, so, a manager managing the Blackfeet

17   Forest for sustained yield management would want to know and

18   plan for -- you know, for protecting the forest from fire in

19   that way, if the -- if that method were, in fact, effective;

20   isn't that right?

21   A.    Perhaps.

22   Q.    And, in fact, at least the forest manager would

23   want to communicate to the beneficial owner of the forest

24   that that is a means of managing this forest -- harvest and

25   burn -- in order to obtain some value from the forest before

Trial

1   a large fire consumes it.  Isn't that true?

2        A.    There's a number of factors there in your

3   question.  The standard practice in these kinds of forest

4   types is for -- is clear-felling, essentially a clearcut, and

5   then prescribed burning.  A lot of times, the burning isn't

6   done.  Slash piles are created and they're burned as piles

7   rather than a broadcast burn, okay, and that's for practical

8   uses.

9        Q.    What I'm getting at, though, is that you have

10  testified that that is ecologically appropriate for these

11  forests, that kind of treatment.

12       A.    Yes.

13       Q.    And, so, the beneficial owner would need to know

14  that to make intelligent decisions about how the forest

15  should be managed.  Isn't that true?

16       A.    I suppose.

17       Q.    I want to talk about mechanical treatments for a

18  minute.  It is possible to mechanically treat a forest to

19  convert it to an FM 8 by removing small understory trees, by

20  removing dead-down material; isn't that true?

21       A.    It depends on the forest type.  It really depends.

22       Q.    Well, are you saying that in the forest types that

23  we're talking about in this case it's not possible to go in

24  and actually remove understory trees and remove the dead-down

25  material on the forest floor, the large, dead-down material

Trial

1    on the forest floor that can be piled and burned?

2        A.   That can be accomplished, but the consequence is

3    not a Fuel Model 8.

4        Q.   Okay.  All right, I'm going to get to that in a

5    minute.  I just want to establish that, in fact, through

6    mechanical means or harvesting, which is a mechanical

7    means --

8        A.   Mm-hmm.

9        Q.   -- it is possible to do the kinds of things that

10   would substantially reduce fuel loads in the forest; isn't

11   that true?

12       A.   You can reduce loading, yes.  You may not change

13   hazard, but --

14       Q.   And your point is that once that is accomplished,

15   you don't have a Fuel Model 8 forest, you have something

16   else.  Is that your testimony?

17       A.   In this area, that's correct.

18       Q.   And that's because when you engage in the

19   mechanical fuel treatments that I've just discussed, you

20   cause generation of -- regeneration of grasses and shrubs; is

21   that correct?

22       A.   Yes.

23       Q.   But you have testified in this case that it is

24   possible to go back in and mechanically treat the shrubs,

25   isn't that -- or the brush; isn't that true?

Trial

Blackfeet Tribe v. USA                                            8/23/2016

1       A.    I think we were talking about like a shrub field.

2    You could mow it or use a mastication machine or something

3    like that, but if it's within a forest condition, how are you

4    supposed to go remove those shrubs or grasses without using

5    prescribed fire?  I don't know of a technique where that's

6    possible over broad areas.

7       Q.    Well, you can remove shrubs through means other

8    than prescribed fire through mechanical means, can't you?  I

9    mean, it's possible to take a small chainsaw and remove

10   shrubbery, isn't it, particularly if shrubbery is not a

11   dominant species in the landscape, correct?

12              MR. BAIR:  Objection, Your Honor.  Compound.

13              THE COURT:  Yeah, well, let's break it up, if you

14   can.

15              MR. GRAYBILL:  Okay.

16              BY MR. GRAYBILL:

17      Q.    So, let's talk about removing shrubbery.  First of

18   all, it's clear from the fire summary that what was there in

19   these treatment areas was Fuel Model 5 which was a shrub

20   layer that actually minimized the spread of fire according to

21   the people who fought the fire, correct?

22      A.    That's what they said.

23      Q.    Okay.  And, so, if it actually operated to minimize

24   fire spread, you potentially wouldn't want to remove that

25   shrubbery, correct?

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1     A.    I think we're reading a lot more into what the

2     closeout summary intended than is possible.

3     Q.    Well, but Dr. Anderson himself says with regard to

4     Fuel Model 5 that it is not as combustible as other brush

5     layers, as other brush fuel models, correct?

6     A.    Yes, but -- and it applies to sagebrush, and

7     sagebrush fires can spread at very rapid rates, as well as in

8     other kinds of low shrub ecosystems.  So, Fuel Model 5 is by

9     no means a timid model.

10    Q.    Okay.  It's clear that the vast majority of what

11    we're talking about in terms of cover type in the treatment

12    areas is timber at Fuel Model 10, correct?

13    A.    Yes.

14    Q.    And, so, we're not talking about removing a vast

15    landscape -- shrubbery from a vast landscape; we're talking

16    about pockets of shrubbery.  Isn't that true?

17    A.    No.

18    Q.    Well, did you quantify how much Fuel Model -- a

19    shrub fuel model or brush fuel model existed in the treatment

20    areas?

21    A.    So, I think we're getting confused here.  I'm

22    talking about brush recovery in places that are now Fuel

23    Model 10.  There would be accelerated development of the

24    resprouting brush in there.  And if you look at the

25    definition in Anderson's own paper of Fuel Model 10, it

1347

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    includes other material besides just large dead-and-down

2    woody logs.

3        Q.   Okay.  So, just so we can break it up, the initial

4    conversation to a fuel model type -- to a forest that mimics

5    a Fuel Model 8-type forest, could, in fact, include

6    mechanized removal of brush and, in fact, in this particular

7    forest, there's not all that much brush.  It's mostly Fuel

8    Model 10 timber, correct?

9        A.   At the moment, that's right.

10       Q.   Okay.  And, so, you're not saying that the initial

11   treatment action is not feasible.  Correct?

12       A.   It can be mechanically thinned, and mechanical

13   activities can take place within -- within the fuel break.

14   Yes, they can.

15       Q.   Your concern is that there would be regeneration

16   after it's opened up, correct?

17       A.   Yes, that's correct.

18       Q.   Well, isn't it true, sir, that if the responsible

19   forest manager is tasked to protect this forest, it is

20   absolutely possible to go back in to these large treatment

21   areas and as the brush regenerates treat it in some form,

22   other than with prescribed fire?

23       A.   Everything's possible; it's not practical.

24       Q.   Okay.  You talked about Cases 5 and 6 as being the

25   ones that you believe would most closely resemble what would

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    actually happen with a large fire like the Red Eagle Fire,
2    correct?
3         A.   Yes.
4         Q.   And isn't it true, sir, that in both of those
5    models you include fuel cover types other than FM 8 that are
6    not treated?
7         A.   That's true.
8         Q.   You were asked some questions about Defendant's
9    Exhibit 187.  And you were first asked about -- do you still
10   have that in front of you?
11        A.   Yes.
12        Q.   On the first page, you were asked about this
13   statement, "Large fires burning under extreme conditions of
14   high winds and low humidity are difficult, if not impossible,
15   to suppress."  Do you remember that testimony?
16        A.   Yes.
17        Q.   It's easier to suppress -- first of all, that
18   statement doesn't say that they are impossible to suppress,
19   correct?  It says they are difficult.
20        A.   Yes.
21        Q.   If not impossible, correct.
22        A.   Right, once the weather changes, then suppression
23   activities are usually possible.
24        Q.   Would you agree that they are easier to suppress if
25   they encounter fuel breaks or landscape-area fuel reduction

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    treatments?

2         A.    The possibility is there.

3         Q.    And if you turn to the conclusions, which is three

4    pages from the end, you state that "We suggest that problems

5    to society posed by wildland fires are analogous to those of

6    traffic accidents."  Do you see that?

7         A.    Yes.

8         Q.    And traffic accidents can't be stopped either by

9    increasing the police force or reducing the speed limits.

10   And then a little farther down, you say, "Likewise, wildland

11   fires can't be stopped."  You then go on to say, "The

12   challenge for fire management is to reorient the focus of

13   efforts toward limiting the undesirable effects of fires on

14   ecosystems and human development, not stopping fires."

15            And a little bit below that, you say,

16   "Sustainability of wildland ecosystems can be accomplished by

17   managing fuels and landscape pattern to change fire

18   behavior."  And do you still agree with that statement, sir?

19        A.    Yes.

20            MR. GRAYBILL:  That's all I have, Your Honor.

21            THE COURT:  All right.  Dr. Finney, thank you very

22   much for your testimony.

23            THE WITNESS:  Thank you, Your Honor.

24            THE COURT:  You are excused.

25            THE WITNESS:  Thank you.

1350

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1            MR. BAIR:  Your Honor, one quick housekeeping

2      matter, if I may.  We wish to provide Dr. Finney's full

3      PowerPoint presentation as Defendant's Demonstrative 3, and I

4      have printed copies here.

5            THE COURT:  All right.

6            MR. BAIR:  May I approach?

7            THE COURT:  Yes.

8            MR. BAIR:  One other minor housekeeping matter,

9      Your Honor.  We also have exhibit stickers for Defendant's

10     Exhibit 186 and 187.  I'm happy to provide those at the break

11     or whatever --

12           THE COURT:  All right, that will be fine.

13           MR. BAIR:  Thank you.

14           (Defendant Demonstrative Exhibit Number 3 was

15     marked for identification.)

16           MS. DRAPER:  The United States calls Dr. Terry

17     Droessler.

18           THE COURT:  All right.

19           Good morning, sir.

20           THE WITNESS:  Good morning.

21     Whereupon,

22              TERRY DONALD DROESSLER, Ph.D.

23     called as a witness, having been first duly sworn, was

24     examined and testified as follows:

25                    DIRECT EXAMINATION

1351

Trial

1        BY MS. DRAPER:

2    Q.   Good morning, Dr. Droessler.

3    A.   Good morning.

4    Q.   Would you please state your full name for the

5    record.

6    A.   Terry Donald Droessler.

7    Q.   And what is your profession?

8    A.   I am a forest biometrician.

9    Q.   And what is the name of your firm?

10   A.   My firm is Forest Analytics, LLC.

11   Q.   And you provided a copy of your resume with your

12   expert report; is that correct?

13   A.   That's correct.

14   Q.   And I believe that has been marked and admitted as

15   Defendant's Exhibit 137.  You don't have any way of knowing

16   if that's correct.  And I believe your resume appears as

17   Appendix C of your report; is that correct?

18   A.   That's my recollection.

19   Q.   Is the resume provided with your report an accurate

20   and up-to-date copy, so far as you recall?

21   A.   It's up-to-date as of the date of that document.

22   Q.   Would you please list the degrees that you've

23   earned and the universities you attended?

24   A.   I began my college education at the University of

25   Wisconsin Stevens Point in the College of Natural Resources.

Trial

Blackfeet Tribe v. USA                                                8/23/2016

1    I spent two years as an undergrad there and then transferred

2    to the University of Wisconsin in Madison, also in the

3    Department of Forestry at the time.  I obtained a bachelor's

4    of science in natural resources, forestry, from the

5    University of Wisconsin Madison.

6              I went on to get a master's degree in forest

7    biometrics from the University of Wisconsin Madison and then

8    went to the University of Minnesota and obtained a Ph.D. in

9    forest biometrics.

10        Q.    And without getting into opinions, can you briefly

11   explain what forest biometrics is?

12        A.    The word "biometrics" literally translates to the

13   measurement of life.  And, so, forest biometrics is the

14   measurement of forest components, such as trees.

15        Q.    Let's turn back to your career path and

16   professional experience.  Since earning your Ph.D., could you

17   briefly walk us through the forest biometrician positions

18   that you've held?  Perhaps you could start with the earliest

19   and proceed to the most recent and maybe give us a general

20   idea of the kinds of forest projects you worked on at your

21   different positions.

22        A.    Sure.  I began with a post-doctorate position with

23   the Forest Service Northeast Forest Experiment Station in

24   Orono, Maine.  In that position, the work focused on the

25   impacts of acid rain on the growth and yield of the spruce

Trial

1    fir forest in that region of the country.

2           Okay, the next job was with the Environmental

3    Protection Agency laboratory in Corvallis, Oregon.  I began

4    my work there looking at the -- extending the impacts of acid

5    rain on the growth and yield of forests on national scales.

6    That work eventually transitioned into the impacts of global

7    change on forest growth and yield on a national and even

8    global scales.

9           After my EPA stint, I worked for the consulting

10   firm Mason, Bruce & Girard, Inc. in Portland, Oregon.  I was

11   hired to do forest biometrics work there, which involved

12   designing and analyzing forest inventory information, among a

13   wide variety of projects, but most were related to forest

14   inventory or their analysis.

15          After Mason, Bruce & Girard, I became a partner

16   with several other folks in a consulting firm in Corvallis,

17   Oregon called Duck Creek Associates.  I was the forest

18   biometrician partner in that firm, and my work continued with

19   forest inventory-related work, forest inventory analysis,

20   statistical analysis, a rather wide variety of work, all

21   involving forest inventory.

22          After Duck Creek Associates, I formed my own

23   company.  This would be 2005, Forest Analytics, LLC, as a

24   sole proprietor.  And my clientele has remained fairly

25   consistent over the length of time I've been in the Pacific

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    Northwest.  I work for -- I do projects for a wide variety of

2    entities, from individual tree farm and woodland owners,

3    neighbors, small, medium, to large-sized timber companies,

4    federal agencies, and the United States Department of

5    Justice.

6         Q.    And, Dr. Droessler, you may have mentioned this,

7    but did you also work at one point for Cavenham Forest

8    Industries?

9         A.    I did have a one-year job with Cavenham Forest

10   Industries, and that was cut short by a hostile takeover,

11   buyout, the company sold.  In that capacity, I did forest

12   biometrics and -- in addition to GIS work for them.

13        Q.    In describing your professional experience, you've

14   used a few terms perhaps we should define.  Let's quickly

15   take them one by one.  Without offering an opinion, what is a

16   forest growth and yield model?

17        A.    A forest growth and yield model is simplistically a

18   way to simulate how trees grow using computers.

19        Q.    And with the same criteria in mind, what is a

20   silvicultural scenario?

21        A.    Silvicultural scenarios are the way that forest

22   managers attempt to achieve particular goals on their

23   property.

24        Q.    And you mentioned forest inventory as one of your

25   specialties.  What is a forest inventory?

1355

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      A.   Forest inventory simply and most -- in most cases
2   for me in particular involves an inventory of the trees that
3   are on a property.
4      Q.   Please just briefly describe your professional
5   experience with statistical sampling.
6      A.   Statistical sampling is a necessary requirement in
7   both the development of a forest inventory in developing
8   sampling strategies and also in the review of existing forest
9   inventory work.
10      Q.   Do you have any experience reviewing inventory work
11   prepared by others?
12      A.   Yes.  I'm called upon on a regular basis and really
13   throughout my career to review existing forest inventories.
14      Q.   Do you have any experience calculating confidence
15   intervals?
16      A.   Yes.  Confidence intervals provide an estimate of
17   the variability in the value of interest, typically an
18   average or a total.
19      Q.   And what kinds of projects have you worked on that
20   involved calculating confidence intervals?
21      A.   I've had two very recent projects, both with the
22   same client, that required me to come up with the inventory
23   design, subcontract out the field work to cruisers and
24   compile the results, determine the total volume, and provide
25   that confidence interval or measure of variability with it.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      Q.    Dr. Droessler, have you worked on any projects
2    involving Indian forestlands?
3      A.    Yes.   I've had a long tenure in working with Indian
4    country.
5      Q.    What kinds of projects have you worked on that
6    involved Indian forestlands?
7      A.    I've been asked to take existing CFI -- continuous
8    forest inventory -- plot data and develop a timber inventory
9    database for the tribe.   I've been asked to use inventory to
10   assist them in developing forest management plans.   And
11   develop harvest schedules.
12     Q.    Which Indian tribes have retained your services?
13     A.    I've worked for the Confederated Tribes of the
14   Coos, Lower Umpqua and Siuslaw in Oregon; the Coquille Tribe
15   in Oregon; the Cow Creek Tribe in Oregon; the Warm Springs
16   Tribe in Oregon; a couple tribes in Washington, the Quinalt
17   Indian Tribe and the Colville Tribe.   I've worked for First
18   Nations Tribe in British Columbia.   That's what I recall.
19     Q.    Thank you.   What regions of the United States have
20   you primarily worked in?
21     A.    My most recent work really for about the past 28
22   years has been in the Pacific Northwest, so it's primarily
23   focused on work in British Columbia, Washington, Oregon,
24   Northern California, and extending a bit into the Inland
25   Empire region, but primarily the Pacific Northwest.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    Q.    Have you worked on any forest projects outside the
2  Continental United States?
3    A.    Yes.  I have worked -- had projects in the Russian
4  Federation, Sakhalin Island specifically; in Canada, in
5  British Columbia; and also in Brazil.
6    Q.    Have you led any training sessions related to
7  forest biometrics?
8    A.    Yes.  Part of my business is routinely to provide
9  training for individuals interested in learning how to
10  develop inventory or use inventory software.  So, I provide
11  one-on-one or group training every year on a, you know, very
12  regular basis.
13         I also have developed specialty workshops, often
14  with colleagues, and last year I with two colleagues, two
15  forest biometricians, presented a two-day workshop in
16  Portland for about 75 folks on how to use growth and yield
17  models.
18    Q.    Are you affiliated with any professional
19  organizations?
20    A.    I'm a member of the Western Forest Mensurationists
21  or otherwise known as Western Forest Biometricians group, and
22  I'm a certified forester in the Society of American
23  Foresters.
24    Q.    And you just mentioned you're a certified forester.
25  Are there any continuing education requirements associated

Trial

1   with that certification?

2       A.    Yes.   There's -- basically, they specify a three-

3   year continuing education requirement that has to be met.

4   And, you know, I try and undertake that to basically do it on

5   an annual basis to make sure I get -- meet or certainly

6   exceed that three-year requirement.

7           MS. DRAPER:  Your Honor, we would move to qualify

8   Dr. Droessler as an expert forest biometrician.

9           THE COURT:  All right.  Any voir dire?

10          MR. GRAYBILL:  No objection.

11          THE COURT:  All right.  The Court will accept the

12  witness as an expert in forest -- whatever the noun is.

13          MS. DRAPER:  Biometrics.

14          THE WITNESS:  Biometrics.

15          MS. DRAPER:  It's a long word.

16          BY MS. DRAPER:

17      Q.    Dr. Droessler, let's start with a few basic

18  background concepts.   What are the basic tools a forest

19  biometrician uses to measure forest inventory?

20      A.    The basic tools are field measurements, and those

21  field measurements involve tree diameters, the measurement of

22  the diameter of the tree at four and a half feet above the

23  ground and total tree heights, perhaps measurement of how

24  much taper there is in a tree, those sorts of measurements.

25  The ultimate goal, of course, is to estimate volume in the

Trial

Blackfeet Tribe v. USA                                            8/23/2016

1   tree.

2        Q.    And I assume you're speaking of timber volume.

3        A.    Correct.

4        Q.    What was your assignment in this case?

5        A.    I had two assignments in the case.  First, I was

6   asked to develop a total net board foot volume of commercial

7   timber burned within the Red Eagle Fire perimeter; and

8   secondly to provide an estimate of the net board feet per

9   acre at rotation age for the forest cover types that occur

10  within the Red Eagle Fire perimeter.

11       Q.    Dr. Droessler, before we continue, we've heard

12  other testimony in this trial referring to commercial timber.

13  Are merchantable and commercial timber essentially

14  interchangeable terms for purposes of discussing your

15  analysis?

16       A.    Mostly, yes.

17       Q.    Is there a distinction we should be concerned about

18  here?

19       A.    Not in my testimony.

20       Q.    Did you provide a report in this case on your

21  analysis of the two issues you've just described for us?

22       A.    I did.

23       Q.    And are we seeing on the monitor as -- this would

24  be the title page from your report; is that correct?

25       A.    That's correct.

Trial
Blackfeet Tribe v. USA                                             8/23/2016

1      Q.    And I believe this has been admitted as Defendant's
2    Exhibit Number 137.  Before we turn further into the
3    specifics of your analysis, let's briefly discuss the general
4    information you considered.  Did you have an opportunity to
5    inspect the Blackfeet Tribal Forest after the Red Eagle Fire?
6      A.    Yes.  I spent several days touring the burn area
7    and adjacent areas.  That would have been in September of
8    2014.
9      Q.    And how did your observations factor into your
10   analysis, if at all?
11     A.    They certainly factor in throughout.  In sort of
12   reviewing the data that was available to me, I had mental
13   pictures of having been in specific locations.  And, so,
14   for example, if I had plot data that I knew came from a
15   specific area, I had -- I had been in that area, and I cross-
16   checked -- basically a mental cross-check between what I was
17   seeing in the data to make sure it made sense based on what I
18   saw in the field.
19     Q.    We've been speaking generally about the two major
20   issues you analyzed.  Let's turn to specifically now your
21   commercial timber volume estimate for the Red Eagle Fire.
22   Could you start by giving us a general overview of the steps
23   you followed in estimating commercial timber volume within
24   the fire perimeter?
25     A.    Yeah.  The general steps were to first determine

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    the total area that I was -- that I needed to work with,

2    which would have been the total area of commercial timber

3    burned within the Red Eagle Fire perimeter.  The second step

4    was to estimate volume for that area.

5         Q.   Volume for the acreage that you'd finished

6    calculating; is that correct?

7         A.   That's correct.

8         Q.   Okay, let's take each of those steps in the order

9    that you just listed them.  What was your starting point?

10   And I'll refer your attention to slide number 2 on the

11   screen.  I believe this is table -- can you recognize this as

12   Table 1 from your report?

13        A.   Yes.

14        Q.   Okay.  And of the land -- of the land category

15   acreages set out in Table 1, which one was significant for

16   your purposes?

17        A.   Yeah, I focused entirely on the fourth row down,

18   which is labeled Commercial timber - Burned, and it shows as

19   12,502.3 acres.

20        Q.   Once you -- and is this information -- where did

21   you obtain this information that appears in Table 1?

22        A.   Table 1 came from Mr. Nelstead's document.

23        Q.   And that would be the Mr. Nelstead who testified

24   earlier in the trial, I take it.

25        A.   Correct.

Trial

1       Q.   Once you had Mr. Nelstead's 12,502.3 acres for

2   commercial timber burned, did you make any adjustments to the

3   acreage calculation?

4       A.   Yes.  There were several adjustments to that, but

5   that was my starting point.

6       Q.   What was the first adjustment you made to the

7   12,000-acre figure?

8       A.   The first adjustment was to --

9       Q.   If I could refer your attention to Figure 1.  I'm

10  asking about the -- did you make any adjustments with respect

11  to the acreage that was within the perimeter?

12      A.   I made no adjustments to the acres that were within

13  the perimeter, except I focused on the burned area in that

14  Table 1, right.  So, you know, what we're looking at is a --

15  the red outline is the revised fire perimeter from Mr.

16  Nelstead's work.  There are also -- show some small islands

17  within that perimeter that were unburned areas, which, of

18  course, are not included in that 12,500.3-acre estimate.

19      Q.   Okay.  And, then, from the area we're looking at --

20  and we might want to go to the next slide.  From the area we

21  are looking at now, did you exclude any land -- any areas as

22  you went to the next step in your analysis?

23      A.   Yeah.  My next step, I was certainly aware of the

24  Fox Creek Fire reburn area.  We visited that area in the

25  field, spent considerable time walking around it and

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1   discussing it, so I was -- I had a good mental image of what
2   that area looked like.  And the relevance is that the 2002
3   Fox Creek Fire had burned this area, which is shown in a
4   crosshatch.  Actually, the whole green-outline area is the
5   Fox Creek Fire, but the cross -- the green crosshatch is the
6   area of the Fox Creek Fire that the Red Eagle Fire then
7   reburned, and I'll refer to that or use the term "reburn
8   area" here.  That reburn area, at most, could have contained
9   four-year-old seedlings at the time of the Red Eagle Fire.
10  So, I knew there was no volume in that area, no commercial
11  timber volume in that reburn area.  That certainly gibed with
12  what the mental image I had was, and also from looking at
13  data that was available from that area.
14      Q.   And how many acres does that Fox Creek Fire reburn
15  area encompass?
16      A.   My recollection, it was 1,625.7 acres, an estimate
17  from Mr. Nelstead.
18      Q.   If I suggested your report said it was 1,627.7,
19  would that --
20      A.   That...
21      Q.   Thank you.  And what was the source of your
22  information on the number of acres within the reburn area?
23      A.   I received that acreage estimate from Mr. Nelstead.
24      Q.   So, if I'm understanding you correctly, you then
25  from the initial figure, the 12,000-acre -- 12,500-acre

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1   figure that we looked at, you then subtracted out the 1,600-

2   acre figure that represented the Fox Creek reburn.  Did you

3   subtract out any other acreages before you got to the -- to

4   calculating volume?

5        A.   Yes.  So, the Red Eagle Fire occurred in late July

6   of 2006, and I knew that the inventory data that was

7   available to work with was measured in 2004 and into 2005.  I

8   was also aware that there had been harvesting that occurred

9   between the time of that inventory and the Red Eagle Fire, so

10  roughly two years of elapsed time.  And, so, I asked Kevin

11  Nelstead for the acreage of the harvest units that had

12  occurred from 2004 until the time of the Red Eagle Fire.  And

13  he provided a figure of 327.8 acres that had been harvested.

14            Now, there was a chance that a plot -- one of the

15  inventory plots I was working with would have fallen into

16  these harvest areas, so if the measurements were taken after

17  harvesting had begun, I could see that in the plot data.  I

18  checked the plots, and in the vicinity of where these harvest

19  units were and there was no indication that they fell within

20  the harvest areas.  So, I concluded that I needed to subtract

21  these harvest areas out to get to an inventory estimate at

22  the time of the Red Eagle Fire.  And, so, I subtracted them

23  out, which resulted in a figure of 10,548.8 acres, which is

24  shown at the bottom of this summary.

25        Q.   So, once you had that, the 10,548.8 acres shown on

Trial
Blackfeet Tribe v. USA                                        8/23/2016

1   the bottom of your summary of opinions, taken from your
2   report, what was the next problem you set out to solve?
3        A.   The next problem was obtaining a volume estimate
4   for those acres.
5        Q.   Referring you to Figure 2 from your report, does
6   that map depict this -- can you walk us through the process
7   that you followed to determine volume on the estimated acres?
8        A.   Yes.  So, there was inventory data collected in
9   2004 and 2005, and it was well designed with known plot
10  locations.  So, what Figure 2 shows -- oh, the numbers refer
11  to individual plot numbers, and the blue dots to the location
12  of those plots.  And what -- my intent here was to identify
13  which plots fell within the Red Eagle Fire perimeter.  And
14  it's that subset of plots then that I could begin to work
15  with to develop a volume estimate.
16       Q.   Dr. Droessler, let's pause for a moment from your
17  step-by-step description and focus on some background
18  information.  Other witnesses have mentioned CFI plots.  As a
19  forest biometrician, could you help us understand what CFI
20  plots are?
21       A.   A CFI inventory, again it stands for continuous
22  forest inventory, is an inventory commonly used in Indian
23  country.  The Bureau of Indian Affairs has relied on it to
24  develop inventory estimates for many decades.  So, it
25  basically defines a fixed radius circular plot that is one-

Trial

1   fifth acre in size.  And then they inventory the trees that

2   occur on that plot.  Then there are specific things that they

3   are measuring on portions of the plot or the whole plot.  And

4   it's all laid out in an inventory design document.  And for

5   the Blackfeet in particular, I cite the inventory design

6   document in my list of citations.

7        Q.   Are these CFI plots typically -- are they revisited

8   on any periodic basis?

9        A.   Part of the word "continuous" refers -- or alludes

10  to any way that they attempt to remeasure them, approximately

11  every ten years.  Okay, but this data set, these plots were

12  first installed in 2004 and 2005.  So, there was just a

13  single measurement available.

14       Q.   And what is this -- is there a standard protocol

15  for collecting information from a CFI plot?

16       A.   Yes.  And it's laid out in that inventory design

17  document.  Procedures and methods are clearly stated.

18       Q.   And, in general, are there standard protocols that

19  are similar for laying out -- for designing a CFI inventory

20  and laying out the plots?

21       A.   The general concepts are transferrable, yes.

22       Q.   Let's turn back to the point we left off in your

23  volume estimate analysis for this case.  I believe the last

24  step you mentioned was you were obtaining the CFI plot data

25  from Mr. Nelstead.  And how did you go about getting the plot

Trial

1   data and were there any sources other than Mr. Nelstead?

2       A.    Right.  I obtained the inventory data, the plot

3   data, from the Bureau of Indian Affairs Bureau of Forest

4   Resource Planning Office in Lakewood, Colorado.  They are

5   sort of the clearinghouse or the -- that's the wrong word to

6   use.  They are the folks that provide resource planning to

7   the Bureau of Indian Affairs.  And they maintain these CFI

8   inventory databases and compute inventory volumes, which

9   then, you know, are utilized in a wide variety of ways.

10      Q.    What data did -- am I using the correct acronym --

11  I believe it's BOFRP.

12      A.    BOFRP is the commonly used acronym for that group.

13      Q.    What data did BOFRP provide to you?

14      A.    They provided me an Access -- a Microsoft Access

15  database, which contained tables that contained the raw plot

16  data, the data -- the tree measurements that were collected

17  on each of these CFI plots.  They also provided me software

18  that I could use directly with that database to compute

19  volumes.

20      Q.    Once you had the CFI data, what was the next task

21  you set out to complete, and referring you again back to our

22  Figure 2, I believe, from your report?

23      A.    Right.  The next task was to identify which CFI

24  plots fell within that Red Eagle Fire perimeter.  And I -- at

25  this scale, this figure alone, you can sit and count which

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1   ones show up or seem to show up.  I took that a step farther.

2   Any plot that was at all close to the perimeter border I

3   asked Mr. Nelstead to provide a more detailed -- more

4   resolution, and the ultimate determination as to whether a

5   plot fell within the perimeter or not was whether the center

6   of the plot fell within the perimeter.  If the center of the

7   plot fell within the perimeter, I counted it and used it.

8        Q.    Referring again to Figure 2, how many CFI plots did

9   you ultimately conclude were within the Red Eagle Fire

10  perimeter?

11       A.    There are a total of 41.

12       Q.    Once you determined there were a total of 41 within

13  the perimeter, did you exclude any other CFI plots, for

14  example, how did you treat those that were within the reburn

15  area?

16       A.    Right.  That reburn area, again, since I had

17  visited it, I knew there was no commercial timber volume in

18  it.  I then excluded the plots that fell within that reburn

19  area, first checking to make sure they showed that there were

20  no trees in that area.  And, in fact, they did show that.

21  So, there were six plots that showed in that reburn area, and

22  I excluded those.  So, 41 minus 6 results in 35 total plots.

23       Q.    Once you had your 35 total plot figure, what was

24  the next step in your analysis with respect to the BOFRP

25  data?

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1    A.   Right.  The next step then was to use the BOFRP

2  software and calculate the average volume per acre from those

3  35 plots.

4    Q.   So, referring you to Table 2, which I believe

5  appears on page 9 of your report, does this show -- does this

6  include the BOFRP data you were working with?

7    A.   Right.  This is a table exactly out of that

8  software run.  So, the software produces this table, and I

9  simply copied it and put it into my report.  There's really

10  only one number that was of interest to me here, and it's

11  under the Total Volume heading, so that first group of three

12  columns.  And it's the third column, the board measure.  And

13  what this number represents, I can't make it out clearly on

14  my screen here.  I'd be guessing as to what that number is.

15    Q.   I believe if we go to the next slide that the

16  number will be clearer.

17    A.   Okay.  What that number is, though, is the gross

18  volume from those plots, which is the total volume that fall

19  within the dimensions of the diameters and the heights.

20    Q.   Dr. Droessler, how did you decide whether the BOFRP

21  data you were looking at was reliable?

22    A.   The inventory field guide specified both the

23  measurements that were to be taken with followup checks of

24  all field people to make sure that they were conforming to

25  predetermined standards for those measurements.  So, that

Trial
Blackfeet Tribe v. USA                                      8/23/2016

1    procedure was followed.

2         Q.    And did you receive from BOFRP only data for the 35

3    plots you were considering?

4         A.    No.   I received the whole CFI -- the inventory

5    database I received contained all of the CFI plot data.

6         Q.    Once you were satisfied that the BOFRP data was

7    reliable, how did you use the data in your calculations?

8         A.    Well, the first step was to determine this gross

9    board foot volume per acre figure, which I can read on there

10   now was 5,659.1 board feet per acre.

11        Q.    And, Dr. Droessler, if I could just ask you, is

12   this a summary or this is basically an excerpt from your --

13   the calculations that appear in your report, is that correct?

14        A.    Yes.

15        Q.    Okay.   And I'm sorry, please go ahead.

16        A.    Okay.   So, the first step was getting this gross

17   board foot volume per acre figure.   And, again, gross is

18   simply the volume that shows or is within the dimensional

19   characteristics of the tree.   But not all of that dimensional

20   volume is useable for a variety of reasons, one of which is

21   defect, and visible defect in particular, which you can think

22   about as a rot area.   The person measuring the tree can see

23   these rot areas, and they make an estimate of how much of the

24   dimensional characteristics is not useable.   Okay, so, I'll

25   call this visible defect.   It's defect that you can see and

Trial

1    estimate.

2            So, gross volume, but it's really net board foot

3    volume, which is gross net of defect.  In this case, I've

4    talked about visible defect.  The estimate for defect that I

5    used came from the 2007 Sawyer report, and --

6        Q.   Dr. Droessler?

7        A.   -- which was based on this CFI plot data, this

8    particular inventory, but it was Blackfoot-Forest-wide, not

9    just the Red Eagle Fire area.

10       Q.   Okay.

11       A.   That Sawyer report.

12       Q.   Dr. Droessler, if I could pause you for a moment

13   and maybe take a couple steps back.  I just want to make sure

14   we've defined all the terms we're using.  We've been

15   routinely using the term "board feet."  What does that term

16   actually mean?

17       A.   Okay.  A board foot is a dimensional -- literally a

18   board that is 1-inch thick, 12 inches wide, and 12 inches

19   long.  That's at a rough-cut level.

20       Q.   And is another way of describing or capturing the

21   concept of net volume, is it essentially the quantity of

22   timber that a buyer can saw into useable lumber and is

23   therefore willing to pay for?

24       A.   That's a clearly -- it's what a buyer is willing to

25   pay for that is the estimate of interest here.

1372

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1              THE COURT:  Ms. Draper, let's take a lunch break at

2       this point.

3              MS. DRAPER:  Certainly, Your Honor.

4              THE COURT:  We'll resume at 1:30 p.m.

5              (Court in recess for lunch.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1                        AFTERNOON SESSION

2                          (1:31 p.m.)

3              THE COURT:  You may be seated.

4              Ms. Draper, let's go ahead.

5              BY MS. DRAPER:

6         Q.   Good afternoon, Dr. Droessler.  When we paused for

7    lunch, I believe you were in the midst of explaining to us

8    you timber volume estimates.  And as I recall, we were in the

9    process of discussing defect.  Does defect vary by region,

10   location, or tree species?

11        A.   Yes, certainly by all three.

12        Q.   Is there a difference between visible defect and

13   total or overall defect?

14        A.   Yes.  There's a term commonly used called "hidden

15   defect," which is defect that occurs inside the tree, that

16   there are no external visible ways to discern.  So, hidden

17   defect is another type of defect.

18        Q.   Where did you obtain the data you used to account

19   for defect on the timber within the burn perimeter?

20        A.   I ultimately went to the Sawyer report, which

21   reported a 5.6 percent defect was appropriate to apply to the

22   inventory.

23        Q.   We heard reference to the Sawyer report earlier.

24   Is that the Sawyer 2007 report?

25        A.   Correct.

Trial
Blackfeet Tribe v. USA                                            8/23/2016

1      Q.   What was the overall defect figure you actually

2   used to calculate net board feet per acre within the burn

3   perimeter?

4      A.   I used 5.6 percent.

5      Q.   And I believe we see on the screen your

6   calculations from page 9 of your report; is that correct?

7      A.   Yes.

8      Q.   Would you walk us through the calculations that you

9   took to get from gross board feet to net board feet?

10     A.   Okay, in the top line, the 5,659.1 is the gross

11   board foot volume per acre, the average gross board foot

12   volume per acre from the 35 CFI plots.  I multiply that by

13   .944, which is 5.6 percent defect, to obtain 5,342.2 net

14   board feet per acre.  Okay, so, then the next step, skipping

15   down to the last line because I'm not interested in gross

16   board foot volume any longer, I have a net board foot volume,

17   and that is what I want to carry forward in calculations.  I

18   multiply that net board foot volume per acre by the area

19   estimate of the commercial timber burned within the Red Eagle

20   Fire perimeter, which is a number we referred to earlier of

21   10,548.8 acres.  And that multiplication results in 56

22   million -- 56.4 million net board foot total for the

23   commercial area burned in the Red Eagle Fire.

24     Q.   And then, Dr. Droessler, once you had that 56.4

25   million board feet figure, did you make any adjustments to

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1  address the two-year gap between the 2004/2005 CFI inventory

2  and the July 2006 Red Eagle Fire?

3       A.   Right.  So, there are -- yes.  There are

4  approximately two years in there.  It's something more than

5  one year and something less than two years, but I decided to

6  simply apply a two-year growth estimate to it.  So, I

7  obtained an estimate of board foot volume growth from the

8  BOFRP software for these 35 plots.  That is standard output

9  that that software produces.  That gave me the average board

10  foot per acre growth per year, and I expanded that to a total

11  to get the total growth and then multiplied by two to get two

12  years of growth.  And it basically amounted to one-and-a-half

13  million board feet growth per year times two is 3 million

14  board feet, added to the 56.4 million comes up with 59.4

15  million.

16       Q.   Okay.  And the calculations you've just described,

17  is that what's appearing on the screen as I believe your

18  summary from your report; is that correct?

19       A.   That's correct.

20       Q.   So, recapping for a second, so I'm sure I'm

21  understanding you, the 59.4 million net board feet you

22  calculated represented the volume of commercial timber within

23  the Red Eagle Fire perimeter; is that accurate?

24       A.   That's accurate.

25       Q.   After you calculated net timber volume, Dr.

1376

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    Droessler, what further steps did you take to assess the
2    reliability of the CFI plot data that you used?
3        A.    Okay.   The 35 plots, clearly some of those plots
4    were from seedling/sapling areas; some of them were from old
5    timber areas; and some of them were from mature sawtimber
6    areas.   So, I understood there was quite a bit of variability
7    between those plots.   So, I felt it important to give some
8    estimate of the variability within that Red Eagle Fire
9    perimeter of the 35 plots that I was using.
10            And the way to do that, the way to present that, is
11    to calculate a confidence interval.   So, I went ahead and
12    calculated a confidence interval for my total volume
13    estimate.
14        Q.    If I could ask -- I apologize.   I did not mean to
15    speak over you.   If I could ask you to pause and define for
16    us what is a confidence interval.
17        A.    Confidence interval, there's standard statistical
18    formula for calculating it, but basically simply it's a
19    measure of the amount of variability in the estimate that
20    you're looking at.   And the estimate I'm interested in here
21    is the total net board foot volume burned within the
22    commercial area within the Red Eagle Fire perimeter.   So, I
23    wanted to have an estimate of the variability that was in
24    that total volume estimate.   So, that's what the confidence
25    interval provides.

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      Q.    And, so, if I can recap it and ask you to delve
2   just maybe one layer deeper, so when we're looking -- in this
3   specific instance when you're calculating the confidence
4   interval, what is it actually measuring the variability of?
5      A.    It is measuring the variability between the 35
6   plots that I used in this analysis.
7      Q.    To further explain how confidence intervals work,
8   perhaps you could explain this example.  If every plot
9   sampled was 100 percent the same, exactly the same, what
10  would the confidence interval be?
11     A.    Right, there would be zero variability, and the
12  confidence interval would be zero.
13     Q.    And what did you calculate as the confidence
14  interval for the CFI plot sampling?
15     A.    The confidence interval resulted in a figure of
16  plus or minus 33.5 percent, and that's 33.5 percent of the
17  59.4 million net board feet.
18     Q.    And perhaps if you could give us an example, what
19  does the confidence interval signify, if you could maybe give
20  us an example of if there were 20 -- if we looked at 20
21  samples, what is this confidence interval telling you?
22     A.    Yeah.  If there were -- if 20 independent people
23  went out and put plots into this area, 35 plots, so 20
24  independent inventories, the 95 percent confidence interval
25  says you would expect 19 of the results of those inventories

Trial
Blackfeet Tribe v. USA                                          8/23/2016

1    to fall within the plus or minus 33.5 percent confidence

2    range, and one of those inventory estimates to fall outside

3    of that confidence range.

4         Q.   Anything else the confidence interval is telling

5    you about how representative or variable the CFI plots used

6    in the 2004/2005 CFI inventory actually were?

7         A.   As I mentioned, some of these plots were

8    seedling/sapling -- from seedling/sapling areas; some were

9    from poletimber-size tree areas; and some were from a mature

10   sawtimber-size tree area, so I expected there to be a lot of

11   variability and a figure of plus or minus 33.5 percent

12   reflects that.

13        Q.   Okay.  So, is a fair way to summarize what you just

14   indicated the plots were highly variable but also

15   representative?

16        A.   That's correct.  Those plots provide an unbiased

17   estimate of the volume.

18        Q.   And, finally, to close out our discussion on timber

19   volume estimate, based on all the factors you considered, is

20   your 56.4 million net board feet an estimate that's

21   sufficiently reliable in your opinion as a forest

22   biometrician?

23        A.   It's the 59.4 is the figure to use.

24        Q.   I apologize.

25        A.   And, yes, that is a good estimate of the total

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1     volume in that Red Eagle Fire perimeter.

2          Q.   Now, let's turn to the second major question you

3     address, which relates to your work on forest cover type

4     within the fire perimeter.  Again, let's start by defining a

5     few of the terms we're going to use.  What is forest typing?

6          A.   Forest typing is essentially a way to code the

7     predominant species, the size class, and the density class of

8     an area in the forest.

9          Q.   Why did you set out to assess forest cover type?

10         A.   I was asked by Dr. Zhang, who was doing economic

11    analysis, that he needed to have an estimate of the net board

12    feet per acre at maturity for the various forest cover types

13    that existed pre-fire within the Red Eagle Fire perimeter.

14         Q.   Basically, what was your objective in assessing

15    forest cover type?

16         A.   The objective was to come up with an estimate of

17    net board foot volume per acre at maturity.

18         Q.   Is that the same or different than you were

19    attempting to determine the volume of merchantable timber at

20    rotation age?  Is that another way of stating the same thing?

21         A.   I'm using the word "maturity" for rotation age

22    here, yes.

23         Q.   What does -- in this context, then, what does

24    maturity or rotation age mean?

25         A.   Rotation age is a concept that forest managers use

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    to assign an age at which they believe an area is ready for

2    harvest.

3         Q.   What did you determine the rotation age was for the

4    trees in the Blackfeet Tribal Forest?

5         A.   I went to the forest management plan in existence

6    at the time of the Red Eagle Fire, and it showed two figures,

7    differentiated by predominant species.  And one of those

8    figures was for lodgepole pine areas, and it had a rotation

9    age of 90 or reported a rotation age of 90.  And the other

10   was for mixed conifer species, and they reported a rotation

11   age of 110 years.

12        Q.   You just used the term "mixed conifer species."

13   How are you using that term?

14        A.   I'm using it simply to relay there were multiple

15   conifer species in the area.

16        Q.   You mentioned the forest management plan as your

17   source material for rotation age.  Is the mixed conifer

18   description simply part of the information you derived from

19   the plan?

20        A.   The term was used in that forest management plan,

21   yes.

22        Q.   Are you using the mixed species descriptor for any

23   purpose other than as a component of looking at rotation age

24   to determine merchantable timber volume?

25        A.   No other purpose.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1       Q.    Are you using that term in an ecological sense?

2       A.    No.

3       Q.    Are you offering any opinion at all about fire

4    ecology?

5       A.    No.

6       Q.    Are you offering any opinions at all about fire

7    behavior?

8       A.    No.

9       Q.    Referring you to your summary table that appears on

10   page 15 of your report, could you walk us through the steps

11   you took to determine forest cover type, perhaps starting

12   with the chart and explaining the data it displays?

13      A.    Sure.  This is a table -- I requested and received

14   from Mr. Nelstead a list of all of the forest cover types

15   that occurred within the Red Eagle Fire perimeter -- the

16   burned area within the Red Eagle Fire perimeter.  And, so,

17   this first column is labeled Burn Area Forest Cover Type.

18   This is the cover type that's pre-fire.  Okay?

19           The goal was then to get an estimate of the net

20   board feet per acre at rotation age for each of those cover

21   types.  And the way I got that estimate of volume was to take

22   the CFI plot data, which also had a forest cover type code

23   associated with it, and attempt to match a mature CFI plot

24   for the burn area forest cover types.  And, so, there are two

25   colors you see in that second column, Mature CFI Forest Cover

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    Type.   The green represents forest cover types which had a
2    matching CFI plot forest cover type within the Red Eagle Fire
3    burn area perimeter.   The yellow means that there was a
4    matching CFI plot or plots outside of the Red Eagle Fire
5    perimeter.
6           Okay, I was using mature volume estimates at this
7    point.   This has nothing to do with the inventory at the time
8    of the Red Eagle Fire.
9           Q.   And to go back just one step, Dr. Droessler, I
10   believe you mentioned the data for this table, I believe you
11   mentioned came from Mr. Nelstead.   Did some also come from
12   BOFRP, from the CFI plot data?
13          A.   The CFI plot data, which I used to estimate volume,
14   yes.   That whole inventory database of CFI plot data came
15   from BOFRP.
16          Q.   Okay.   And perhaps, Dr. Droessler, could you select
17   one of the rows listed there and just take us through quickly
18   an example of the matching process you've just been
19   describing for us?
20          A.   Sure.   Let's look at the second row.   So, the burn
21   area forest cover type shown is code DS33, and that stands
22   for Douglas fir, spruce, size class three, which is small
23   sawtimber, and density class three, which is a medium/high
24   density.   So, that's what that code refers to.   For a
25   matching mature CFI forest cover type, I located one to

1   several -- I don't know how many plots there were -- within

2   the Red Eagle Fire perimeter that had a code of DS32, so I

3   felt that was a good -- that those plots provided a good

4   estimate of the board foot volume at maturity or at rotation

5   age for that forest cover type -- burn area forest cover

6   type.

7        Q.   And, Dr. Droessler, are the results of your forest

8   cover type shown on Table B2 of your report?

9        A.   Yes.  The last column there shows the net board

10  foot volume per acre estimate.

11       Q.   Dr. Droessler, maybe I could ask you to walk us

12  through very briefly, what do each of the columns on Table B2

13  that we're now looking at, what do each of those columns

14  describe?

15       A.   Okay, the first column is the burn area forest

16  cover type that we've been talking about.  The second column

17  is an estimated stand age in 2006 at the time of the Red

18  Eagle Fire -- just prior to the Red Eagle Fire.  That

19  estimate came from Mr. Nelstead.  RA Type stands for rotation

20  age type, and it's -- the M refers to a mixed species.  There

21  are -- there is also L further down in the table.  That

22  refers to lodgepole.  So, there were those two rotation age

23  types that we've talked about.

24            The years to rotation age is a simple calculation

25  of the rotation age for the type minus the stand age in 2006,

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    so the very first line shows the years to rotation age of 100

2    because it's a mixed type and the rotation age is 110 and the

3    stand age in 2006 was age 10.  So, simple subtraction.

4              The total acres was the acres of the specific

5    forest cover type in that line.  And then a species code and

6    a net board feet per acre.  These values came from the CFI

7    plot data.

8         Q.   Okay.  Dr. Droessler, we have illustrated on the

9    screen just the first page of your Table B2.  And in its

10   entirety, it continues through page 28 of your report.  Do

11   each of the successive pages basically show the same

12   categories of information you've just walked us through?

13        A.   Correct.  It just goes through the full list of

14   forest cover types.

15        Q.   Once you compiled all this information on forest

16   cover type, what did you do with it?

17        A.   I provided this information to Dr. Zhang for his

18   economic analyses.

19        Q.   Switching topics now, Dr. Droessler, did you review

20   Mr. Long's initial report?

21        A.   Yes, I did.

22        Q.   And as -- is it correct that Mr. Long did

23   essentially two separate analyses?  He calculated -- one, he

24   calculated timber volume within the fire perimeter, and then

25   as a separate task estimated the number of acres he

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1    recommended for thinning or planting?

2         A.    There were several tasks that he addressed, but my

3    comments really focus on two of those areas.

4         Q.    And which two of those areas did you focus on?

5         A.    In general terms, his estimate of volume, and then

6    his estimate of condition class, and the condition class

7    refers to whether there was planting needed or whether

8    there'd be future thinning required.

9         Q.    Let's focus first on Mr. Long's timber volume

10   estimates.  What issues did you identify as problematic with

11   Mr. Long's approach?

12        A.    I reviewed his poletimber volume estimate and his

13   sawtimber volume estimate, so both of those estimates I have

14   some commentary on.

15        Q.    Let's proceed, and we'll kind of proceed in the

16   order you listed them.  Initially, did you address those

17   issues in your rebuttal report, which has been admitted as

18   Defendant's Exhibit 142?

19        A.    Yes, I did.

20        Q.    Let's take -- I believe you just mentioned Mr.

21   Long's poletimber estimate.  Let's take that estimate first.

22   What issues did you identify with Mr. Long's methods for

23   arriving at that estimate?

24        A.    Okay.  He -- Mr. Long used an estimate of 1,699 net

25   board feet per acre for poletimber stands, and it's a number

Trial

1    that he pulled from the 2007 Sawyer report.  In a close

2    reading of the Sawyer report, that poletimber volume estimate

3    has two major problems with it.  First, it is an average

4    estimate from all the CFI plots, the few that are within the

5    Red Eagle Fire perimeter, but most of them outside of the Red

6    Eagle Fire perimeter.  So, that's issue one.

7                 Two, that estimate represents the average

8    poletimber volume per acre of poletimber-sized trees that

9    occur on seedling/sapling plots, that occur on poletimber

10   plots, and that occur on sawtimber plots.  And that's an

11   issue because by including poletimber-sized trees on other

12   than poletimber plots, he's getting an underestimate of the

13   actual poletimber volume on poletimber plots.

14        Q.    Anything else you would add in terms of why that

15   approach is problematic?

16        A.    Well, it clearly dilutes the true value of the

17   poletimber volume.

18        Q.    You also referred to issues with Mr. Long's

19   sawtimber estimate.  What issues did you identify with the

20   sawtimber estimate?

21        A.    Okay, the sawtimber estimate, he used -- he started

22   with a gross board foot volume estimate, again out of the

23   Sawyer report.  And he pulled that estimate from a section of

24   the report that dealt with an allowable -- annual allowable

25   cut calculation.  And in reviewing that part of the Sawyer

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1   report, that gross board foot volume estimate, which he
2   started with, I believe it was 9,192 gross board foot -- feet
3   per acre, that volume represents the volume of overmature
4   stands only, and not all sawtimber burned within the Red
5   Eagle Fire was overmature.  Okay, so, that's one issue.
6           Ultimately, he needed to get to a net board foot
7   volume per acre estimate, and again, as part of that
8   allowable cut calculation, Sawyer reports he applied a 30
9   percent defect to that gross board foot volume per acre
10  estimate to derive a net board foot volume per acre estimate.
11  And that 30 percent defect, again, applies to overmature
12  stands only, and not all sawtimber burned within the Red
13  Eagle Fire was overmature.
14          Okay, so I believe that 30 percent defect estimate
15  is an overestimate.
16      Q.   Did Mr. Long provide a confidence interval for his
17  timber volume estimates?
18      A.   He did not.
19      Q.   Is that problematic?
20      A.   There's no way to understand the variability in his
21  total volume estimate without having a confidence interval.
22      Q.   Is it standard practice to calculate a confidence
23  interval?
24      A.   Yes, it is.
25      Q.   What are the ramifications in terms of addressing

Trial

1    or reviewing Mr. Long's timber volume estimates if no

2    confidence interval is provided?

3         A.   There's just no way to understand the variability

4    that exists in his total volume estimate.

5         Q.   Let's turn to Mr. Long's condition class estimates,

6    in which he estimates the acreage he believes will require

7    planting or thinning post-fire.  What issues did you identify

8    with Mr. Long's condition class inventory and estimates?

9         A.   Okay.  Mr. Long designed this inventory, and any

10   time I review someone's inventory design, I keep in mind some

11   common elements that are important in inventory design.  And

12   I'll just quickly run through these and then spend a little

13   bit more time on each one.

14        The first is the plot size that he chose to use.

15   He chose to use a hundred-acre plot size.  The second is the

16   plot locations, and typically a systematic grid with a random

17   start is a good method, and, in fact, he did that.  And it

18   provides a good level that the resulting volume estimate, or

19   in this case, tree count estimates, area estimates, are

20   unbiased.  So, that's a good thing.

21        The sample size.  I like to see a sample size, and

22   it's required of me in most inventories I work on to provide

23   a sample size that achieves a stated statistical goal.  And

24   you can think about that stated statistical goal as a

25   confidence level that is less than some percentage.  Okay,

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    keep that in mind.

2            The fourth element is a well-documented inventory

3    design, along with well-documented field methods, and he did

4    have a general document, but very lacking in detail with

5    specific -- in specific areas.

6            For -- I look for predetermined standards that the

7    cruisers have to achieve, and that some percentage, generally

8    5 percent, of each field person's field work gets checked by

9    an independent cruiser.  And a calculation is made as to

10   whether they achieved the standards or not and then what, if

11   any, corrective action is required, based on the results of

12   whether those standards were achieved or not.

13           And, finally, I like to see and am required to have

14   that each plot that is installed is monumented, which

15   generally means some semi-permanent location of the plot

16   center is placed in the field so that within some reasonable

17   period of time an independent cruiser can come out and locate

18   it.  So, those are the general elements that I look for.

19           Even if GPS coordinates are provided for plot

20   center, they still have to be monumented because a GPS gets

21   you in a close vicinity, but you need to know exactly where

22   that plot center was.

23   Q.   And, Dr. Droessler, before we continue, I think you

24   might have mentioned a term I don't know that we've defined

25   yet this afternoon.  You mentioned check cruising.  Can you

Trial
Blackfeet Tribe v. USA                                      8/23/2016

1    tell us what that concept is?

2         A.   Yes.  Check cruising is a procedure used to ensure

3    that the data that was collected by the field people is

4    reliable.  And I mentioned a little bit the way you do that

5    is to have predetermined standards for each of the

6    measurements being taken defined so the field person knows

7    what those standards are when they go out and that an

8    independent check cruiser, when they go out, they can either

9    verify exactly the measurements that were taken or come up

10   with independent measurements and then compare them to what

11   the original measurements were.

12        Q.   So, if I'm understanding you, essentially it's a

13   second group of people or a second individual that goes out

14   independent of the first group who did the fieldwork to

15   basically do a quality control check?

16        A.   Yes, that's correct.

17        Q.   And now, Dr. Droessler, you've listed for us the

18   good design elements or how you would define a well-designed

19   inventory design.  How does Mr. Long's inventory design

20   measure against those elements you've described for us?

21        A.   Okay.  So, regarding plot size, he used a 100-acre

22   plot size, and it simply is unprecedented in my review of

23   field operations and in my inventory design.  I would say

24   it's more than 100 times larger than any plot size that I

25   would advise using or would certainly see in review of

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    inventory designs.

2        Q.    Do you recall, Dr. Droessler, what the plot size

3    was in the CFI plots for the 2004/2005 inventory?

4        A.    The CFI plots were one-fifth acre in size.

5        Q.    Is that closer to a standard size?

6        A.    Closer, yes.

7        Q.    And I'm sorry, I interrupted your discussion.   I

8    believe you were taking us through the list.   I believe you

9    discussed plot size.   What about plot location?

10       A.    Plot locations, he -- Mr. Long did lay out a

11   systematic grid of 25 plots, 25 of these 100-acre plots,

12   which is a good design, but there were no GPS coordinates

13   provided for plot centers, at least he did not report any GPS

14   coordinates for those plot centers.   So, without that, you

15   have no way to go back and relocate that plot center.

16       Q.    What issues, if any, did you see with the general

17   field methods?

18       A.    The field methods, so, what the cruiser was asked

19   to do was to go out and locate the plot, however they did

20   that, and do a walk-around somewhere within the -- within the

21   100-acre circle.   First, there is no way to replicate the

22   walk-around.   We have no idea where they walked.   During that

23   walk-around, they were asked to hand draw boundaries on a map

24   of the condition classes that they were encountering.   And,

25   again, these condition classes are needs planting or will

Trial
Blackfeet Tribe v. USA                                        8/23/2016

1    need thinning, and there were descriptions and various
2    classes that they were to look for and record.  And in order
3    to help them decide which condition class an area fell in,
4    they carried with them a PVC pole for which they could lay it
5    on the ground and spin it around and -- excuse me -- count
6    the number of seedlings that occurred within that fixed area
7    to key them into the right condition class it should be coded
8    as.
9           Well, what I look for there is where did they take
10   these measurements, where did they lay that pole down, how
11   many places and where specifically did they do it so an
12   independent person could come out and replicate the
13   estimates, the measurements that they took.  I did not see
14   individual estimates recorded.  I have no -- there's no
15   record of the number of these little area PVC plots that they
16   took, or where they took them.  It's not in the design
17   protocol, and it's not in the writeup.
18          The issue that comes up there is it raises a
19   question of bias in that if you don't have specific locations
20   that you can go back to, you cannot verify the counts that
21   were taken to support the condition class that was labeled
22   for that hand-drawn unit.
23   Q.   And turning to that next item on your list, Dr.
24   Droessler, was there a confidence level specified?
25   A.   There was no confidence level specified in his

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1    report.

2         Q.    Were there any check cruising standards developed

3    or reported on?

4         A.    No.   There was no predetermined check cruising

5    standards mentioned in his report, and no check cruising was

6    done.

7         Q.    And I believe you may have already addressed this

8    in your early response, but any issues with the plot centers

9    as they were described in Mr. Long's report?

10        A.    The plot centers, to my knowledge, were not

11   monumented.   At least there is no mention that they were

12   monumented.   And, again, without GPS coordinate and without

13   monumentation, there is no way to come back and precisely

14   locate where they were.

15        Q.    Do the deficiencies you've just been discussing

16   undermine the reliability of Mr. Long's results in your

17   opinion?

18        A.    Yes.   There are several issues that arise that

19   relate to a bias in the condition class selections recorded,

20   and no way to know the variability since there was no check

21   cruise results, and no way to go back and independently

22   verify.

23        Q.    Overall, how would you characterize Mr. Long's

24   inventory design and sampling methods for his condition class

25   work?

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1        A.    Overall, it was a poor design.

2        Q.    In terms of whether it was subjective, objective,

3    do you have an opinion?

4        A.    Yes.  I would say it was subjective.

5        Q.    According to the information Mr. Long provided in

6    his report, were there any quality control checks used to

7    ensure that the condition class estimates reported were

8    verifiable and accurate?

9        A.    None that I could make out.

10       Q.    What effect does the lack of quality control checks

11   have on Mr. Long's condition class estimates?

12       A.    There's simply no way to judge the variability in

13   the estimates that you would expect.

14       Q.    What effect does not following the standard

15   protocols that you've outlined for us in implementing cross-

16   checks have on the data collected or the reported

17   observations?

18       A.    I simply couldn't trust the information from that

19   inventory.

20       Q.    Dr. Droessler, is experience preparing forest

21   inventories a substitute for relying on standard sampling

22   protocols?

23       A.    Experience is not a substitute for it.  Experience

24   is very helpful in working through those design elements and

25   choosing the best methods and techniques and measurements to

1    take.

2        Q.   Is a forest biometrician's opinion an acceptable

3    substitute for following standard protocols to ensure that

4    the sampling was reliable?

5        A.   No.

6        Q.   In other words, if Mr. Long's opinion is that

7    standard protocols were not required because he is

8    experienced in preparing forest inventories, is that

9    sufficient assurance that his methods were reliable in your

10   opinion?

11       A.   No.

12       Q.   With your 28-plus years of experience as a forest

13   biometrician, would you have followed standard protocols in

14   installing the inventory that Mr. Long undertook?

15       A.   If I designed the inventory, I would have followed

16   the standard elements that I've just talked about.

17            MS. DRAPER:   I have nothing further, Your Honor.

18            THE COURT:   All right.

19            Cross examination?

20                      CROSS EXAMINATION

21            BY MR. GRAYBILL:

22       Q.   Good afternoon, Mr. Droessler.

23       A.   Good afternoon.

24       Q.   My name is Ben Graybill.  I represent the Blackfeet

25   Tribe in this case.  So, you just testified that if you'd

Trial

1    been asked to design a precommercial thinning and planting

2    inventory, you would have followed a different set of

3    standards than Mr. Long.  Is that correct?

4         A.   I wouldn't -- I would have followed the same

5    standards, the same elements, but I would have designed a

6    very different inventory.

7         Q.   Okay.  Were you asked to design a precommercial

8    thinning and planting inventory?

9         A.   I was not.

10        Q.   Are you aware of whether or not any precommercial

11   thinning and planting inventory was done in this case other

12   than Mr. Long's?

13        A.   I am not.

14        Q.   And, so, in fact, there is no data from any other

15   inventory to compare Mr. Long's to, correct?

16        A.   That's correct.

17        Q.   Okay.  You are simply criticizing Mr. Long's

18   reliability based on looking at the design of his inventory,

19   correct?

20        A.   Correct.

21        Q.   Have you actually gone out in the field and

22   conducted inventories?

23        A.   I have.

24        Q.   Okay.  Does that include a planting and thinning

25   inventory?

Trial
Blackfeet Tribe v. USA                                    8/23/2016

```
 1      A.   Yes.
 2      Q.   Okay.  And in this particular case, all Mr. Long
 3 was doing essentially, and his crew essentially, was counting
 4 trees in these plots to determine if planting was needed
 5 because not enough trees were present, or thinning was needed
 6 because too many trees were present.  Isn't that true?
 7      A.   That's correct.
 8      Q.   That's about as simple an inventory as anybody
 9 would have to design when it comes to forest metrics, isn't
10 that right?
11      A.   There are all kinds of very simple inventories that
12 can be done.
13      Q.   Counting trees is one of them.
14      A.   Yes.
15      Q.   Okay.  The only other questions I have concern the
16 volume of net board feet of timber that you calculated in the
17 forest that burned in the Red Eagle Fire.  And the obvious
18 is, first, that your estimate is larger than Mr. Long's
19 estimate.  Yours is 59 million roughly board feet, and his is
20 a little under 42 million board feet, correct?
21      A.   That sounds correct, yes.
22      Q.   Okay.  So, the thing that I'm interested in that
23 I'm wondering whether or not it accounts for the difference
24 is the two different defect rates that you each used.  You
25 used a 5.6 percent defect rate, correct?
```

Trial

1       A.    That's correct.

2       Q.    And that was the visible defect rate, is that

3    right?

4       A.    It was the estimate that came out of the 2007

5    Sawyer report, and they used wording something like this was

6    the appropriate defect for the inventory.

7       Q.    So, you don't know whether it was a scale defect or

8    the visual defect.  You don't know what kind of defect rate

9    it was?

10       A.    It was the defect estimate that they applied to the

11    CFI plot inventory.

12       Q.    There are different kinds of defect rates, right?

13       A.    There are, yes.

14       Q.    Okay.  One is a visual defect rate where you're

15    cruising through the forest and you can see the defect in the

16    timber and you can make an estimate.  Is that a visual defect

17    rate?

18       A.    Defect that you can see is visible defect, yes.

19       Q.    There's another kind of defect rate called a scale

20    defect rate, where you're actually at the mill, and the mill

21    is telling you based on what it's seeing as it mills the

22    timber what the defect rate is, correct?

23       A.    That's correct.

24       Q.    Okay.  So, let's go to -- and you don't have it in

25    front of you.  Hopefully, you'll be able to see it on the

Trial

1   screen.  Plaintiff's Exhibit 65, page 58, it's 65-58.  And
2   the only reason I'm on this page is to show you, sir, that
3   down at the bottom there's a heading called the Cut
4   Calculation.  Do you see that?
5       A.   I see it.
6       Q.   All right.  And then if you go just two pages
7   further, we're still talking about the cut calculation, and
8   we go to 65-60.  And by the way, let me just step back.  You
9   understand that this is the 2007 Blackfeet Forest inventory
10  that was prepared by Pete Sawyer.
11      A.   Yes, I do.
12      Q.   Okay.  And, so, you go to the third paragraph on
13  65-60, and halfway down, Mr. Sawyer says, "If we harvest on a
14  100 year rotation as proposed, approximately 511 acres will
15  come under management each year.  Total gross volume removed,
16  at 9,192 board feet per acre for 511 acres is nearly 4.7
17  million board feet."
18           And then he says, Using 1 defect factor based on
19  the inventory along with a known scaled defect of the Red
20  Eagle salvage sale is 30 percent, we end up with an IAC of 3-
21  point -- 32.8 or 3.3 million board feet net.  Do you see
22  that?
23      A.   I see that.
24      Q.   So, when it comes to determining the cut
25  calculation, and you're going to know this answer, and I,

Trial

1   frankly, don't know the answer, was Mr. Sawyer here using a

2   30 percent defect rate?

3        A.   He did use the 30 percent defect rate.

4        Q.   Okay.  I'm just curious, why did you use the 5.6

5   defect rate when the Sawyer inventory used a 30 percent

6   defect rate for the cut calculation?

7        A.   Because the cut calculation is an entirely

8   different exercise than working with inventory at a point

9   estimate in time.

10       Q.   And how is that, sir?

11       A.   Because it -- the cut calculation is dealing with

12  merchantable timber on out into the future, not what you

13  currently have.

14       Q.   Okay.

15       A.   And what was currently there is best estimated by

16  that 2004 CFI inventory.

17       Q.   Okay.  Even though he is using a defect rate that

18  is specific to the Red Eagle Fire salvage, with regard to the

19  cut calculation?

20       A.   Yeah.  The 30 percent is -- seems to be pulled out

21  of thin air in that part of the Sawyer report.  I mean, it's

22  there, but -- and they say that it came from a combination of

23  inventory along with known scale defect from Red Eagle

24  salvage sales.

25       Q.   Are you critical of Mr. Sawyer's reliability, as

```
 1   well, sir?
 2   A.    I'm saying this is an --
 3         MS. DRAPER:  Objection.
 4         THE WITNESS:  -- allowable cut calculation.
 5         MR. GRAYBILL:  That's all I have, Your Honor.
 6         THE COURT:  All right.
 7         MS. DRAPER:  Just a very few questions, Your Honor.
 8         THE COURT:  All right, redirect.
 9                    REDIRECT EXAMINATION
10         BY MS. DRAPER:
11   Q.    Dr. Droessler, for comparison purposes, what would
12   an inventory system look like designed according to the
13   standard protocols for the exercise that Mr. Long undertook?
14   A.    Okay, the condition class inventory?
15   Q.    Yes.
16   A.    I would use a much smaller plot size, something,
17   you know, in the neighborhood of a fiftieth of an acre, and I
18   would have a lot of plots.  So, I would lay them out,
19   hundreds of plots using a systematic grid with a random
20   start, and that's what I would use.  So, there would be tree
21   counts taken at each of those small plots -- a single tree
22   count.  And then each of those plots represents some -- gets
23   expanded into the sum acres.  Each plot, say, represents 10
24   acres or 20 acres or whatever it would end up to be based on
25   how many of those grid points or plots there were.
```

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1        Q.    And, finally, Dr. Droessler, in your opinion, is
2    Mr. Long's planting and thinning estimate reliable?
3        A.    I don't believe it is.
4        Q.    And is that based on the factors you've already
5    discussed here this afternoon?
6        A.    Yes.
7             MS. DRAPER:  Nothing further, Your Honor.
8             THE COURT:  All right.  Anything further, Mr.
9    Graybill?
10            MR. GRAYBILL:  Just a very brief couple of
11   questions.
12            THE COURT:  Okay.
13                      RECROSS EXAMINATION
14            BY MR. GRAYBILL:
15       Q.    Mr. Droessler, Mr. Long's plot locations were
16   stated in his exhibits, correct?
17       A.    They were shown in his exhibits.
18       Q.    Well, I understand you testified that you couldn't
19   determine his plot centers, but you could determine where his
20   plots were, right?
21       A.    A 100-acre plot shown on a map, you could probably
22   position yourself somewhere on that 100 acres, yes, from the
23   map.
24       Q.    So, were you ever asked to go out and check the
25   reliability of Mr. Long's work?

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1       A.    I was not.

2             MR. GRAYBILL:  That's all I have, Your Honor.

3             THE COURT:  All right.

4             Dr. Droessler, thank you very much for your

5    testimony.  You may step down.

6             MR. BAIR:  Your Honor, the United States calls Mr.

7    Roy Montgomery.

8             THE COURT:  All right.

9             MR. BAIR:  May I ask permission for Ms. Moore to

10   approach the witness with some exhibits, Your Honor?

11            THE COURT:  Sure.

12            Good afternoon.

13            THE WITNESS:  Good afternoon, Your Honor.

14   Whereupon,

15                        ROY MONTGOMERY

16   called as a witness, having been first duly sworn, was

17   examined and testified as follows:

18                      DIRECT EXAMINATION

19            BY MR. BAIR:

20       Q.   Good afternoon, Mr. Montgomery.

21       A.   Good afternoon.

22       Q.   Ms. Moore just handed you three of Defendant's

23   exhibits, Numbers 135, 141, and 151.  Are these the expert

24   reports you prepared in this case?

25       A.   They look like it, yes.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1      Q.   Let's start off by talking about your

2   qualifications.  Do those reports -- or at least your initial

3   report -- contain your resume?

4      A.   Yes.

5      Q.   And is that a full and complete copy of your

6   resume?

7      A.   Yes, it is.

8      Q.   Okay.  Let's talk about your qualifications.

9           THE COURT:  Mr. Bair, could you give me those

10  exhibit numbers once more?

11          MR. BAIR:  Oh, my apologies, Your Honor.  It's Mr.

12  Montgomery's three reports, Defendant's Exhibits 135, 141,

13  and 151.

14          THE COURT:  Thank you.

15          MR. BAIR:  My apologies, Your Honor.

16          BY MR. BAIR:

17     Q.   Could you please tell me about your educational

18  experience, Mr. Montgomery?

19     A.   I have a bachelor of science degree in forest

20  management from Oklahoma State University.

21     Q.   After obtaining your bachelor's degree, did you

22  then enter service with the Federal Government?

23     A.   Yes, I did.

24     Q.   And specifically, did you then work for the Bureau

25  of Indian Affairs?

Trial

1      A.   Yes, I did.

2      Q.   What -- I understand you held multiple positions

3   there, but overall, what years were you employed with the

4   Bureau of Indian Affairs?

5      A.   I started to work with the Bureau of Indian Affairs

6   in 1962, and I continued to work with the Bureau of Indian

7   Affairs in several locations, out in New Mexico, Oregon,

8   Wyoming, and Montana, up until 1978.

9      Q.   And in those approximately 16 years, what kinds of

10   positions did you hold?

11      A.   I started out as a forester, worked -- most all my

12   work was fieldwork in forestry.  And I -- in 1966, when I

13   moved to the Wind River Reservation in Wyoming, I became

14   agency forest manager.  After about six years at the Wind

15   River Reservation, I transferred to the Flathead Reservation

16   as a fire management officer.  After a couple of years, I

17   transferred into what was known then as the Billings Area

18   Office; it's now known as the Rocky Mountain Regional Office,

19   and I worked there for a period of years until 1978.

20      Q.   And during that period, were you involved in land

21   management decisions?

22      A.   I was involved in forestry management decisions,

23   yes.

24      Q.   And were you also involved in designing and

25   implementing fuel treatments?

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1      A.   I designed and implemented several fuel treatments
2  in some of those locations.
3      Q.   After leaving the BIA, did you then enter service
4  with the U.S. Bureau of Land Management?
5      A.   I did.
6      Q.   And what years were you employed with BLM?
7      A.   As I say, I transferred over in 1978, and I
8  continued with the Bureau of Land Management in Montana and a
9  couple of locations in Montana, transferring to Oregon in
10  1985, and into the Oregon State Office in 1988.  And I
11  retired there in 1997.
12      Q.   In total, what years were you employed by the BLM?
13      A.   From 1978 until 1997.
14      Q.   And continuously from the early 1960s through 1997,
15  you were employed by the United States Department of the
16  Interior; is that true?
17      A.   That's correct.
18      Q.   Let's talk about your BLM work in a little more
19  detail.
20      A.   What kinds of positions did you hold with the
21  Bureau of Land Management?
22      A.   Well, the first position I had was the state fire
23  management officer in Montana and it also included a district
24  in the Dakotas.  I was reassigned to a resource area manager
25  job in Lewistown, Montana in 1980.  That job is -- has

1   responsibility for a division of a BLM district with

2   responsibilities for management of a multiple-use program

3   within that resource area.

4        Q.   So, what did your typical duties involve in those

5   roles?

6        A.   Starting with the state fire management officer?

7        Q.   Please.

8        A.   I had responsibility for oversight of all of the

9   fire management programs within -- I believe there was, as I

10  recall, four districts within Montana and the Dakotas at that

11  time.  And that involved responsibility for fire preparedness

12  and the fire protection program, including suppression.  It

13  included fuels management.

14       Q.   And what did your duties involve once you moved to

15  the resource management officer roles?

16       A.   That involved a multiple use program that included

17  a range program, recreation program, forestry, wildlife.

18  There was a minerals program within the district and a realty

19  program that I had responsibility for.  And I -- although I

20  didn't have direct fire management responsibilities, I

21  provided oversight to a fire management staff that was

22  centralized within the district.  I provided oversight for

23  those activities within my resource area.

24       Q.   And, finally, what did your duties involve in your

25  role in the Oregon and Washington BLM state office?

1408

Trial

1    A.    Okay, when I left Lewistown, Montana, I moved to
2    Roseburg, Oregon as a resource area manager there.  I had the
3    same kinds of responsibilities with a different type of
4    program, different -- it was a multi-use program, but it was
5    heavily oriented toward forestry, forest management.  And I
6    had responsibility for all the disciplines within my resource
7    area there, including forestry, the fuels management program,
8    wildlife, fisheries, recreation.
9    Q.    And then you retired in 1997.
10   A.    I retired in 1997.
11   Q.    So during your roughly 35 years of employment with
12   the Department of the Interior, did you gain expertise in
13   forest management?
14   A.    Yes, I did.
15   Q.    Did you become familiar with Department of the
16   Interior policies?
17   A.    Yes, I did, that was ever in effect at that time.
18   Q.    Did you become familiar and gain expertise in fire
19   behavior?
20   A.    Yes, I did.
21   Q.    And did you gain expertise in the ecology of the
22   Northern Rockies?
23   A.    I did while I was in Montana, yes.
24   Q.    While you were employed with the Federal
25   Government, did you also serve in a wildland firefighting

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1    role?

2         A.   Yes, I did.  That was one of the things that you

3    were expected to participate in with the Bureau of Indian

4    Affairs as a forester.  So, I got my training and

5    firefighting experience initiated and progressed up through

6    the ranks and became qualified at various positions.

7         Q.   And let's talk about those positions.  Did you ever

8    become qualified as a commander of incident management teams?

9         A.    Yes, I became qualified as a Type 2 incident

10   commander and held those qualifications for approximately 12

11   years.  And then I became qualified as a Type 1 incident

12   commander and had held those qualifications for perhaps 15

13   years.

14        Q.   Have you continued working since you retired from

15   federal service?

16        A.   Yes, I have.

17        Q.   How so?

18        A.   Well, in the year 2000, I started my own consulting

19   business dealing with wildland fire management issues.

20        Q.   And what sort of work do you do in that consulting

21   business?

22        A.   Well, I have done a variety of work.  Initially, I

23   was able to get contracts with the Forest Service and BLM to

24   do various kinds of fire management work for them in the area

25   of program analysis, evaluations, leading test forces to

Trial

Blackfeet Tribe v. USA                                                8/23/2016

```
 1   address certain issues that they wanted addressed.  And then
 2   I also participated in wildland fire suppression, not in a
 3   tactical sense, but in support roles on the incidents.
 4        Q.   And in your work as a consultant since 2000, have
 5   you continued to maintain your familiarity with new
 6   developments in forest management?
 7        A.   Yes, I have.
 8        Q.   And in fuels management?
 9        A.   Yes, I have.
10        Q.   And in fire suppression?
11        A.   Yes.
12             MR. BAIR:  Your Honor, we offer Mr. Montgomery as
13   an expert in those topics:  forest management, fuels
14   management, and fire suppression.
15             THE COURT:  All right, any voir dire?
16             MR. GRAYBILL:  No objection.
17             THE COURT:  All right.  The Court will accept Mr.
18   Montgomery as an expert in the areas proffered.
19             MR. BAIR:  Thank you, Your Honor.
20             BY MR. BAIR:
21        Q.   Mr. Montgomery, let's talk about your opinions and
22   first lay out what some of those are.  Did you submit an
23   initial report in this case?
24        A.   Yes, I did.
25        Q.   And did that initial report reach conclusions about
```

Trial

Blackfeet Tribe v. USA                                           8/23/2016

1   the fuels management programs of the BIA and to a lesser
2   extent the Glacier National Park?
3        A.   The BIA and then the Blackfeet Reservation, yes.
4        Q.   I see.  Thank you, Mr. Montgomery, for the
5   clarification.
6             Broadly speaking, what other topics were addressed
7   in your initial report?
8        A.   I did an assessment of their fire management
9   programs in terms of their fire management planning.  That's
10  one of the areas that I looked at.  And I looked at the
11  effects of their forest management program, their timber
12  sales program, and their -- the types of activities that were
13  performed in that program and its effect on the health and
14  well-being of the forest.
15       Q.   And did you also submit two rebuttal reports in
16  response to the opinions rendered by Mr. Darrell Schulte?
17       A.   I did.
18       Q.   Okay.  So, we'll be talking about all of those
19  issues today, but let's talk -- start by talking about your
20  assessment of the BIA's Blackfeet Agency fuels program.  And
21  to that, we should start by talking about fire history.
22            Did you become familiar with the history of
23  wildland fires in the Blackfeet Tribal Forest?
24       A.   Yes, I did.  I looked at the fire occurrence
25  history on the Reservation and did an analysis of the fires

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    that had -- the large fires that had occurred for the last --
2    since about 1940.
3         Q.   And although your analysis may have focused on
4    large fires, did you also examine smaller fires in the tribal
5    forest?
6         A.   Yes, I did.
7         Q.   And is that history, both large and small fires,
8    fully discussed in your initial report.
9         A.   Yes, it is.
10        Q.   Let's talk about some of the highlights.  What did
11   you find when you examined the history of major fires in the
12   Blackfeet Tribal Forest?
13        A.   Well, I found that looking at some of the history
14   documents for the Reservation that they -- in 1940, they had
15   a record of a fire that occurred then.  And from 1940 on
16   forward, up until the Red Eagle Fire in 2006, there were
17   seven large fires that occurred during that period of time.
18        Q.   Out of those seven fires, did any of them spread
19   from Glacier National Park to the Blackfeet Forest?
20        A.   There was -- the Napi Peak Fire was one that spread
21   from the Blackfeet Reservation.  The 1940 fire was one that
22   spread from the Lewis and Clark National Forest.
23        Q.   So let's talk about the Napi Peak Fire.  Before you
24   began your research for this case, were you already familiar
25   with that fire?

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      A.   Yes.

2      Q.   How?

3      A.   I was the incident --

4           THE COURT:  Did you mean to say that it spread from

5    Glacier National Park?  The Napi fire?

6           THE WITNESS:  The Napi Peak Fire started just

7    inside the Glacier National Park boundary and spread onto the

8    Reservation.

9           THE COURT:  Okay, I think maybe you misspoke, but

10   thank you for the clarification.

11          THE WITNESS:  I'm sorry.  I'm sorry, Your Honor.

12          MR. BAIR:  Thank you, Mr. Montgomery.  And thank

13   you for the clarification, Your Honor.

14          BY MR. BAIR:

15     Q.   Were you personally familiar with the Napi Peak

16   Fire before you began your research for this case, Mr.

17   Montgomery?

18     A.   Yes, I was.

19     Q.   How?

20     A.   I was the incident commander that went in there

21   with an incident management team to manage that fire.

22     Q.   Tell us a little bit about that fire.

23     A.   Well, when I arrived, I received a briefing from

24   the agency administrator, and I was told that the fire

25   originated on the Glacier National -- just inside the Glacier

Trial

1    National Park, a few feet, and then spread onto the Blackfeet

2    Reservation.

3          Q.   Now, you just said a few feet.  Could you clarify

4    that?

5          A.   Well, I was told that it was somewhere in the

6    neighborhood of 50 to 100 feet inside the boundaries where it

7    started.

8          Q.   So, the fire started inside Glacier but only just

9    inside Glacier?

10         A.   Yes.

11         Q.   Okay.  And could you tell us generally about that

12   fire, its behavior, its extent?

13         A.   Well, it -- I think when it initially spread onto

14   the Reservation it had come under the influence of at least

15   moderate winds.  They weren't extremely high-speed winds, but

16   there was enough fire intensity that it spread onto the

17   Reservation and burned approximately 1000 acres.  Most of

18   that had burned by the time that I arrived there with my

19   incident management team, but we were able to get a

20   containment on that at approximately 1000 acres.  And that

21   was after about ten days, two weeks on that fire.

22              And we had declared containment on it, and we were

23   in the process of demobilizing my incident management team to

24   turn it over to an organization set up to continue with the

25   mop-up and so forth.  And one of those extreme wind events

Trial

1    that's typical of that area hit about midnight one night, the

2    night before that we were to depart the fire.  And there was

3    no problem during that night.  The winds were in the

4    neighborhood of 50 to 70 miles an hour, starting around

5    midnight.  I remember it very well because it tore the camp

6    up.  And the next morning, we still had no fire visible in

7    the fire area.  So, we thought we'd escaped the winds there.

8              The winds had died down about daybreak and

9    continued to blow in the 20 to 30 mile an hour range

10   throughout the morning, and we were very anxious about what

11   was going to happen.  We were getting reports from

12   firefighters that we had up on the fire, and there was no

13   visible fire anywhere.  But about noon or shortly after noon,

14   the fire blew out and it ended up skirting around the

15   northern flank of the fire and burned a couple more thousand

16   acres, as I recall.

17        Q.   So, to clarify, although you and your team thought

18   the fire was contained at approximately 1000 acres, winds

19   then led to the fire breaking containment and burning several

20   thousand more.

21        A.   That's right.

22        Q.   Let's move forward to the years just before the Red

23   Eagle Fire.  In your research, did you become familiar with

24   the 2002 Fox Creek Fire?

25        A.   Yes, I'm familiar with the location and how it

Trial

Blackfeet Tribe v. USA                                         8/23/2016

1   burned.

2          Q.   So, tell us just a little bit about that fire.

3          A.   Well, it was another one of those fires that came

4   under the influence of high winds, and those winds were

5   influential in the acreage burned on that fire.

6          Q.   In your research, did you find that high winds were

7   a common factor to the large fires burning within the

8   Reservation?

9          A.   Yes, I did.

10         Q.   And were those fires all stand-replacement fires?

11         A.   Yes, they were.

12         Q.   Okay.

13         A.   To some degree.  And after the winds hit them,

14   anyway.

15         Q.   And with the exception of the Napi Peak Fire, did

16   you find any other fires that had crossed the boundary

17   between Glacier National Park and the Blackfeet Reservation?

18         A.   Not until the Red Eagle Fire.

19         Q.   We've been talking about large fires.  Did you also

20   do research into small fires that burned within the

21   Reservation?

22         A.   Yes.

23         Q.   And what were -- first, what was your basis for

24   that research?

25         A.   I looked at the fire occurrence maps and their

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    records of fires, and also looked at their fire management

2    planning analysis.

3          Q.    And what did you find about small fires?

4          A.    Well, it showed that during the period in which

5    they analyzed for that fire management planning analysis that

6    fire occurrence during a ten-year period, 1994 through 2003,

7    there were 680 fires within the Reservation, and all of those

8    except the Napi Peak Fire had alleged -- 1994 through 2003,

9    so that was before, but all of those fires were within the

10   boundaries of the Reservation.

11         Q.    Now, did any of those smaller fires become larger

12   fires?

13         A.    Some of them were larger fires.  Those were mostly

14   out in the rangelands.

15         Q.    So, based on what you learned through your

16   research, what would you say was the primary fire threat

17   faced by the Blackfeet Tribal Forest?

18         A.    It's the fires that originate within the boundaries

19   of the Blackfeet Reservation.

20         Q.    I see.  And based on that conclusion about the fire

21   threat, what sort of fuel treatments would you expect a

22   prudent forest manager to implement?

23         A.    I would expect them to treat the fuels within the

24   boundaries of the Reservation.

25         Q.    Okay.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1       A.    Let's take a look at Defendant's Exhibit 124.

2             May I approach the witness, Your Honor?

3             THE COURT:  Sure.

4             MR. BAIR:  Mr. Anderson and Mr. Graybill have been

5       extremely gracious in letting us use their large copy of this

6       exhibit.

7             BY MR. BAIR:

8       Q.    What is this exhibit, Mr. Montgomery?

9       A.    This is -- this shows the locations of the fuel

10      treatments that have taken place on the Reservation.

11      Q.    Okay.  And tell us a little bit about what you see

12      in this map of those fuel treatments?

13      A.    Well, they were focused within areas that had

14      either been harvested in timber sales and had regenerated,

15      and their approach was to go in to those cutting units and

16      treat the fuels that had regenerated and reached age --

17      approximately 15-year-old trees.

18      Q.    Now, a moment ago, you expressed an opinion about

19      what a prudent forest manager would have done to respond to

20      the fire threats the Reservation faced.  Do you believe that

21      this history of fuels treatments is consistent with that?

22      A.    I think it is.  It -- well, it creates a mosaic

23      that creates -- those treatments create a more resilient

24      forest stand within those areas.

25      Q.    Now, let's be very clear.  Would these fuel

1419

Trial

1   treatments be effective against every potential fire the

2   Reservation could have faced?

3        A.   No.  I think it would be effective against your low

4   to moderate-intensity fires, but it would not be effective

5   against high -- high-wind-speed fires that are driven by high

6   wind speeds.

7        Q.   And were these fuel treatments effective against

8   the Red Eagle Fire?

9        A.   No.  The fire -- the Red Eagle Fire -- either

10  burned around them, spotted over them.  Anyway, some of them

11  were burned in the fire; some of them survived the fire.

12       Q.   But were these fuel treatments an appropriate

13  response to the fire threats that the Reservation did face

14  typically?

15       A.   I feel it was.

16       Q.   Okay.  Let's go on and discuss your opinions in

17  rebuttal to Mr. Schulte's proposal and his opinions.  And

18  specifically let's start by talking about how both Glacier

19  National Park and the Blackfeet Reservation are managed.

20  Last week, did you observe Mr. Soleim's testimony about

21  Glacier National Park's management policies?

22       A.   I did.

23       Q.   And generally speaking, do you agree with how he

24  characterized those policies?

25       A.   Yes.

Trial

1      Q.    Let's talk about some of them in particular.  Are

2   you familiar with Glacier National Park's policy of managing

3   large parts of the Park as wilderness?

4      A.    Yes.

5      Q.    Tell us about that.

6      A.    Well, the management of the Park as a wilderness

7   puts certain kinds of restrictions on fire suppression

8   activities that can be performed, specifically related to use

9   of mechanized equipment.

10     Q.    And would those same policies also apply to

11  implementing fuel treatments or specifically fuel breaks?

12     A.    Yes, I believe they would.

13     Q.    Okay.  Do you -- well, actually, let's move on from

14  this and talk about the policies governing the Blackfeet

15  Reservation.  Are there limitations on what forest management

16  activities can be undertaken where in the Blackfeet Tribal

17  Forest?

18     A.    There is some restrictions, one of those being in

19  Class 1 -- along Class 1 streams, areas that are designated

20  as stream buffers.  It runs 100 feet on both sides of those

21  Type 1 -- Class 1 streams, and that precluded -- they

22  prohibit all forest management activities within those, at

23  least they did at that time.

24     Q.    Was that changed later, by the way?

25     A.    It was changed later in -- I think it was the 2009

Trial
Blackfeet Tribe v. USA                                      8/23/2016

1    forest management plan.

2         Q.    Aside from the stream buffer restrictions, were

3    there other restrictions in the 1997 forest management plan

4    that are relevant to your opinions about Mr. Schulte's

5    proposed fuel break?

6         A.    Yes.   The forest management plan had designated

7    viewsheds, and these were established to address tribal

8    priorities, to protect the visual quality of those areas.

9         Q.    So, let's stop there for a moment.   Could we take a

10   look at Defendant's Exhibit 6?   Do you recognize this

11   document, Mr. Montgomery?

12        A.    Yes.

13        Q.    Can we zoom out, Megan, and zoom in on the last

14   "whereas" clause there.

15              Does this document discuss some of those

16   limitations that you just mentioned?

17        A.    That's leading up to what they say.   I think if we

18   move on to the next page, it would address it.

19        Q.    Okay, yeah, let's move to the first "therefore"

20   clause on page 2.

21        A.    That previous paragraph addresses some of their

22   concerns and why they have established these other

23   restrictions.

24        Q.    And what were those concerns?

25        A.    Could we back up to that, please?

Trial

Blackfeet Tribe v. USA                                              8/23/2016

1       Q.    Yeah, certainly.

2       A.    Yeah, it talks about the aesthetic beauty of the

3    Reservation and their interest in protecting those.  It also

4    mentions the streams and protecting the quality of the

5    watersheds and the quality of the water.  And then it goes

6    into the next page.

7       Q.    And in response to those concerns, did the Tribe

8    make recommendations?

9       A.    This, and the next page there.

10      Q.    So, on page 2 of this document, what does the Tribe

11   recommend?

12      A.    Well, they -- in addition to declaring a moratorium

13   on commercial clearcutting on the Reservation, they talked

14   about restricting that in terms of timber harvests which have

15   an adverse impact on the aesthetic routes of the Blackfeet

16   Reservation, as well.  And that's along the Highway 89 that

17   traverses the Reservation there, I think is what that refers

18   to.

19          And they also -- and then they made some exceptions

20   to the moratorium that they -- involving disease-infected

21   areas and insect and mistletoe-damaged areas that are within

22   the forest.  And number three there talks about that they

23   will -- that the Blackfeet Tribal Business Council and the

24   forestry staff will meet from time to time to talk about how

25   those -- how that direction will be implemented to protect

Trial

Blackfeet Tribe v. USA                                         8/23/2016

1    the natural environment, the aesthetic beauty, and natural

2    ecosystems of the Reservation.

3        Q.    And do you know whether these concerns and

4    recommendations resulted in action in the forest management

5    plan?

6        A.    They did.  It resulted in the designation of

7    viewshed areas, and it also resulted in the designation of

8    highway scenic corridors along the Highway 89.

9        Q.    Let's talk about those viewshed areas.  Could we go

10   to Plaintiff's Exhibit 26 at page 6, please.

11             Page 6, please.  The paginated page 6.

12             Actually, I may have the wrong number here, but

13   let's just, if you could, Mr. Montgomery, describe what some

14   of those specific limitations in viewsheds were.

15       A.    Can that be enlarged?

16       Q.    Oh, I see, excellent.

17       A.    It's kind of fuzzy.

18       Q.    There we go.  My apologies.  I had the wrong page

19   there.  We're now on paginated page 3.  If we could look at

20   heading five for Aesthetics.  Does this discuss some of the

21   limitations on activities affecting the visual quality of

22   Highway 89?

23       A.    Yes.

24       Q.    Okay.  And is this in accord with the Tribe's

25   wishes for preserving the aesthetic quality of that highway?

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1     A.    Yeah.

2     Q.    And if we move forward to page 62, please.

3   Actually, I think we may have the wrong document here.   My

4   apologies, Mr. Montgomery.  Could you just tell us what some

5   of the limitations on activities within those viewsheds were

6   in the 1997 forest management plan?

7     A.    Well, the restrictions on the viewsheds were that

8   timber harvest operations were restricted there and that only

9   selective marking of trees that are in imminent threat of

10   mortality from insects and diseases could be harvested.

11     Q.    And, so, the only harvest that could take place

12   would be for individual trees at risk.

13     A.    Yes.

14     Q.    Okay.  And we can move on from this and talk about

15   one other issue raised in your report, which is funding.  Did

16   you hear Mr. LaPlant's testimony last week about BIA funding

17   practices for fuel treatments?

18     A.    Yes.

19     Q.    And do you agree with the way Mr. LaPlant

20   characterized those funding policies?

21     A.    That was my understanding, yes.

22     Q.    Could you tell us a little bit about how the BIA,

23   circa 2006 and the years before then, prioritized funding for

24   fuel treatment projects?

25     A.    Well, early on, when they had first initiated the

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    fuels program, they were able to utilize hazardous fuel

2    treatment funding to treat these forest fuels that we saw in

3    the previous map, but after about the year 2000, those

4    priorities changed to place priority emphasis in wildland

5    urban interface areas.

6          Q.   And if we can back up just for a moment to the

7    viewshed issues, my colleagues have just saved me here.  This

8    is Defendant's Exhibit 26 -- Plaintiff's Exhibit 26, page 62.

9    Does this describe those viewshed activity restrictions you

10   were just describing?

11         A.   Yes, that's out of the forest management plan.

12         Q.   Okay.  So, let's move on and discuss how all of

13   these issues would affect Mr. Schulte's proposed fuel break.

14   First, let me ask you, what do you understand Mr. Schulte's

15   proposal to be?

16         A.   Well, they changed as time went on.  His initial

17   proposal was to convert areas of Fuel Model 10 to Fuel Model

18   8 by treating the crown fuels, but he also talked about

19   thinning to a 14-foot crown spacing.

20         Q.   Okay.  And, so, in analyzing whether the issues

21   we've just discussed would be relevant to his proposal, how

22   did you understand his proposal to be at that time?  Did you

23   understand -- what I'm driving at is did you understand it to

24   include that thinning proposal?

25         A.   Yes.

Trial

1    Q.   But would some of these issues still apply

2    regardless of whether thinning is required?

3    A.   Yes.

4    Q.   So, let's describe these specifically.  First, let

5    me ask you, do you believe it would have been prudent for the

6    forest managers of Glacier National Park and the Blackfeet

7    Tribal Forest to construct Mr. Schulte's fuel break prior to

8    the Red Eagle Fire?

9    A.   No.

10   Q.   Why not?

11   A.   Well, because that wasn't the area that was the

12   primary threat, for one thing.  The primary threat to the

13   Reservation from fire was from fires that originated within

14   the boundaries of the Reservation.  And there were some

15   constraints on being able to do that.  They wouldn't have

16   been able to conduct those activities required to construct

17   that fuel break.

18   Q.   So, let's talk about that specifically.  Do you

19   believe that Glacier National Park's management policies

20   would have created an impediment to implementing this

21   proposal on the Park side of the boundary?

22   A.   Yes.  The wilderness management practices that they

23   have on the Park would have prevented the use of any kind of

24   mechanized equipment to construct that.

25   Q.   And when you say mechanized equipment, what do you

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1   mean?

2       A.   Well, chainsaws are one of the issues.  This -- to

3   construct this fuel break would have required a removal of

4   some mature, overmature timber, which is your larger timber,

5   so it would almost certainly require removal of that using

6   perhaps dozers, skidders, or something to remove that

7   material from the area.

8       Q.   So, in your opinion as an expert in forest

9   management, do you believe there would be any way to

10  implement these changes while still maintaining consistency

11  with those wilderness management policies?

12      A.   Well, the National Park Service has a process that

13  they have to go through to analyze such projects.  It's

14  called minimum requirement analysis process, and after going

15  through that, I guess that's their determination process

16  there.

17      Q.   And after reviewing this proposal and those

18  policies, do you believe that the two are likely consistent

19  with each other?

20      A.   I don't think it would have allowed the project to

21  proceed.

22           MR. BAIR:  May I approach the witness with a

23  demonstrative, Your Honor?

24           THE COURT:  Sure.

25           BY MR. BAIR:

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1        Q.    This is Defendant's Demonstrative 1.  Could you

2    tell me what this is, Mr. Montgomery?

3        A.    It identifies areas that are excluded from

4    commercial timber sales.

5        Q.    And my apologies, Mr. Montgomery.  If you could

6    speak a little more directly into the microphone, that would

7    be helpful.

8        A.    I'm sorry.  It looks like areas that have been

9    excluded from commercial timber sales within the Reservation.

10       Q.    Okay.  And does this include the areas subject to

11   the stream buffer restrictions that you described earlier?

12       A.    Yes, it does.

13       Q.    Okay.  And does this also include areas that are

14   designated as viewsheds?

15       A.    Yes, it has the viewsheds delineated as well.

16       Q.    And would those stream buffer areas first fall

17   within the area proposed for Mr. Schulte's fuel break?

18       A.    Certainly the one on Divide Creek.

19       Q.    Okay.  And would that create impediments to

20   implementing Mr. Schulte's proposal?

21       A.    Yes, it would.

22       Q.    How so?

23       A.    Well, there's no -- any kind of forest management

24   activities in there would have been prohibited.  They could

25   not have done any thinning.  They couldn't have run --

1429

Trial

1   operated any kind of equipment within that stream buffer

2   zone.

3       Q.   And would the restrictions within viewsheds --

4   well, first, are those viewshed areas within the area in

5   which Mr. Schulte proposes his fuel break?

6       A.   Yes, there is the one there.  I don't know if you

7   can see it there, but it's the -- it starts along Divide

8   Creek and -- and goes to the south toward Divide Mountain.

9       Q.   And would those viewshed restrictions create

10  impediments to implementing Mr. Schulte's proposal?

11      A.   Yes, it would.

12      Q.   How so?

13      A.   Well, there again, this was mature and overmature

14  timber within that viewshed, and it supported some of the

15  heaviest timber volumes within the Reservation based on the

16  forest inventory analysis.  That would have required some

17  pretreatment before they proceeded with the subsequent

18  thinning operations to create Mr. Schulte's fuel break, and

19  that would have required preparing a timber sale to remove

20  that.

21      Q.   A moment ago, we looked at a tribal resolution to

22  discuss the Tribe's stated preferences for management of the

23  forest.  Do you believe Mr. Schulte's proposal would be

24  consistent with the Tribe's preferences?

25      A.   No, because that would -- a timber sale in that

Trial

1   area to remove the mature and overmature timber that would be
2   required would have an adverse visual impact on the viewshed
3   area.
4            THE COURT:  Mr. Bair, why don't we take a 15-minute
5   break.
6            MR. BAIR:  Certainly, Your Honor.  Thank you.
7            THE COURT:  Reconvene at 3:15.
8            (Court in recess.)
9            THE COURT:  Please be seated.
10           All right, let's go ahead.
11           MR. BAIR:  Thank you.
12           BY MR. BAIR:
13      Q.   Mr. Montgomery, I have just one more topic I'd like
14   to discuss about the practicability of Mr. Schulte's proposed
15   fuel break.  Do you believe that Mr. Schulte may have
16   improperly used the benefit of hindsight in designing this
17   fuel break?
18      A.   Yes, because that's something that fire managers
19   don't have whenever they're planning these.
20      Q.   And how do you see the influence of hindsight in
21   Mr. Schulte's fuel break design?
22      A.   Well, it's clear that he looked at the fire
23   behavior that occurred on the Red Eagle Fire and then he
24   started designing his fuel break to accommodate that fire
25   behavior.  And he looked at -- not only looked at the crown

Trial

1    fire behavior that occurred but the spotting as well.  And

2    ended up designing his fuel break to be one mile wide, a half

3    mile on each side of the boundary.

4         Q.   And do you believe that a prudent forest manager

5    would have been able to exercise that same judgment without

6    specific knowledge of the Red Eagle Fire?

7         A.   No, you don't have that information available to

8    you.

9         Q.   Let's move on and talk about your opinions about

10   the efficacy of Mr. Schulte's fuel break.  What is a fuel

11   break designed to do?

12        A.   It's designed to alter the fuels within your fuel

13   break to allow fire suppression forces to take suppression

14   action on the fire.

15        Q.   So, we should talk in more detail, then, about

16   suppression and how it works.  What is wildland fire

17   suppression?

18        A.   That's the tactical operations that are taken to

19   stop the spread of the fire.

20        Q.   And what are some of those operations?

21        A.   Building a fire line is one of those things.

22        Q.   And are there also air forces involved?

23        A.   Well, you have -- those are the resources that are

24   utilized in suppression, but the primary -- if you're talking

25   about the firefighting resources, the primary resources that

Trial

Blackfeet Tribe v. USA                                8/23/2016

```
 1    you use there are fire line construction crews.  You have

 2    engines that can also be used, and dozers are used quite a

 3    lot on fires.  And then you have your air resources, which

 4    include helicopters and air tankers.

 5         Q.   And what are all of those forces trying to do when

 6    they attempt to suppress a fire?

 7         A.   They're working in concert to get a fire line

 8    constructed so that it will stop the spread of the fire.

 9         Q.   Is wildland firefighting dangerous?

10         A.   It's very dangerous.

11         Q.   How so?

12         A.   Well, if you don't pay attention to all the safety

13    risks and the hazards in firefighting, it's very easy for

14    firefighters to get trapped and overrun by the fire.

15         Q.   And how does that typically happen?

16         A.   Well, quite often it happens because of the

17    misjudgment on the part of firefighters, but it also occurs

18    due to events that suddenly happen and catch the firefighters

19    by surprise.

20         Q.   Now, when you say events, what do you mean?

21         A.   Well, you can get a sudden wind change, that's one

22    of the things that happens quite a lot.

23         Q.   Is the fire's behavior relevant to how dangerous it

24    is?

25         A.   Repeat that, please.
```

Trial
Blackfeet Tribe v. USA                                          8/23/2016

1        Q.    Is the fire's behavior relevant to the dangers that
2    firefighters face?
3        A.    Oh, that's the thing that gets you in trouble.  As
4    long as you have a low-intensity fire, you can pretty much
5    control things there.  But when you have extreme fire
6    behavior, then that imposes some risks that you really have
7    to prepare for.
8        Q.    Does that extreme behavior include crowning?
9        A.    Yes.
10       Q.    And does it also include spotting?
11       A.    Yes.
12       Q.    And what's the danger with spotting?
13       A.    Well, if you have firefighters deployed on the --
14   along the fire's edge, and you get a spot fire that goes over
15   the firefighters, it can start to burn back into them and
16   trap them between a spot fire and the main head of the fire.
17       Q.    Are there policies in place to help protect
18   firefighter safety?
19       A.    Yes, there are.
20       Q.    Tell us about those.
21       A.    Well, there are several of them.  One of them is
22   that you have a duty or a limitation.  That's referred to
23   as a two-to-one work ratio.  For every two hours of work,
24   you have to have one hour of rest during your operational
25   period, which is within the day.  There's length of

Trial

Blackfeet Tribe v. USA                                            8/23/2016

1   assignment limitations, and after 14 days on a fire, they

2   have to take -- they have to be released and take two days

3   off.  You also have requirements for safety zones and escape

4   routes on the fire.

5       Q.   And I may be getting the terms wrong here, are

6   there standard firefighting orders in place to protect

7   firefighter safety?

8       A.   Yes, there are ten standard orders.  And there's

9   also watch-out situations.

10      Q.   What is a watch-out situation?

11      A.   Well, those are situations that can happen on a

12  fire that you need to pay attention to, and you have to

13  constantly be looking for those things.  And if there's

14  something out there, you need to do an analysis.  And if it's

15  something that needs to be addressed, you have to mitigate

16  it.

17      Q.   A moment ago, you mentioned safety zones.  What is

18  a safety zone?

19      A.   A safety zone is a place where firefighters can get

20  to in case the fire behavior becomes too extreme for them.

21  It gives them a chance to get out of the front of the fire.

22      Q.   And could a fuel break be a safety zone?

23      A.   No.

24      Q.   So, what is a safety zone?  What are you looking

25  for in identifying one?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1     A.    A safety zone -- a safety zone is a clearing
2    that's cleared of all the combustible material.  There are
3    standards for the size of a safety zone, and it's basically
4    four times the height -- you have to have a separation
5    between the fire and the firefighters themselves.  And the
6    radius of that safety zone has to be at least four times the
7    length of the -- maximum length of the flames.
8         And that's the standard on level ground without
9    wind.  And if you have steep ground and winds, you have to
10   compensate for those to increase the radius of the safety
11   zone.
12    Q.    All of these policies you've discussed -- the
13   orders, the watch-out situations -- is compliance with those
14   compulsory for firefighters?
15    A.    The ten standard orders are compuls- -- are
16   required.  You don't violate them.
17    Q.    I see.  In your preparation for the case, did you
18   familiarize yourself with the behavior and progression of the
19   Red Eagle Fire?
20    A.    Yes, I did.
21    Q.    Did you hear Mr. Soleim's testimony yesterday about
22   the fire's progression?
23    A.    Yes.
24    Q.    And do you believe that he described it accurately?
25    A.    Yes, he did.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1      Q.    Okay.  And is there a full history of the fire in
2    your initial expert report?
3      A.    Yes.
4      Q.    Did you see the video that Mr. Soleim introduced
5    yesterday?
6      A.    Yes.
7      Q.    I'd like you to look at some excerpts from that
8    video, focusing on the 29th of July, and tell us what's
9    happening.  And perhaps we should start on the morning of
10   July 29th, 2006.  What was happening at 10:00 a.m. and what
11   had happened leading up to this?
12     A.    Well, you heard -- you saw this video yesterday,
13   and Mr. Soleim talked about the deployment of the smoke
14   jumpers and the air tankers there.  And you also heard him
15   say that they were ineffective in the initial attack.  There
16   were no firelines constructed during initial attack because
17   by the time six smoke jumpers arrived the fire had grown
18   beyond their capability to have any effect on it.  And
19   without the ground forces there to reinforce the retardant
20   drops, there was no chance that they would be effective.
21         So, you saw that yesterday.  And as you look at the
22   video, starting here today, you'll see that this is starting
23   in the morning, and you'll see that the fire is under an
24   inversion layer, and that's a layer of air -- of warm air
25   over a cooler air, and it creates a layer over the fire

1   itself that holds down the heat.  And, so, the fire intensity
2   early in the morning is -- it's not burning with any high
3   intensity.  But as we get into the video, you'll see that
4   that changes.
5        Q.   So, let's begin playing a short clip from this
6   video, beginning at 10:00 a.m. on the 29th of July.  And, Mr.
7   Montgomery, feel free to describe what we're seeing here.
8        A.   Okay.  The next morning, they did a helicopter
9   reconnaissance around 10:00 a.m., and they found that the
10  fire had spread to approximately one mile northeast of Red
11  Eagle Lake.  And they estimated the size to be 2200 acres.
12  What you're seeing now is the fire size at about noon, and
13  the inversion layer has lifted, and you're starting to see
14  smoke rise as the day -- as the temperature warms up during
15  the day.  And you're starting to see a little bit of effects
16  of winds on this.
17       Q.   So let's continue watching from noon on.
18       A.   Here you can see the effects that the winds are
19  having as the fire builds in intensity.
20            Okay.  This is at 3:00 p.m. approximately, and at
21  this time, you had sustained south/southwest winds at 20, 25
22  miles per hour.  And you saw the effects of that as it built
23  up to this particular time in the video.  Relative humidity
24  had dropped down low to -- into the low twenties, and the
25  fire behavior is starting to become extreme with sustained

Trial

Blackfeet Tribe v. USA                                          8/23/2016

```
 1    wind-driven crown fire.  And this was classed by the fire
 2    behavior people out there as wind-driven, dependent, and
 3    independent crown fire.
 4         Q.    And what does an independent crown fire mean again?
 5         A.    An independent crown fire -- well, I might mention
 6    dependent first of all.  It's crown fire that is dependent on
 7    fire -- the heat that's generated from burning of the surface
 8    fuels.  And an independent crown fire is the fire that's in
 9    the crowns but it's spreading with the influence of the
10    winds, without influence from the surface fuels.  And as long
11    as those winds continue to blow and -- it carries the heat
12    into the adjacent crowns, and it maintains that crown fire
13    independent of the surface fuels.
14         Q.    So, would you characterize the fire's behavior as
15    of 3:00 p.m. as extreme?
16         A.    Yes.
17         Q.    Was the fire inside the Blackfeet Tribal Forest
18    yet?
19         A.    No.
20         Q.    Do you know approximately how far away it was?
21         A.    It was probably -- I would guess that it's probably
22    three miles.
23         Q.    Okay.  So --
24               THE COURT:  Mr. Montgomery, are you referring to a
25    document of some kind in giving this testimony?
```

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1          THE WITNESS:  Yes, I am.

2          THE COURT:  And what is that?

3          THE WITNESS:  It was a fire behavior analyst's

4    documentation of the fire behavior that occurred on that day.

5          THE COURT:  Is it one of the exhibits in our case?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8          THE WITNESS:  It's not a -- it's not -- I don't

9    recall.  It's not an exhibit for the Defendants, but it's an

10   exhibit to my report.

11         BY MR. BAIR:

12   Q.    And if I may, Mr. Montgomery, do you also have some

13   brief notes about the fire's progression in front of you to

14   cue your memory?

15   A.    Pardon me?

16   Q.    Do you also have some notes about the fire's

17   progression to cue your memory in front of you?

18   A.    Yes, as far as the time frames.

19         MR. BAIR:  We'd be happy to disclose those if you'd

20   like, Your Honor.

21         THE COURT:  Yeah, just make sure the Plaintiff gets

22   a copy.

23         MR. BAIR:  We'll make sure we do.

24         THE COURT:  Thank you.

25         BY MR. BAIR:

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1      Q.   And I'm sorry, Mr. Montgomery, do you have any

2    other documents with you today?

3      A.   All I have is the guides for constructing fire --

4    the safety zones.

5           MR. BAIR:  We're happy to disclose that, as well,

6    Your Honor.

7           THE COURT:  All right, very well.

8           BY MR. BAIR:

9      Q.   So, as of 3:00 p.m., were there suppression forces

10   in the area of the boundary between the Park and Reservation?

11     A.   I don't -- I'm not aware of any on the boundary,

12   no.

13     Q.   What were the available suppression forces doing at

14   this time?

15     A.   On the 29th, there were no suppression forces that

16   were available to be deployed on the fire.  They were -- they

17   were mobilizing structure protection resources to provide

18   protection around the community of St. Mary.

19     Q.   Okay.  So, would their goal in that role be to

20   protect structures?

21     A.   Yes.

22     Q.   And also to protect human life?

23     A.   Yes.

24     Q.   Okay.  So, let's move on from 3:00 p.m. in the

25   video.  Please tell us what we're seeing here, Mr.

Trial

1    Montgomery.

2          A.    You can see the continued influence of the winds as

3    they increased and carried the fire to the northeast toward

4    St. Mary and the Reservation boundary.

5          Q.    And it's a little hard to see the timestamp here,

6    but do you know approximately what time it is in the video?

7          A.    It looks like it's about 4:00 p.m.

8          Q.    And can you tell us anything about the fire's

9    behavior from what you see here?

10         A.    Well, you can see some intense flame lengths there,

11   and you can see the black smoke, which is the result of the

12   intense fire behavior.

13         Q.    Okay.  And let's go ahead and watch the rest of the

14   brief video.

15         A.    It continues to spread to the northeast, and you

16   can see the intense fire behavior with the flame lengths that

17   were occurring there.  These were estimated to be 100 to 150

18   feet.  In one case, they estimated that they were in excess

19   of 150 feet.

20         Q.    And are those typical of the conditions that the

21   fire would have -- the behavior that the fire would have been

22   exhibiting at the time it would have reached Mr. Schulte's

23   fuel break, if such a fuel break were in place?

24         A.    Yes.

25         Q.    So, tell us, do you believe that Mr. Schulte's

Trial

Blackfeet Tribe v. USA                                                                      8/23/2016

1    proposed fuel break would have allowed for effective

2    suppression of the Red Eagle Fire?

3         A.   I don't believe it would.

4         Q.   Tell us why.

5         A.   Well, because of the crown -- the wind-driven crown

6    fire, the winds were carrying the flames through the crown,

7    so you had the winds keeping the crown fire heat moving from

8    crown to crown, and it would have continued to spread through

9    that crown.  You had spotting that was up to a mile ahead of

10   the fire, and this was documented in the fire behavior

11   analyst report.  And, so, it would have spotted across the --

12   the fuel treatment.

13        Q.   Do you believe the topography would have presented

14   safety risks for the firefighters?

15        A.   They were -- if they had been -- first of all, if

16   the fire had not laid down, you would never deploy those

17   firefighters ahead of the fire because that's one of the

18   watch-out situations.  You don't put firefighters out ahead

19   of the fire when it's burning with that intensity.  And in

20   this case, they would not have had the safety zones, and

21   escape routes would have been questionable as well.

22        Q.   Would it have been possible to implement those

23   safety zones?

24        A.   Not ahead of this.  If that fire was spreading at

25   the spread rates that you've observed here, they wouldn't

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    have had opportunity to construct those because there's no

2    natural safety zones that would be adequate.

3         Q.   Do you believe that the limited availability of

4    suppression resources would have presented issues to

5    suppressing this fire?

6         A.   Not in my opinion, because I believe the fire

7    behavior would have continued with a level of intensity that

8    you wouldn't have been able to deploy firefighters out front.

9         Q.   And even if the fire's behavior had moderated

10   somewhat, would there have been sufficient available

11   suppression resources?

12        A.   It would have had to almost lay down and stop

13   spreading in order to utilize the few resources that were

14   starting to arrive.

15        Q.   Are you familiar with Dr. Finney's FARSITE modeling

16   of Mr. Schulte's proposal?

17        A.   Yes.

18        Q.   Does his modeling accord with your expectations for

19   the fire's behavior and how it would have affected

20   suppression?

21        A.   Yes, I agree with Dr. Finney.

22        Q.   Is there anything specific in his report that is

23   relevant to your opinion?

24        A.   Yes.  In his modeling, he showed the fire continued

25   to spread through the fuel break.  He showed that there was

Trial

1     spotting, and he also showed that the -- that the flame

2     lengths were anywhere from 20 to 60 feet and that the -- and

3     that the fire breached the fuel break rather quickly.

4          Q.    Now, 20 to 60 feet is a lot less than 150 feet.

5     Would that still have presented safety issues?

6          A.    Yes, it would, because it's still a crown fire

7     that's high intensity.  It's just not as intense as what

8     you've been observing.

9          Q.    Is there anything that we haven't discussed that's

10    relevant to your opinion about whether this fire could have

11    been suppressed in Mr. Schulte's proposed fuel break?

12         A.    Nothing more than just to emphasize the safety

13    issues that would have been involved here, in addition to

14    having firefighters out in front of an intense fire that was

15    burning under the influence of these winds as it approached

16    the fuel break, you would have had to deploy firefighters up

17    on -- by the timberline on Divide Mountain.  They would have

18    been building fire line down-hill, and that's another watch-

19    out situation.

20         Q.    So, in sum, do you believe this fire could have

21    been attacked by firefighting forces in a way that would

22    prioritize firefighter safety?

23         A.    I don't think so.

24         Q.    Do you believe that any reasonable fuel break would

25    have allowed for effective suppression of this fire?

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      A.    I don't believe so.

2      Q.    Okay.  Now, during your work on this case, have you

3  become familiar with the area burned by the Red Eagle Fire?

4      A.    I'm sorry, say --

5      Q.    Have you become familiar with the area burned by

6  the Red Eagle Fire?

7      A.    Yes, I have.

8      Q.    After a fire like this, how would you expect the

9  ecosystem to respond?

10      A.    Well, initially, you're going to get your grasses

11  and your shrub species come in, but because there's a lot of

12  lodgepole pine, there are lodgepole pine stands, as well as

13  scattered lodgepole pine in the spruce and subalpine fir

14  stands, and lodgepole pine thrives on stand-replacement fire

15  by releasing seeds.  So, you get good regeneration of

16  lodgepole pine.  So, I've seen good regeneration of lodgepole

17  pine in those areas.  And in some areas, you have some spruce

18  that is regenerating.

19      Q.    So, to be clear, have you visited the Red Eagle

20  Fire burn area?

21      A.    Yes, I have.

22      Q.    And have your observations of that regeneration

23  matched what you would expect?

24      A.    Yes.

25      Q.    Let's take a look at Figure 12 from Mr.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    Montgomery's initial report, which is a photo of the burn

2    area.  Tell us about what we see here, Mr. Montgomery.

3         A.   Well, what -- you see those grasses and the heavy

4    lodgepole pine regeneration.

5         Q.   And if we look at Exhibit -- I'm sorry, Figure 14

6    from Mr. Montgomery's initial report, what do we see here?

7         A.   This is an aspen stand that was burned through, and

8    this is a typical response of those aspen stands.  It will

9    kill the trees, but aspen is a prolific sprouter when fire

10   kills the main tree.

11        Q.   Ecologically, is the area burned by the Red Eagle

12   Fire recovering from the fire in the way you'd expect?

13        A.   Yes, it is.

14             MR. BAIR:  We have no further questions.  Thank

15   you.

16             THE COURT:  All right.

17             Cross examination?

18             MR. GRAYBILL:  May I approach, Your Honor?

19             THE COURT:  Yes.

20             MR. GRAYBILL:  This is a bundle of exhibits that we

21   may or may not get to.

22                       CROSS EXAMINATION

23             BY MR. GRAYBILL:

24        Q.   Good afternoon, Mr. Montgomery.

25        A.   Good afternoon.

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1      Q.   You know me by now.  You've been at the trial, I
2   think, from the beginning; isn't that right?
3      A.   That's right.
4      Q.   Okay.  I'd like to start with your resume.  So, if
5   we could go to your report at page -- let's see, it's
6   Defendant's Exhibit 135.  And I think it starts around 135-
7   113.  Is that right?
8      A.   Yes.
9      Q.   And do you have it there?
10      A.   Yes.
11      Q.   And we'll probably be able to bring it up here at
12   some point.  In any event, let me go on, and then we'll work
13   out these issues.  You have it in front of you?
14      A.   Yes, I do.
15      Q.   I want to -- I want to take a look at your
16   employment history first.  It appears from your employment
17   history wildfire suppression is a large component of it; is
18   that correct?
19      A.   It's a significant part of it, yes.
20      Q.   Okay.  I think you testified that as part of your
21   work at the BIA and the BLM you engaged in some fuels
22   management, correct?
23      A.   That's correct.
24      Q.   I think you testified that you designed some fuels
25   treatment when you worked for the BIA, correct?

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1        A.    That's correct.

2        Q.    And that would have been before 1980?

3        A.    Yes.  Yes.

4        Q.    Okay.  In any event, after that, my sense from

5    reading the resume is that as a fire officer you were more

6    focused on suppression and suppression preparedness when you

7    were working for the BLM; is that correct?

8        A.    That was a key aspect of it, but I also was

9    initiating a fuels management program in some of the BLM

10   districts.  And I worked with the fire management officers in

11   those districts to initiate that.

12       Q.    When you say you were initiating them, does that

13   mean you were designing them?

14       A.    We were -- I was helping them design them, lay them

15   out, and helping them implement.

16       Q.    And where were they?

17       A.    One of them was in Miles City District; another one

18   Lewistown District.

19       Q.    And what kind of cover type are we talking about?

20       A.    These were in ponderosa pine -- along the Missouri

21   Breaks area.

22       Q.    Okay.  How big an area?

23       A.    Missouri Breaks is a big area.  Our fuels

24   treatments were designed more like a landscape treatment.  We

25   were using prescribed fire to not only reduce the fuels in

Trial

1    these ponderosa pine stands but also to improve the health of

2    the stands.

3          Q.    And that was when?

4          A.    That would have been 1979 and -- 1978, '79.

5          Q.    Okay.  So, it's fair to say that other than what

6    you've just described, most of your career with the BLM as a

7    fire officer has been focused on suppression and suppression

8    preparedness?

9          A.    No, there was -- when I moved into the -- well, in

10   -- when I moved to the Roseburg District, one of the major

11   programs within my resource area was the forestry program.

12   And it involved treatment of logging slash from all of the

13   clearcutting that was done.  We had -- I don't recall the

14   exact number of acres that we were treating using broadcast

15   burning in those areas, but I was responsible to see that

16   those were conducted and conducted properly.

17         Q.    But you just said that -- you used the term

18   "broadcast burning," and you used the term "logging slash,"

19   that you were burning logging slash.  You don't use broadcast

20   burning to burn logging slash, do you?  Or is that a

21   situation where you were doing that?

22         A.    When you have clearcuts, like we had there in the

23   Roseburg District, you -- were weren't piling any of that.

24   We were using broadcast burning internally.

25         Q.    Okay, so you were burning the slash after the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

1   clearcut?

2       A.    After the timber harvest, yes.

3       Q.    Similar to what Dr. Finney was talking about

4   earlier today where you do a clearcut and then burn.

5       A.    Yes.

6       Q.    Is that right?

7       A.    And that's to dispose of the fuels, but also

8   seedbed preparation.

9       Q.    Okay.  Well, let's go to the examples of litigation

10  consultant work, which is at page 135-113, page 109 of your

11  report.  And, actually, probably if we start on page 110, and

12  as I look through this, I see that with regard to litigation

13  consultant work, you appear to be focused on origin and cause

14  investigations regarding fire suppression strategies,

15  wildland fire personnel issues, adequacy of prescribed fire

16  planning and implementation, suppression cost, overall

17  management of a fire.  These don't appear to be related to

18  fuels management; is that correct?

19      A.    Several of the cases, while fuels management may

20  not be described in there, fuels management was one of the

21  issues that had to be addressed in the cases.

22      Q.    Okay.  Well, let's go on to your wildland

23  firefighting experience on page 111 of your resume -- or of

24  your report, I should say.  And this indicates that -- some

25  of what you've already talked about, that you have

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1    firefighting experience as an incident commander; you're

2    familiar with prescribed fire; wildland fire and emergency

3    training instructor; you attended wildland fire training.

4    Within this section of your resume, Wildland Firefighting

5    Experience, there is no fuels management experience stated;

6    is that correct?

7         A.   This is strictly fire suppression experience that's

8    listed here.

9         Q.   Okay.  Is it safe to say that in the latter part of

10   your career the focus has been suppression and fuels

11   management has not been nearly as much of an issue in the

12   latter half of your career?

13        A.   What are you calling latter half?

14        Q.   All right, that's a good point, sir.  After you

15   started with the BLM.

16        A.   No.  As state fire management officer, I had

17   responsibility for the programs that were being implemented

18   in 11 BLM districts.  And --

19        Q.   Let me just stop you.  When you say programs, are

20   you talking about fuels management programs?

21        A.   Fire management programs that included fuels.  When

22   those -- the fire management programs within the BLM

23   districts involved not only the preparedness and all those

24   aspects of making sure that you're prepared to suppress the

25   fires that occur in suppressing those fires, but the fire

Trial

Blackfeet Tribe v. USA                                           8/23/2016

1    management officers are also responsible for the fuels

2    management programs within the districts.

3         Q.   I see.  And, so, then, as part of your work with

4    the BLM, you were actively planning fuels managements in the

5    various units that you were responsible for, and I take it

6    you did that in order to protect those units, that land, from

7    being impacted by wildland fire?

8         A.   Yes.

9         Q.   Okay.

10        A.   Some of it was -- some of it was for restoration

11   purposes.  That also means protecting an area from fire.

12        Q.   And, so, you would agree with me that in order to

13   effectively protect forestlands from wildland fire, planning

14   is a key component, correct?

15        A.   Very much so.

16        Q.   And you would agree with me that evaluating the

17   risks of wildland fire with regard to the lands that you're

18   responsible for is a key component to protecting those lands.

19        A.   Yes.  You look at what your threats are and you

20   address those threats.

21        Q.   So, after you've evaluated the threats and you've

22   planned to meet the threats in some way, another key

23   component is to actually implement a plan?

24        A.   Yes.

25        Q.   Okay.  So, let me ask you about some issues that

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1    you just discussed with Mr. Bair.  You indicated in your

2    testimony that fire coming from Glacier National Park was not

3    the primary threat to the Blackfeet Forest.  Is that right?

4         A.    That's correct.

5         Q.    Okay.  So, had you been a forest manager for the

6    Blackfeet Forest, you would have -- as you just described,

7    one of the things you would have done is evaluate the risks

8    to the forest, correct?

9         A.    I'm sorry, would you clarify your question?

10        Q.    One of the things that you just described that you

11   did with the BLM is evaluated the risk of fire to the forest

12   or to the lands you were protecting, correct?

13        A.    Correct.

14        Q.    And in doing that for the Blackfeet Tribal Forest,

15   you would have known, I take it, that the vast majority of

16   fires that originate on the Reservation, that are ignited

17   within the Reservation boundaries, are extinguished at less

18   than ten acres, correct?

19        A.    That's correct.

20        Q.    You would also have known that there were very

21   substantial fire suppression resources located on the

22   Reservation to fight fires that ignited on the Reservation,

23   correct?

24        A.    I'm aware of the resources that were available on

25   the Reservation.

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1      Q.    And they're substantial, aren't they?

2      A.    Yes.  When -- as long as there's nothing happening

3   elsewhere and they aren't dispatched to other fires.

4      Q.    Well, are you critical at all of the BIA for under-

5   resourcing the fire cache on the Blackfeet Reservation?

6      A.    I didn't say that.

7      Q.    Okay.  You're not critical of the BIA for that

8   reason, are you?

9      A.    No.

10      Q.    Okay.  And, so, we just saw this video.  We've seen

11   it a couple of times now, of a very intense fire moving

12   across the Glacier Park landscape towards the Blackfeet

13   Reservation, correct?

14      A.    That's correct.

15      Q.    Okay.  That kind of fire scenario is not a scenario

16   that would allow for control through suppression of that

17   fire, at least absent some sort of fuels treatment; isn't

18   that true?

19      A.    Even a fuels treatment would not have had any

20   effect on that fire burning at that intensity.

21      Q.    Okay.  So, it's fair to say that fires that ignite

22   on the Reservation have suppression resources that can be

23   immediately or very quickly applied to them, and they

24   typically get put out.  But a fire coming from Glacier

25   National Park that is out of control like the one that we've

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1    seen in the video, your testimony is that that's a fire that

2    suppression, the kind of suppression resources on the

3    Blackfeet Reservation, would not be able to control, correct?

4        A.   That's correct.

5        Q.   So, isn't it true, then, that the primary threat to

6    the Blackfeet Reservation is the kind of fire that is coming

7    across the landscape that can't be controlled through

8    suppression?

9        A.   It's that kind of fire, but there's fires that can

10   originate within the boundaries of the Reservation, and if

11   they come under the same influence from strong winds as the

12   Red Eagle Fire, you could have the same outcome.  And there

13   have been fires that have had that outcome.

14       Q.   There's never been a fire that has burned as many

15   commercial timber acres as the Red Eagle Fire, correct?  On

16   the Blackfeet Reservation.

17       A.   I think that's correct, but you -- that's simply

18   because the winds didn't persist like they did under the

19   conditions that the Red Eagle Fire burned.

20       Q.   Okay.  My point is that large fires moving across

21   the landscape are a primary -- the primary threat to the

22   Blackfeet Reservation Forest, isn't that right?

23       A.   Fires that come under the influence of a strong

24   wind, such as the Red Eagle Fire did, have the potential to

25   burn large acres, and you're going to end up with stand-

1456

Trial

8/23/2016

1   replacement fire.

2        Q.   Okay.  And, so, part of the purpose of planning and

3   evaluating risks like a large, uncontrolled fire coming

4   across the landscape is to determine whether or not some form

5   of fuels reduction treatment can be implemented to control or

6   change that fire behavior, making it more susceptible to fire

7   suppression; isn't that right?

8        A.   In the absence of total removal of the fuels out in

9   front of that, you could not have created a reasonable fuel

10  break that would have influenced the Red Eagle Fire.

11       Q.   Can you see that, sir?

12       A.   Yes, sir.

13       Q.   Apparently, we don't have our screen.  Okay.

14            I'm going to refer you to Defendant's Exhibit 124,

15  and you talked about this in response to some of Mr. Bair's

16  questions.  First of all, you did not plan these fuel

17  reduction projects that are stated here, correct?

18       A.   That's correct.

19       Q.   And you didn't talk to anybody who did plan them in

20  preparing for your testimony?

21       A.   I talked to a person who was involved in some of

22  them.

23       Q.   And who was that?

24       A.   Ray Hart, who was the fuels specialist there for a

25  period of time.

Trial

1     Q.    Okay.  It's your testimony that these -- was it
2     your testimony that these are precommercial thinning
3     projects, or are they hazard fuel reduction projects?
4     A.    They were hazard -- classified as hazard fuels
5     reduction projects that involved thinning and disposal of the
6     thinning slash.
7     Q.    Okay.  And I think you testified that the Red Eagle
8     Fire burned around some of these.  Do you remember that
9     testimony?
10    A.    Some of them, yes.
11    Q.    And you also testified that the Red Eagle Fire was
12    -- that even though the Red Eagle Fire burned through this
13    area, some of these fuel hazard reduction projects survived.
14    Some of these -- the forests where this was done.
15    A.    Some of them survived, but some of them didn't
16    survive.
17    Q.    Okay.  The fact of the matter is that when this
18    large, out-of-control fire moved into the Blackfeet Forest,
19    there is evidence that these hazard fuel reduction projects
20    were effective and that some survived and the fire burned
21    around others.  Isn't that true?
22    A.    Some of them.
23    Q.    It's true, however, that there were no fuel
24    reduction treatment areas, landscape-sized treatment areas
25    along the border that would have potentially changed the

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    behavior of the Red Eagle Fire in the way that these fuel

2    reduction projects did that are on Exhibit 124?

3        A.    There were none right along the boundary, no.

4        Q.    Now, as I understand it, You indicated that -- you

5    stated in response to some of Mr. Bair's questions that it

6    would not have been prudent to do those kinds of treatments

7    along the boundary, the kind that Mr. Schulte is recommending

8    in this case, one, because fire coming across the border was

9    not the primary threat; and, two, because of certain

10   constraints.  Do you remember that testimony?

11       A.    Yes.

12       Q.    Will you agree with me that fire coming across from

13   Glacier Park would certainly be a major threat to the

14   Blackfeet Forest?

15       A.    It's one of the threats to the Blackfeet Forest.

16       Q.    It's one that a forest manager working for the BIA

17   responsible for the Blackfeet Forest would have to consider?

18       A.    You would have to consider it.

19       Q.    Okay.  Now, with regard to these constraints, as I

20   understand it, the first set of constraints were National

21   Park Service policies that would not have permitted the kind

22   of treatments that Mr. Schulte is proposing; is that right?

23       A.    That's my opinion, yes.

24       Q.    Okay.  You're not offering a legal opinion here,

25   though, are you, sir, with regard to whether or not National

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    Park Service policies take some sort of priority over trust

2    responsibilities that the BIA has?

3         A.   No.

4         Q.   You also indicated that some of these constraints

5    involved policies on the Blackfeet side, on the Blackfeet

6    Reservation, correct?

7         A.   It involved practices that were laid out in the

8    forest management plan.

9         Q.   Okay.  And the forest management plan that you're

10   talking about is the 1997 to 2006 forest management plan?

11        A.   Yes.

12        Q.   And that's a forest management plan that was

13   generated by the BIA, correct?

14        A.   It was generated by the BIA, and it integrated

15   tribal priorities and direction from the Tribal Council.

16        Q.   Okay.  Are you here to offer a legal opinion about

17   whether or not the BIA has the final word with regard to the

18   policies that are followed in terms of forest management or

19   the Tribe does?

20        A.   No.

21        Q.   Okay.  The fact of the matter is that the forest

22   management plan is a BIA-generated document; isn't that true?

23        A.   It is.

24        Q.   Okay.

25        A.   With -- in coordination with the Blackfeet Tribal

Trial

Blackfeet Tribe v. USA                                      8/23/2016

1    Council.

2        Q.    Okay.  You worked for the BIA.  Does the BIA, at

3    least when you were working for it, did it have authority to

4    determine what forest management policies were going to be

5    applied in tribal forests?

6        A.    There were certain requirements that had to be met

7    based on regulations -- laws and regulations, but we always

8    consulted with the Blackfeet Tribe in how we went about

9    implementing those.

10        Q.    Okay.  So, the BIA would consult with tribes.  Did

11    you actually work on the Blackfeet Reservation?

12        A.    I did.  I wasn't assigned to the Blackfeet

13    Reservation, but I've worked on the Blackfeet Reservation,

14    assisting them to do their work there from time to time.

15        Q.    And, so, based on that experience and based on your

16    review of the fire and forest management plans in this case,

17    would you agree with me that the BIA is the entity that

18    provides technical and formal and scientific information with

19    regard to management of the tribal forest?

20        A.    Yes.

21        Q.    Okay.  So, the BIA, in consulting, as you say, with

22    the Tribe, is the expert with regard to forest management;

23    isn't that right?

24        A.    They're supposed to be, yes.

25        Q.    And based on your review of the forest and fire

Trial

1    management plans, the Blackfeet Tribe, that was true with

2    regard to the Blackfeet Agency; isn't that right?

3        A.   I think so.

4        Q.   And, so, if there were policies that were in place

5    that made the Blackfeet Reservation less resilient to fire,

6    those policies would be based on the technical and scientific

7    information that the BIA either brought to bear or didn't

8    bring to bear in formulating the forest plan; isn't that

9    right?

10       A.   I'm not sure I understand your question.

11       Q.   So, is it your testimony in this case that there

12   were policies in the forest plan that made the Blackfeet

13   Forest less resilient to fire?

14       A.   For example?

15       Q.   For example, not harvesting or conducting fuel

16   treatments in reserve areas or stream buffer zones?

17       A.   The BIA at the Blackfeet Agency were responsive to

18   the Blackfeet Tribe's wishes in protecting those values that

19   they considered high priority.

20       Q.   As I understand your testimony in this case, you

21   believe that those policies -- reserve lands, stream buffer

22   zones, no harvesting, no hazard fuel reduction in those areas

23   -- made the Blackfeet Forest less resilient to fire.  Isn't

24   that true?

25       A.   It also addressed the multiple-use mandate that the

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1   BIA was operating under as well to protect those aesthetic

2   values and those things.

3        Q.   Yeah, that's not quite my question, sir.  My

4   question is is it your testimony in this case that the

5   prohibition against harvesting and fuel reduction projects in

6   reserve areas and stream buffer zones and the scenic byways

7   made the forest less resilient to fire.

8        A.   In those particular stands, they are more -- it --

9   they're less resistant to fire --

10       Q.   Okay.

11       A.   -- in some of your younger stands that develop

12   following timber harvest, yes.

13       Q.   Okay.  And, so, you would agree with me that if a

14   forest manager engages in management actions like harvesting

15   or hazardous fuel reduction, then on the Blackfeet

16   Reservation, that can, in fact, serve to protect --

17   potentially protect the forest from wildland fire.  Isn't

18   that right?

19       A.   You're saying timber harvest?  Is that what you're

20   referring to?

21       Q.   That's one of the management actions that I'm

22   talking about.

23       A.   Certainly, timber harvest helps to restore the

24   health of the forest and if other actions are implemented can

25   improve the health of the forest and increase the resistance

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    to fire.

2         Q.    Okay.  So, a forest manager shouldn't wait until

3    the forest is damaged by a wildland fire like the Red Eagle

4    Fire in order to take actions to protect the forest, correct?

5         A.    Well, you don't have the foresight to know when the

6    Red Eagle-type fire is going to occur, so you address the

7    threats that do exist -- the major threats that do exist.

8    And in the case of the Blackfeet Reservation, this was from

9    fires within the Reservation.

10        Q.    Okay.  Well, I understand that you're critical of

11   Mr. Schulte because he engaged in hindsight.  Would you agree

12   with me, sir, that forest managers are required to engage in

13   foresight in trying to determine risks that may affect or may

14   impact the forest from wildland fire?

15        A.    Yes.  You do your analysis to determine where the

16   risk is, and they did that through the fire management

17   planning analysis.

18        Q.    Okay.  And, so, one of the things that you want to

19   do is you want to decide whether or not these reserve areas

20   or the stream buffer zone areas actually present a greater

21   risk of fire damaging the Blackfeet Forest because they are

22   not subjected to harvesting or fuels treatment.  That's

23   something that a forest manager would want to think through,

24   correct?

25        A.    You want to be able to recognize those risks, yeah.

Trial

1      Q.    And you would want to tell the beneficial owner,

2   the Tribe, about those risks when the decision was made and

3   put into a policy not to harvest or not to engage in

4   hazardous fuel reduction in those areas.  Isn't that right?

5      A.    I think you would need to advise them of the

6   consequences of their requirements.

7      Q.    Okay.  So, you've indicated the constraints, and

8   it's largely these constraints that we've been talking about

9   on the Blackfeet side were part of the reason that the Red

10  Eagle Fire -- strike that.

11         That these constraints made the forest less

12  resilient to fire.  Sir, you -- and I think you alluded to it

13  in response to one of Mr. Bair's questions.  You realized

14  that after the Red Eagle Fire the policies with regard to the

15  reserve areas and the stream buffer zones changed, correct?

16     A.    I don't know that the policy changed for the

17  viewsheds, but it did change in the stream buffer zones.

18     Q.    And as a result -- as a specific result of the Red

19  Eagle Fire, harvesting and hazard fuel reduction is now

20  permitted in stream buffer zones; isn't that right?

21     A.    They've relaxed the restrictions on that based on

22  experience of having fires channeled through those buffer

23  zones before.

24     Q.    Well, it was the experience of the Red Eagle Fire

25  channeling through those areas, isn't that right, that caused

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    the change?

2        A.    That's correct.  And sometime I think you have to

3    experience it to recognize it.

4        Q.    Okay.  Well, those zones prior to the Red Eagle

5    Fire were not managed in terms of hazard fuel reduction,

6    correct?

7        A.    That's correct.

8        Q.    And forest managers knew at that time that not

9    managing the forest fuels could result in making the forest

10   more susceptible to a large wildland fire -- to being damaged

11   by a large wildland fire; isn't that right?

12       A.    Fuel treatments in the fuel types that you have on

13   the Blackfeet Reservation cannot be protected from a fire

14   such as the Red Eagle Fire with the extreme wind events that

15   you had.

16       Q.    Okay.

17       A.    And if you're trying to treat it for low severity,

18   moderate severity, then you can have some impact.

19       Q.    Okay.  I'm just talking about -- it's my

20   understanding that part of the reason you are critical of Mr.

21   Schulte is that fire coming across -- in your opinion, fire

22   coming across the border is not a primary threat, and there

23   are these constraints, both in Glacier Park and on the

24   Reservation, with regard to actually treating fuels.  And

25   we've talked about those, and I don't want to belabor it.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1       Let's go to the other reasons that you think that
2   the fuel break -- Mr. Schulte's fuel break would not be
3   effective.  My understanding is that because of the weather,
4   you believe that this fire could not have been suppressed,
5   the Red Eagle Fire, I mean.  Is that right?
6       A.   Until the wind subsided, no.
7       Q.   Until the wind subsided.  And that was sometime
8   after 2:00 a.m. on July 30th, correct?
9       A.   That was the time that the records show that the
10  wind subsided, humidity increased, and the fire dropped to
11  the ground.
12      Q.   Okay.  And I think you testified that in order to
13  deal with a fire like the Red Eagle Fire with regard to
14  applying suppression forces, the fire would have to drop to
15  the ground, correct?
16      A.   Yes.  You couldn't put forces out in front of a
17  wind-driven crown fire.
18      Q.   You certainly couldn't put forces out in front of
19  the Red Eagle Fire as it actually burned, true?  We agree on
20  that.
21      A.   That's true.
22      Q.   Right.  Okay.  So, you're familiar with Dr.
23  Finney's modeling, correct?
24      A.   Yes.
25      Q.   And you understand that in the model that he did

Trial

1    actually converting Fuel Model 10 forest to a Fuel Model 8
2    forest, the fire did drop to the ground, and the flame
3    lengths at that point were two feet.  You're familiar with
4    that?
5          A.   Under one of his earlier modeling efforts, yes.
6          Q.   Okay.  The modeling efforts that you were talking
7    about in responding to some of Mr. Bair's questions with the
8    20 to 60-foot flame lengths, those were models that Dr.
9    Finney ran that -- in which he did not treat the other cover
10   types, the other fuel types, that were in the treatment
11   areas, correct?
12         A.   That was a result of modeling utilizing what was
13   realistic fuel models in that area.
14         Q.   Are you a -- are you someone who performs FARSITE
15   modeling?
16         A.   I've never done FARSITE modeling.  I've used the
17   product.
18         Q.   Okay.  So, you understand that if some of the fuels
19   in a fuel treatment area are treated in FARSITE by converting
20   them to an FM -- from an FM 10 to an FM 8, but other fuels in
21   the treatment are not converted and are left untreated, those
22   fuel cover types that are untreated can act as corridors of
23   fire and spread the fire through the treatment; isn't that
24   true?
25              MR. BAIR:  Objection, Your Honor.  Excuse me.  Mr.

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1   Montgomery has not been qualified as an expert in fire

2   modeling.  And he's just testified that he doesn't have

3   expertise in using this program.  There's a foundational

4   issue here.

5           THE COURT:  Mr. Graybill?

6           MR. GRAYBILL:  Let me rephrase the question and see

7   if we can do it that way.

8           THE COURT:  All right.

9           BY MR. GRAYBILL:

10      Q.  Do you -- you reviewed Dr. Finney's modeling,

11  correct?

12      A.  I reviewed the results of his modeling.

13      Q.  Okay.  Did you read his report?

14      A.  I read through portions of his report.

15      Q.  He had two reports.  Did you read the second report

16  that had the modeling in it?

17      A.  Yes.

18      Q.  Okay.  And, so, here's my question.  Based on your

19  reading of that report and your understanding after reading

20  that report, do you recognize that the cases, the modeling

21  that he did that resulted in 20 to 60-foot flame lengths,

22  were the models where he didn't treat all of the fuels?

23      A.  I don't have an understanding of the process and

24  the procedures he used to model.

25      Q.  Okay.  If the flame lengths are dropped to two

Trial

Blackfeet Tribe v. USA                                         8/23/2016

1   feet, then you can apply suppression forces on a fire.  Isn't
2   that true?
3        A.   That's generally the case, yes.
4        Q.   Okay.  And, in fact, you can -- if they're two
5   feet, you can apply human suppression forces, not just
6   equipment, correct?
7        A.   Generally.
8        Q.   By July 30th, isn't it true that crews and engines
9   and dozers and helicopters had all begun to arrive on the Red
10  Eagle Fire?
11       A.   They had started to arrive, and they had a few
12  resources there.
13       Q.   By the 30th, all of those suppression sources that
14  I just named had begun to arrive, correct?
15       A.   What are you calling "all"?
16       Q.   Well, just the crews, engines, dozers, helicopters
17  --
18       A.   How many --
19       Q.   I'm sorry, those had all begun to arrive by the
20  30th, correct?
21       A.   Some had started to arrive, but I don't have the
22  numbers that you're talking about.
23       Q.   Well, I didn't mention any numbers, sir.  Why don't
24  we turn -- well, is it up?  Why don't we go to your report.
25  It's Defendant's Exhibit 135-34.  And --

Trial
Blackfeet Tribe v. USA                                            8/23/2016

 1          A.    I'm sorry, what's that number?

 2          Q.    It is -- at the bottom, there's a Bates stamp, that

 3    it should say 135-34.  It's page 30 of your initial report.

 4          A.    Thank you.

 5          Q.    And do you see there where it says, "By July 30th,

 6    crews, engines, dozers, helicopters, and fire overhead had

 7    begun to arrive"?

 8          A.    Yes.

 9          Q.    And then it says, "the ICS-209 for July 30th."

10    What's an ICS?

11          A.    That's a report that's produced that identifies the

12    situation on the fire in terms of various fire behavior

13    that's being experienced, as well the resources as they have

14    arrived.

15          Q.    Okay.  It goes on to say that "for July 30th ...

16    shows that 170 firefighting personnel, 13 engines, and two

17    helicopters had been assigned to the fire."  Do you see that?

18          A.    Yes.

19          Q.    And, so, assuming, sir, that a big fire like the

20    Red Eagle Fire, and it's coming across the landscape, does,

21    in fact, drop when it hits this composition change, the fuels

22    composition change in a landscape-level treatment, and the

23    flame lengths are reduced to two feet, then suppression could

24    actually get on the fire and potentially control it.  Isn't

25    that true?

Trial

Blackfeet Tribe v. USA                                                 8/23/2016

1      A.    Potentially, but it takes time to assign -- to get

2    those resources assigned.

3      Q.    Okay.  Sir, you -- excuse me.  You admit that the

4    BIA managers have always recognized the threat of fire

5    crossing from the Glacier National Park side onto the

6    Blackfeet Forest, correct?

7      A.    I don't know firsthand, but I would assume that

8    they realize that's a possibility, along with all the other

9    threats to the Reservation.

10     Q.    Okay.

11           (Brief pause.)

12           MR. GRAYBILL:  Your Honor, that's all I have at

13   this point.

14           THE COURT:  All right.  Thank you, Mr. Graybill.

15           Do you have any redirect, Mr. Bair?

16           MR. BAIR:  I do, Your Honor, briefly.

17           THE COURT:  Everybody always says briefly.

18           MR. BAIR:  This time, Your Honor, I believe I mean

19   it.

20                    REDIRECT EXAMINATION

21   BY MR. BAIR:

22     Q.    Mr. Montgomery, Mr. Graybill asked you earlier

23   whether wildland fire suppression is a large component of

24   your professional background.  Is fire suppression a large

25   component of federal fire policy?

Trial

Blackfeet Tribe v. USA                                            8/23/2016

1       A.    I'm sorry, could you repeat your question?

2       Q.    Is fire suppression a large component of federal

3    fire policy?

4       A.    Yes.

5       Q.    And is an understanding of fuel breaks relevant to

6    performing suppression?  Is it important to understand how

7    fuel breaks work to perform suppression?

8       A.    Absolutely.

9       Q.    And is understanding suppression important to

10   understanding how fuel breaks work?

11      A.    Yes.

12      Q.    Earlier today, you testified about various

13   requirements in the 1997 forest management plan.  Did the

14   Blackfeet Tribe's chairman sign that plan?

15      A.    I believe they did.

16      Q.    And does the plan reflect the Blackfeet Tribe's

17   stated wishes?

18      A.    As I understand them.

19      Q.    Typically, does BIA attempt to act in a way that

20   reflects tribes' wishes?

21      A.    I think they do.  There's tribal resolutions that

22   have been passed by the Tribe that identifies those wishes.

23      Q.    And even aside from the Blackfeet Agency, does the

24   BIA as a whole attempt to act in a way that's consistent with

25   American Indian tribes' interests?

Trial

1       A.    I think so.

2       Q.    And does doing that sometimes involve balancing

3   multiple priorities?

4       A.    Yes.

5       Q.    Is it sometimes reasonable for the BIA to

6   prioritize one value, such as scenic viewsheds, over other

7   values, such as fire resistance?

8       A.    I think it would depend on the circumstances and

9   what the level of risk was by doing that and how strongly the

10  tribe may feel about their priorities.

11      Q.    And to be clear, do you think the BIA Blackfeet

12  Agency did anything here knowingly increasing the risk of

13  fire?

14      A.    No, I don't believe they would

15      Q.    Let's talk about fuel treatments.  Earlier today

16  during cross examination you testified about some fuel

17  treatments that survived the Red Eagle Fire.

18      A.    Yes.

19      Q.    I'd like to ask one question first.  Were the

20  weather conditions necessarily the same when the fire reached

21  those fuel treatments as when the fire crossed the boundary?

22      A.    There were some things that were occurring there,

23  and it's documented in the fire behavior analyst report

24  about the influence of the topography and how it affected

25  the winds.  And while you can't absolutely determine that

Trial

1     those -- the topography and the influence that had on the

2     winds and then splitting up the fire front resulted in

3     survival of those areas that we're talking about.  I think

4     that, in my opinion, was probably a factor, and I know that

5     the fire behavior analyst report talks to that situation.

6          Q.    So, is it possible that the weather is a major

7     factor in why some of those fuel treatments survived?

8          A.    In my mind, it was.

9          Q.    Did the fire burn through the area previously

10    burned by the 2002 Fox Creek Fire?

11         A.    A portion of it.

12         Q.    Okay.  And that area had just burned a few years

13    earlier, hadn't it?

14         A.    2002.

15         Q.    And did that create a sort of natural fuel

16    treatment?

17         A.    Yes, to some degree, but there again, you had some

18    grass that had come in, and like Dr. Finney talked about,

19    that allowed some spread through there, as long as the winds

20    were pushing it.  But then when the wind subsided, I believe

21    that's when the spread through the Fox Creek Fire began to

22    subside.

23         Q.    Do you remember earlier today or perhaps yesterday

24    when Dr. Finney testified about a photo in Dr. Agee's paper

25    showing a fuel break that survived even as the fire burned

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    around it?

2          A.    Yes, I saw that.

3          Q.    Is whether a fuel treatment survives the measure of

4    its success?

5          A.    I know you have to look at what allowed it to

6    survive.  And that's what I was talking about just a moment

7    ago is there's no way of really knowing.

8          Q.    So, does the fact that a small number of fuel

9    treatments within the Reservation survived the Red Eagle Fire

10   show in any way that a fuel treatment could have stopped the

11   Red Eagle Fire from crossing the boundary?

12         A.    No.

13         Q.    You've testified that you don't think this fire

14   could have been suppressed, even with a fuel break in place.

15   Before you saw Dr. Finney's FARSITE modeling, did you have

16   opinions about whether Mr. Schulte's fuel break would have

17   been effective?

18         A.    Yes, I did.

19         Q.    Did you develop those opinions by applying your

20   decades of expertise to the facts of this case?

21         A.    Yes, I did.

22         Q.    Does Dr. Finney's modeling match your expectations

23   and predictions for how this fuel break would perform if it

24   were somehow implemented?

25         A.    Yes, it helped me to understand why it would not

Trial

1    have been effective.

2         Q.   But is Dr. Finney's modeling the sole basis for

3    your opinion that this fuel break would be ineffective?

4         A.   No.

5         Q.   Let's finish up by asking just a few questions

6    about the Reservation's fire history.  You testified during

7    your cross examination in response to Mr. Graybill's question

8    that the vast majority of fires within the Reservation are

9    extinguished at less than ten acres.  Is that true?

10        A.   Ninety percent of them, I believe, is the record.

11        Q.   So, that leaves approximately 10 percent that grow

12   larger than ten acres.

13        A.   Yeah, but that doesn't mean they're all large

14   fires.

15        Q.   Do small fires sometimes become big fires?

16        A.   Every fire starts small.

17        Q.   And historically, did some of those small fires

18   inside the Reservation become big fires?

19        A.   Yes.

20        Q.   Particularly when under the influence of strong

21   winds?

22        A.   Yes.

23        Q.   Can you ever predict those wind conditions in

24   advance, for instance, when designing a fuel treatment?

25        A.   Not when you're designing fuel treatments.

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1        Q.    Was the Fox Creek Fire one of those small fires
2   that became a big fire?
3        A.    Yes.
4        Q.    And could fuel treatments inside the Reservation
5   help keep small fires small?
6        A.    They can if you're dealing with low severity or
7   moderate severity perhaps fire conditions.
8        Q.    Was there a risk of fires crossing the boundary
9   from the Park to the Reservation?
10       A.    I'm sorry, would you repeat it?
11       Q.    Was there a risk of fires, particularly under the
12  influence of high winds, crossing the boundary from the Park
13  to the Reservation?
14       A.    There's always that risk.
15       Q.    In your view, was that the primary fire risk faced
16  by the Blackfeet Tribal Forest?
17       A.    No.
18       Q.    Exercising foresight and good judgment, could the
19  BIA have predicted when a fire like the Red Eagle Fire was
20  going to occur?
21       A.    No.
22       Q.    Do you believe that the BIA acted reasonably in
23  light of the Reservation's fire history and the fire risk the
24  Reservation faced?
25       A.    I believe they did.

Trial
Blackfeet Tribe v. USA                                    8/23/2016

1          MR. BAIR:  No more questions.

2          THE COURT:  Okay.  Anything further, Mr. Graybill?

3          MR. GRAYBILL:  It's going to take a long time.

4          THE COURT:  Oh, don't say that.

5          MR. GRAYBILL:  I'm just setting up your

6    expectations, Your Honor.

7          THE COURT:  That's impossible.

8          MR. GRAYBILL:  I'm going to try to be very brief,

9    Your Honor.

10                    RECROSS EXAMINATION

11         BY MR. GRAYBILL:

12    Q.    Mr. Montgomery, you just stated in response to a

13    question from Mr. Bair that the Blackfeet forest manager, BIA

14    forest manager, couldn't predict when a fire might come

15    across the border from Glacier Park, correct?

16    A.    That's correct.

17    Q.    But certainly, sir, you would agree that fire

18    managers for the -- and forest managers for the Blackfeet

19    Reservation could predict that a fire could come across the

20    border onto the Reservation, correct?

21    A.    I don't know if you can predict, but you can -- any

22    time that you have an area like that with just a boundary,

23    there's always that possibility.

24    Q.    Okay.  And certainly -- well, certainly if there's

25    a possibility that these unmanaged -- at least not managed

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    for fuel reduction treatments -- forests on the Park side are

2    continuing to generate fuels.  It is certainly a possibility

3    and therefore predictable that fire can come across; isn't

4    that right?  A forest manager would know that, right?

5         A.   Well, I think that's what I said a while ago.

6         Q.   Okay.

7         A.   It's always possible.

8         Q.   In addition to that, a Blackfeet -- a BIA Blackfeet

9    forest manager could certainly predict that there would be

10   high winds in the area of the Blackfeet Forest.  That's a

11   feature of that forest, isn't it?

12        A.   I don't think the right term is "predict."  You

13   know that that's common to that area, but you cannot

14   necessarily predict it.

15        Q.   Okay.  Well, you can't predict exactly what day the

16   winds are going to be blowing hard, but you certainly can

17   predict that there are going to be winds and that those winds

18   can affect fire behavior --

19        A.   I can.

20        Q.   -- if you're a forest manager, correct?

21        A.   But you don't know that a fire is going to occur

22   coincident with those winds.

23        Q.   Okay.  I won't belabor that point.

24             You stated in response to some questions that Mr.

25   Bair asked that when the Red Eagle Fire made its big run on

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1   July 29th and into the 30th, there weren't any natural fuel

2   breaks, but then there was -- the fire did hit a fuel

3   composition change and drop down.  Do you remember that?

4        A.   I think it was coincident with the -- some sighting

5   of the winds and the increased relative humidity, too.

6        Q.   Well, let's quickly bring up the Final Fire

7   Narrative, Plaintiff's Exhibit 57.  And this is going to be

8   57-26.  And you may have that in front of you there, sir, if

9   you want to look it up.

10       A.   What's that number again, please?

11       Q.   Yeah, it's Plaintiff's Exhibit 57-26.  Not 157, 57.

12  Plaintiff's 57.

13       A.   What page?

14       Q.   Twenty-six.  It's down at the bottom, you'll see

15  the Bates stamp 57-26.

16       A.   Yes, I'm there.

17       Q.   And do you see there -- this is your report,

18  correct?  Or excuse me, this is the Final Fire Narrative,

19  correct?

20       A.   This was an exhibit to my report.

21       Q.   Right, and it's an exhibit to your report.  And it

22  says that "the fire stopped where it hit the fuel composition

23  change, on the north end of the fire, burned into the old Fox

24  Creek Fire and old logging units."  Do you see that?

25       A.   Which paragraph is that in?

Trial

Blackfeet Tribe v. USA                                        8/23/2016

```
1        Q.    It's the last paragraph.  It's the beginning of the
2   last paragraph on page 57-26.
3        A.    Okay, I found it.
4        Q.    Okay.  And it's a paragraph describing what we've
5   just talked about, when the fire comes into contact with this
6   fuel composition change, correct?
7        A.    That's what it states.
8        Q.    And the fire narrative, the person who is writing
9   this fire narrative, who was in charge of fighting the fire,
10  it doesn't say anything about winds slowing the fire down at
11  this point, correct?
12       A.    It says it somewhere else in this narrative,
13  though.
14       Q.    Well, do you want to find -- do you know where?
15             Well, let me ask this question, sir, before you
16  start looking for that.  There isn't anything in this
17  narrative that suggests that when the fire hit this fuel
18  composition changed and dropped in intensity that that had
19  anything to do with the winds dropping, that that was
20  coincident with the winds dropping.  That's true, isn't it?
21       A.    On these pages here, I don't see that, but there's
22  another fire behavior narrative for the fire behavior analyst
23  that was with the Type 2 team that documented that.
24       Q.    Right.  Well, he documented or she documented that
25  the winds died down at -- after 2:00 p.m. and that caused the
```

Trial

1    fire to reduce in intensity.  But that comment had nothing to

2    do with these composition changes, did it?

3         A.    I'd have to look at that, but as I recall I thought

4    it did.

5         Q.    Okay.  Well, in any event, this description has

6    nothing to do with the winds, only the compositions changed,

7    correct, sir?

8         A.    This paragraph doesn't say anything about winds,

9    but --

10        Q.    So, if we take a look at Exhibit -- Plaintiff's

11   Exhibit 55, the fire progression map, we see that by 2200

12   hours -- this is the red area -- by 2200 hours on July 29th,

13   the fire -- and that's 10:00 -- or 10:00 p.m. on the 29th,

14   the fire had spread into these composition areas; isn't that

15   right?

16        A.    It had started entering some of them.

17        Q.    Okay.  And that's before 2:00 a.m. on the 30th,

18   before the winds died down, isn't that right?

19        A.    2200 would have been -- and that was on the?

20        Q.    29th.  The winds died down on July 30th.

21        A.    Yes.

22        Q.    Okay.  And, so, the composition changes are having

23   an effect, even before the winds die down, correct?

24        A.    Well, I can't say from what I'm looking at here.

25        Q.    Okay.  Last question.  Does the BIA subordinate

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1      sound forest management to a tribe's wishes about how its

2      forests should look?

3           A.   I don't understand your question.

4           Q.   Does the BIA subordinate sound forest management

5      policies to a tribe's wishes about what should be done with

6      its forest, in your experience?

7           A.   In my experience, they would try to work things out

8      to where it was to their benefit to still achieve these

9      results.

10          Q.   Sir, I understand there's coordination with the

11     tribe.  My question is different than that.  In your

12     experience, does the BIA actually subordinate sound forest

13     management policies and elevate over those policies tribal

14     wishes about what should be done with a forest?

15          A.   I don't think they subordinate it, no.

16               MR. GRAYBILL:  All right.  That's all I have

17               THE COURT:  All right.  Mr. Montgomery, thank you

18     very much for your testimony.  You may step down.

19               All right, what's next?

20               MS. PIROPATO:  Dr. Wendy Wente, Your Honor.

21               THE COURT:  Good afternoon.

22               THE WITNESS:  Good afternoon.

23     Whereupon,

24                    WENDY WENTE, Ph.D.

25     called as a witness, having been first duly sworn, was

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    examined and testified as follows:

2            MS. PIROPATO:  Your Honor, may we approach?  Ms.

3    Megan Moore is going to be bringing up the exhibit copies of

4    Dr. Wente's report, as well as I have hard copies for

5    convenience.

6            THE COURT:  Great.  That's fine.

7            THE WITNESS:  Thank you.

8            MS. PIROPATO:  And let me clarify what's before

9    Your Honor.  I have before Your Honor a courtesy copy of the

10   slide presentation prepared by Dr. Wente.  I also have a copy

11   of the presentation with her notes that she might be

12   referring to for both the Court and counsel to see.

13           THE COURT:  All right, very well.

14           MS. PIROPATO:  Okay, great.  May we proceed?

15           THE COURT:  Yes.

16                   DIRECT EXAMINATION

17           BY MS. PIROPATO:

18   Q.    Please state your name for the record.

19   A.    My name is Wendy Heiser Wente.

20   Q.    And I have in front of you Defendant Exhibits

21   Number 139 and 143.  Are these the expert reports you

22   submitted in this matter?

23   A.    Yes, they are.

24   Q.    Okay.  So, we'll get to some of your background

25   right now.  Where do you work?

Trial

Blackfeet Tribe v. USA                                             8/23/2016

```
 1        A.    I work for a natural resources consulting firm
 2   called Mason, Bruce & Girard.
 3        Q.    And what position do you presently hold?
 4        A.    I'm a senior ecologist there.
 5        Q.    Is there a subject matter that you specialize in?
 6        A.    I work in wildlife biology.
 7        Q.    And tell us about your educational background.
 8        A.    Yes.  I went to undergraduate at Miami University
 9   of Ohio, and there I received a bachelor of science in
10   zoology.  And from there, I continued to graduate school at
11   Indiana University, and I earned a Ph.D. in ecology,
12   evolution, and animal behavior.
13              THE COURT:  I think I'll have to disqualify myself
14   because my son went to Miami Ohio.  Just kidding.
15              THE WITNESS:  Go Redskins.
16              MS. PIROPATO:  We'll put all football allegiances
17   aside for the next few days.
18              BY MS. PIROPATO:
19        Q.    Can you outline any additional graduate work you
20   did?
21        A.    Let's see.  So, in my graduate program, working on
22   my Ph.D., I worked on some species of amphibians, and I was
23   working on -- I'm so nervous.  I was working on microhabitat
24   choice and the evolution of this color polymorphism, which is
25   a set of different colorations in the single species of
```

1486

Trial

1    frogs.  So, it was an evolutionary question, and it was on a
2    species that is in the west.
3              THE COURT:  Do you have some water there?
4              THE WITNESS:  I do.
5              THE COURT:  It sometimes helps.
6              THE WITNESS:  Thank you.
7              MS. PIROPATO:  Thank you, Your Honor.
8              THE WITNESS:  So, that was the subject of my
9    dissertation.
10             BY MS. PIROPATO:
11       Q.   And tell us about your employment since you
12   received your Ph.D.
13       A.   Okay.  After I received my Ph.D., I took a position
14   with the U.S. Geological Survey out of Corvallis at the
15   Forest and Rangeland Ecosystem Science Center.  And there I
16   studied amphibian decline in Oregon and Nevada.  I was
17   looking at habitat assessments of a variety of species out in
18   that region and just documenting decline of a number of
19   species.
20       Q.   And, again, can you describe the work you do
21   currently?
22       A.   So, at Mason, Bruce & Girard, I am a wildlife
23   biologist and a senior ecologist, and my work is -- it spans
24   quite a lot of different types of work, but primarily I work
25   on compliance with Endangered Species Act permitting.  So,

Trial

1    going through and analyzing impacts of a proposed project,

2    both public and private, on listed species.  That's a big

3    piece of my work.

4              Also, on just looking at the impacts of proposed

5    projects on a suite of wildlife species and how those impacts

6    might be mitigated.  So, compliance with county and local

7    zoning codes and laws.

8         Q.   And do you do any habitat assessment work?

9         A.   Yes.  Habitat assessment is a part of that work, so

10   oftentimes I'll go out and assess the habitat in the area of

11   a development or of a proposed project.

12        Q.   Do you have any professional certifications or

13   involvement with professional societies?

14        A.   Sure.  I sit on the board of the Oregon Chapter of

15   the Wildlife Society, and I'm also a certified senior

16   ecologist with the Ecological Society of America.

17        Q.   So, let's talk a little bit about your publications

18   and research.  Have you published any work related to habitat

19   assessment?

20        A.   Yes.  Some of my publications that were -- when I

21   was working for the U.S. Geological Survey involved habitat

22   assessment as a part of the research that I was doing, out

23   monitoring amphibian species in the environment.

24        Q.   And have you conducted any research related to

25   habitat assessment?

Trial

1      A.    So, research in the context of a project, so I have

2  completed research on habitat assessment.   That's a component

3  of the work when I'm out on a project assessing the impacts

4  of a proposed project on a suite of species.

5      Q.    So, Dr. Wente, have you testified in court before?

6      A.    No.

7      Q.    Okay.  Have you served as an expert in litigation

8  before?

9      A.    I was an expert witness on one case.

10      Q.    And can you tell us briefly about that case?

11      A.    That was the Moonlight Fire case.  It was the

12  United States of America vs. SPI, and I served as an expert

13  witness as a wildlife biologist for SPI.

14      Q.    And can you briefly kind of describe the kind of

15  work you did for SPI?

16      A.    I did a wildlife habitat assessment, essentially

17  similar to this, for the area that was involved in that fire.

18      Q.    Okay.  So, without getting into any specifics of

19  your opinion, are you offering opinions on habitats and

20  wildlife observed in and around the area burned by the Red

21  Eagle Fire in this case?

22      A.    Yes.

23      Q.    Okay.  So, generally speaking, what methodologies

24  do biologists and ecologists employ for habitat and wildlife

25  assessment?

Trial

1    A.    Yeah, so, generally, we go out and we look at the

2    environmental components that are in the area of interest.

3    We're looking at components of the environment that are

4    important for a suite of wildlife species.  And, typically,

5    that involves vegetation, but there are also other abiotic

6    components like the topography of the land and elevation, a

7    number of other considerations.  But essentially we're

8    considering that when we're assessing the habitat.

9    Q.    So, what does habitat assessment tell a biologist?

10    A.    It tells me a lot about how species might be using

11    a particular landscape.

12    Q.    Okay.  And how, if at all, does your expertise in

13    biology and ecology enable you to evaluate the habitat in a

14    particular area?

15    A.    Yeah, so, it gives me the -- I have observational

16    experience and a lot of background in the types of habitat

17    elements that are important to different wildlife species.  I

18    kind of know what to look for when I'm out there.  I also

19    know about the background information that I might

20    investigate.

21          MS. PIROPATO:  Your Honor, we'd like to offer Dr.

22    Wendy Wente as an expert in biology and ecology.

23          THE COURT:  All right.  Any voir dire?

24          MR. GRAYBILL:  Your Honor, this witness also issued

25    a report responding to Dr. Duffield's HEA analysis.  I think

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    that that report basically contains opinions on his economic

2    analysis and would require an economics background, the kind

3    of background that this witness does not have.  So, to the

4    extent that there are going to be questions regarding her

5    rebuttal report, I would voir dire and try to get into her

6    economics background.

7              THE COURT:  Are we going to get into economics with

8    this witness?

9              MS. PIROPATO:  To clarify, Your Honor, we are not

10   going to be discussing economics in any way, shape, or form.

11   However, Dr. Wente will be offering rebuttal testimony to Dr.

12   Duffield on a very narrow point, which is to say she's going

13   to comment on the aspects of his analysis that address

14   biology and ecology, not insofar as those are economic

15   opinions, but insofar as they have implications that bear on

16   biology and ecology.

17             THE COURT:  Having heard that, do you want to

18   conduct any voir dire?

19             MR. GRAYBILL:  It will go to the weight, Your

20   Honor, so --

21             THE COURT:  I'm sorry?

22             MR. GRAYBILL:  It will go to the weight, then, I

23   guess is what we'll do.  And I won't object for the purposes

24   of tendering this witness as an expert biologist and?

25             MS. PIROPATO:  Ecologist.

Trial

Blackfeet Tribe v. USA                                        8/23/2016

1          MR. GRAYBILL:  Ecologist.  I don't have any

2     objection in that regard, Your Honor.

3          THE COURT:  Well, if you hear a question that you

4     think is out of bounds, well, you can let me know.

5          MR. GRAYBILL:  I will.  Thank you, Your Honor.

6          THE COURT:  Very well.  With that, then, I will

7     accept Dr. Wente as an expert in ecology and biology.

8          MS. PIROPATO:  Thank you, Your Honor.

9          BY MS. PIROPATO:

10    Q.   So, let us proceed.

11         So, Dr. Wente, what were you asked to do in this

12    case?

13    A.   I was asked to go out to the vicinity of the Red

14    Eagle Fire and finish a wildlife habitat assessment.

15    Q.   So, broadly speaking, we're going to start with the

16    big picture first.  What are the bases for your opinion as

17    expressed in your expert report, which is Defendant's Exhibit

18    Number 139?

19    A.   Yeah, so, essentially, my report is based on the

20    observations that I made while out on a field visit to the

21    Red Eagle Fire, and it's based on background information that

22    I reviewed prior to making my site visit.

23    Q.   And can you give us an example of the kind of

24    background information you considered, Dr. Wente?

25    A.   Yeah, so, I looked at aerial photographs.  You can

Trial
Blackfeet Tribe v. USA                                     8/23/2016

1    see one example here on the left.  I looked at topography.  I
2    looked at the burn perimeter that was available, and I
3    reviewed species data for the area.
4          Q.   So, you just stated that you did a field
5    investigation in this case.  When did you do that?
6          A.   I did that in July of 2015.
7          Q.   Did you conduct that investigation with anyone
8    else?
9          A.   Yes.  I took a botanist with me, Daniel Covington.
10         Q.   And what is your relationship with Mr. Covington?
11         A.   Mr. Covington works with me at Mason, Bruce &
12   Girard, and he is a botanist that has experience in Montana.
13   He actually went to school here in Missoula, so he's very
14   familiar with the vegetation in this area.
15         Q.   So, why would you have a botanist accompanying you
16   on your field investigation?
17         A.   Yeah, typically I take a botanist with me that's
18   familiar with the plant species in the area because they can
19   identify the suite of species that I am observing in the
20   field.
21         Q.   And did the botanist you took on this field
22   investigation have any experience in Montana?
23         A.   Yes.
24         Q.   And what was that experience?
25         A.   Well, he was a botanist that studied here in

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1    school, and so he had field experience in this area.

2        Q.   Okay.  And, again, and just looking at the big

3    picture, what was the purpose of your field investigation?

4        A.   Big picture, it was to go out and investigate

5    whether or not I saw evidence of wildlife using the burned

6    area.

7        Q.   Okay.  So, let's take a look at your first slide,

8    which is up on the screen right now.  Where is this image

9    from?

10       A.   So, the image is from my report.

11       Q.   And what does this image depict?

12       A.   This is a map of the Red Eagle Fire's perimeter.

13       Q.   Okay.

14       A.   And my project study area.

15       Q.   And what does the blue line on this map signify?

16       A.   The blue line is the project study area.

17       Q.   So, how did you select the boundaries for the

18   project study area?

19       A.   Yeah, so, I wanted to incorporate the burned area,

20   which is the red outline there, the fire perimeter.  And then

21   also be able to pull in some areas that were outside of the

22   perimeter but adjacent to it, just to have an idea of the

23   types of habitat that I might run into there.

24       Q.   Okay.  And just to specify, to clarify your -- the

25   statement you just made, why would you want to see areas

Trial

Blackfeet Tribe v. USA                                              8/23/2016

1    outside of the Red Eagle Fire burn perimeter?

2         A.    Because they also are part of the ecosystems that

3    are involved in this general area.  So, species aren't

4    necessarily going to pay attention to the burn perimeter

5    itself.  So, I wanted to have an understanding of what else

6    is right near there.

7         Q.    And what does the red line on this map signify?

8         A.    That's the Red Eagle Fire's burn perimeter.

9         Q.    And how did you determine where the Red Eagle Fire

10   burn perimeter was?

11        A.    That was provided to me by Mr. Nelstead from the

12   Department of Justice.

13        Q.    Okay.  And what does the yellow line on this map

14   signify?

15        A.    That's the Fox Creek Fire burn perimeter.

16        Q.    And, again, for the clarity of the record, how did

17   you determine where the burn perimeter was for the Fox Creek

18   Fire?

19        A.    Yeah, I obtained the spatial data from Kevin

20   Nelstead.

21        Q.    Okay.  And what does the green dotted line on this

22   map signify?

23        A.    That is the Blackfeet Tribal Land boundary.

24        Q.    And do the dots on this map signify?  So, here,

25   here we go, there are some of them.

1495

Trial

1    A.    Yeah, those are the locations of my observation

2    points.  These are places where I stopped to collect data.

3    Q.    And what do the white dots on the map signify, and

4    let me see -- there's one.

5    A.    Yeah, so, the white dots are in unburned areas.

6    Q.    And what do the yellow dots signify?

7    A.    The yellow dots signify areas that are burned by

8    the Red Eagle Fire.

9    Q.    Okay.  Let's move on then.

10         Where is this image on the slide from?

11   A.    Yeah, that -- that image is also from my report.

12   Q.    Okay.  And can you walk us through the methodology

13   you used in forming your conclusions for your report?

14   A.    Sure.  So, essentially, there were three steps to

15   my habitat assessment, and the first was done essentially

16   desktop before I went out to the field.  So, in order to

17   determine a project study area, like I said before, I

18   reviewed background information, but I also looked at land

19   cover type data that were available, and this is publicly

20   available.  This is the Montana National Heritage Program's

21   land cover type data that you see on this map, which gives

22   you an idea of vegetation cover types that were on the land

23   prior to the burn.  So, this was prior to 2006 where this

24   particular map comes from.

25         I selected observations points that were based on

Trial
Blackfeet Tribe v. USA                                              8/23/2016

1    kind of a spatial distribution.  I just wanted to have points
2    that were throughout the project study area and that took
3    into account things like elevation, the aspect, habitat type
4    and structure, what I might expect to see out there, and then
5    what I was seeing as I was out there.  So, I also set
6    observation points as I was moving around in the burn
7    perimeter.  And I also considered management regimes.
8         So, essentially, the first step is to look at the
9    data ahead of time.  The second step was to go out and do the
10   field observations.  And then the third step is to synthesize
11   the data that I collected while out in the field.
12        Q.   And for us nonbiologists, what is a Montana land
13   cover type?
14        A.   Yeah, so, land cover type is essentially a
15   vegetation community.  It's a way to describe the species
16   that would be expected to be in that area based on like tree
17   species, shrubs, and then herbaceous or forb species and
18   grasses, so the occurrence in the vegetation community that I
19   would expect to see.
20        Q.   And why are land cover types important?
21        A.   So, land cover types give us an idea of what the
22   resources are that are there for wildlife.  Essentially,
23   wildlife rely on different cover types, and so by
24   understanding the vegetation communities that are present,
25   that gives me a lot of information on what wildlife species

Trial

1    might be using it.

2         Q.    So, let's just clarify what you did.  Did you

3    conduct a habitat assessment based on a statistically derived

4    sampling approach?

5         A.    No.

6         Q.    And did you conduct an exhaustive study of the

7    study area?

8         A.    No.

9         Q.    And can you describe the kinds of conclusions you

10   drew from your report based on your field investigation?

11        A.    Yeah, so, I based my conclusions off of the

12   observations that I actually made while in the field.  So,

13   it's my individual observations, and it's general trends that

14   I saw based on those observations and based on my

15   understanding of what habitat elements are important to

16   species of wildlife.

17        Q.    Okay, we can move on.

18              So, where is this image from?

19        A.    That's from my report, and it's from the

20   photographs that I delivered with my report.

21        Q.    And what does this slide show?

22        A.    Yeah, so this shows an example of an observation

23   point.  So, essentially the red flag there or orange flag

24   kind of marks the center of what was a circular plot.  I

25   collected a circular plot at each observation point.  And for

Trial

Blackfeet Tribe v. USA                                          8/23/2016

1    that, I collected physical attribute data.  I took

2    photographs on the cardinal directions for each of these

3    plots so that I would have something to refer to.  I also

4    collected information on dominant vegetation species.  That's

5    where Daniel came in and was helping.

6           Snags and downed wood I collected regarding the

7    occurrence of that, regarding the occurrence of live trees.

8    And then also any wildlife observations and sign that I made.

9           Q.   And can you give us an example of wildlife

10   observations or signs?

11          A.   Sure, like tracks or scat.

12          Q.   Okay.  And where is this image from?

13          A.   The photographs and the image are from my report

14   and from the photographs that I delivered with the report.

15          Q.   And just for the clarity of the record, were the

16   photographs you delivered with your report, are they included

17   in Defendant's Exhibit 182?

18          A.   Is that the photo --

19          Q.   Yeah, your photo diary.

20          A.   Yes.

21          Q.   Okay, great.  And what does this slide show?

22          A.   So, this slide shows essentially that I was looking

23   at the Montana National Heritage Program data, the land cover

24   mapping, ahead of when I went out there, but of course I was

25   going out there post-burn.  So, essentially, I was looking at

Trial
Blackfeet Tribe v. USA                                              8/23/2016

1    how the information I was collecting in the field actually

2    corroborated the Montana National Heritage Program's land

3    cover type.

4         Q.   And just to clarify one point, is the Montana

5    Heritage data that you just referred to, is that public data?

6         A.   Yes.

7         Q.   Okay.  So, how many observation points did you

8    observe?

9         A.   So, I collected 25 observation points.

10        Q.   Were these observation points in the unburned area

11   of the project study area?

12        A.   There were some in the unburned area, and there

13   were seven of those.

14        Q.   And could you provide us with an overview of your

15   results?

16        A.   Yeah.  So, in the unburned area, on those points, I

17   observed four different vegetation communities.  I saw aspen

18   and mixed conifer forest at two of the points, the

19   parenthetical are the number of observation points where I

20   saw those.  Rocky Mountain subalpine dry-mesic spruce-fir

21   forest and woodland at three.  Rocky Mountain subalpine mesic

22   spruce-fir forest and woodland at one.  And harvested forest-

23   tree regeneration at one observation point.

24        Q.   So, Dr. Wente, you're a biologist.  Why are you

25   gathering information about these different community types?

1500

Trial

1     A.    Yeah, so, the vegetation community, again, gives me
2     an idea of how it might support the wildlife species that are
3     out on the site.
4     Q.    So, you're saying there's a correlation between the
5     vegetation that you see and the wildlife you expect to see;
6     is that right?
7     A.    Yeah, so, the community type is a land cover type,
8     but that's also indicative of the ecosystem type.
9     Q.    And were there observation points in the burned
10    area of the project study area?
11    A.    Yes.  I collected 18 burned observation points.
12    Q.    And can you provide us an overview of your results?
13    A.    Yes.  So, there was one observation point that was
14    Rocky Mountain subalpine-upper montane grassland.  And then I
15    saw early seral stages of the following four, which were
16    aspen and mixed conifer forest, the Rocky Mountain subalpine
17    dry-mesic spruce-fir forest and woodland -- I know that's a
18    mouthful -- Rocky Mountain dry-mesic montane mixed conifer
19    forest, and then harvested forest-tree regeneration.
20         And by early seral stages, I mean that that's an
21    early developmental stage of that particular type of
22    community.  So, when a disturbance happens, the community
23    starts to grow back.  And, so, you can see indicators of the
24    developing community early on, and that's what I'm meaning by
25    early seral stages.

Trial

1      Q.    So, kind of what are the characteristics of an
2   early seral-stage forest or area?
3      A.    Yeah, so you can have grassland species, grasses
4   that are coming in, but then you'll also have seedlings of
5   the tree species that are regenerating in that general area.
6      Q.    Okay.  And where are these images on the slide
7   from?
8      A.    Those are from my report and the associated photos.
9      Q.    And can you walk us through what this slide
10  depicts?
11     A.    Yes, this is a couple of pictures of the Rocky
12  Mountain subalpine dry-mesic spruce-fir forest and woodland.
13  On the left is an unburned example, and on the right is a
14  burned example.
15     Q.    So, we're going to give my last name a little run
16  for its money here.  What is a Rocky Mountain subalpine dry-
17  mesic spruce-fir forest and woodlands?
18     A.    So, this is -- yeah, this is a community type
19  that's associated with well-drained soils, grasses, shrubs
20  and forbs that are tolerant of these warmer, kind of
21  relatively dry conditions.  That's why it's dry-mesic.  This
22  cover type primarily experiences disturbances that are from
23  insect outbreaks, blow-down of trees, and also fire.
24         THE COURT:  Ms. Piropato, is this a good place to
25  stop for today?

Trial

 1        MS. PIROPATO:  This would be a great place to stop,
 2   Your Honor.  Thank you.
 3        THE COURT:  Okay.  Before we all leave today, I'd
 4   like to get a sense of how we're doing on schedule,
 5   specifically whether you all think there's a possibility of
 6   finishing tomorrow.
 7        MR. BAIR:  Ms. Piropato is responsible for our
 8   remaining witnesses, so I'd defer to her.
 9        MS. PIROPATO:  Oh, no, you're looking at me.  I'm
10   very nervous, Your Honor.  I think we could finish the
11   remaining witnesses, which includes Dr. Wente, Dr. Zhang, Dr.
12   Robin Cantor, and Dr. Kronrad within the time frames allotted
13   by this Court by tomorrow.  It is possible they could migrate
14   onto Thursday.  Some of that depends on the scope and the
15   extent of cross examination.
16        THE COURT:  Right.  At this point, does the
17   Plaintiff anticipate a rebuttal case?
18        MR. GRAYBILL:  We don't anticipate one at this
19   point, but that may change.
20        THE COURT:  Sure.
21        MR. GRAYBILL:  I don't think that we'll be done
22   tomorrow based on what I think the cross examination will be
23   of some of the witnesses.
24        THE COURT:  So, it sounds like if you were me you
25   probably would leave your present travel plans in place.

1503

Trial

Blackfeet Tribe v. USA                                    8/23/2016

1          MS. PIROPATO:  That sounds right, Your Honor.

2          THE COURT:  Yeah, okay.  I'll see you all at 9:30

3    tomorrow morning.

4          (Court adjourned at 5:00 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1504

Trial

Blackfeet Tribe v. USA                                      8/23/2016

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3          I, Sara J. Vance, court-approved transcriber,

 4   certify that the foregoing is a correct transcript from the

 5   official electronic sound recording of the proceedings in the

 6   above-titled matter.

 7

 8

 9

10   DATE:   9/16/16

11                            SARA J. VANCE, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1505

Trial

Blackfeet Tribe v. USA                                              8/23/2016

```
 1                          ADMITTED EXHIBITS

 2

 3   PX        PAGE       DESCRIPTION

 4   140       1275       2006 Optimazation Procedure

 5

 6   DX        PAGE       DESCRIPTION

 7   187       1334       USDA Fire, Fuel Treatments, and

 8                        Ecological Restoration:   Conference

 9                        Proceedings.   April 16-18, 2002, Fort

10                        Collins, CO

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```