1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    BLACKFEET TRIBE OF THE          )

5    BLACKFEET INDIAN RESERVATION, )

6              Plaintiff,           ) Case No. 12-429L

7         vs.                       )

8    THE UNITED STATES OF AMERICA, )

9              Defendant.           )

10

11

12                   U.S. Bankruptcy Court

13              Russell E. Smith Federal Building

14                 201 East Broadway Street

15                   Missoula, Montana

16                Thursday, August 25, 2016

17                      9:30 a.m.

18                   Trial Volume 8

19

20

21         BEFORE:  THE HONORABLE THOMAS C. WHEELER

22

23

24

25   Reported by:  Rick Sanborn, CER, Digital Reporter

Trial

Blackfeet Tribe v. USA                                          8/25/2016

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFF:
 3              LAWRENCE A. ANDERSON, ESQ.
 4              Attorney at Law
 5              Post Office Box 2608
 6              300 4th Street North
 7              Great Falls, Montana  59403-2608
 8              (406) 727-8466
 9              laalaw@mc.com
10              BENJAMIN R. GRAYBILL, ESQ.
11              Graybill Law Firm PC
12              Post Office Box 3586
13              Great Falls, Montana  59403-3586
14              (406) 452-8566
15              brg@silverstatelaw.net
16
17    ON BEHALF OF THE DEFENDANT:
18              TYSON BAIR, ESQ.
19              CAROL DRAPER, ESQ.
20              MARISSA PIROPATO, ESQ.
21              U.S. Department of Justice (ENRD)
22              Post Office Box 7611
23              Washington, DC  20044-7611
24              (202) 307-3316
25              tyler.bair@usdojgov
```

Trial

Blackfeet Tribe v. USA                                        8/25/2016

```
 1    ALSO PRESENT:
 2            Tyson Running Wolf, Treacie Burback
 3            Megan Moore, Kristin Nam
 4            Dondrae Maiden, Kristen Kokinos
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1779

Trial

Blackfeet Tribe v. USA                                    8/25/2016

| | WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | VD |
|---|---|---|---|---|---|---|
| 1 | | | I N D E X | | | |
| 2 | WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | VD |
| 3 | KRONRAD | | 1782 | 1811 | 1820 | |
| 4 | | | | | | |
| 5 | EXHIBITS: | | ID | RECVD | | |
| 6 | DEFENDANT | | | | | |
| 7 | 4 | | | 1827 | | |
| 8 | 5 | | | 1827 | | |
| 9 | 12 | | | 1827 | | |
| 10 | 15 | | | 1827 | | |
| 11 | 17 | | | 1827 | | |
| 12 | 30 | | | 1827 | | |
| 13 | 36 | | | 1827 | | |
| 14 | 37 | | | 1827 | | |
| 15 | 44 | | | 1827 | | |
| 16 | 50 | | | 1827 | | |
| 17 | 81 | | | 1827 | | |
| 18 | 82 | | | 1828 | | |
| 19 | 100 | | | 1827 | | |
| 20 | 103 | | | 1827 | | |
| 21 | 180 | | | 1828 | | |
| 22 | 181 | | | 1828 | | |
| 23 | 182 | | | 1828 | | |
| 24 | | | | | | |
| 25 | | | | | | |

1780

Trial

Blackfeet Tribe v. USA                                      8/25/2016

```
 1                    I N D E X (Continued)

 2

 3    EXHIBITS:                ID        RECVD

 4    DEFENDANT

 5    DEMONSTRATIVE

 6    7                                  1811

 7    8                                  1811

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

par

```
 1               P R O C E E D I N G S
 2                  -    -    -    -    -
 3       (Proceedings called to order, 9:31 a.m.)
 4            THE COURT:  Good morning.  Please be seated.  We're
 5   on the record for Day 8 in the trial of the Blackfeet Tribe
 6   versus the United States.  Are there any preliminary matters?
 7            MR. BAIR:  There is, Your Honor.  Before proceeding
 8   with Dr. Kronrad's cross examination, we would like to make
 9   an additional disclosure about the Court's ruling yesterday
10   concerning witness communications.  And we would appreciate
11   an opportunity to have a hearing in-camera, also.  We've
12   spoken to Mr. Graybill and Mr. Anderson, who don't object to
13   that.
14            THE COURT:  All right.  Do you want to do that now?
15            MR. BAIR:  We'd love to, Your Honor.
16            THE COURT:  All right.  If you just follow me back
17   through the door here, we can do that.
18            (An in-camera discussion was held off record.)
19            THE COURT:  All right.  Please be seated.  As I
20   said, we're on the record for Day 8 of the trial of the
21   Blackfeet Tribe versus the United States.  And good morning,
22   Dr. Kronrad.  You understand that you're still under oath
23   in the issue stated.
24            THE WITNESS:  Yes, Your Honor.
25            THE COURT:  All right.  Let's proceed with cross
```

Trial

Blackfeet Tribe v. USA                                                    8/25/2016

1    examination.

2              MR. GRAYBILL:  Thank you, Your Honor.

3                    CROSS EXAMINATION

4              BY MR. GRAYBILL:

5         Q.   Good morning, Dr. Kronrad.

6         A.   Good morning, sir.

7         Q.   So, when we ended yesterday, we were discussing the

8    cost per acre for hazardous fuel reduction, which was Dr.

9    Duffield's restoration action.  And I'd like to turn to

10   Figure 5 in your report, which is page 69 of your report, 140

11   -- excuse me, Defendant's 145-69.

12        A.   Did you say page 69?

13        Q.   Yes.

14        A.   Okay, I'm there.

15        Q.   Okay.  So, as I understand it, Figure 5 represents

16   prices, cost-per-acre prices of various actions that you

17   consider hazardous fuel reduction.  Correct?

18        A.   I'm one of the people who consider it.  So does

19   Blackfeet.

20        Q.   Okay.  And so the pricing that is on -- or in

21   Figure 5 in the middle column, those are not Blackfeet

22   Reservation costs per acre, are they?

23        A.   That's right.  They come from the citations that

24   are right below the table.

25        Q.   Okay.  So, let's talk about -- I'm sorry, sir, did

Trial

1    you -- had you finished?

2         A.   Yes.

3         Q.   Let's talk about those citations.

4         A.   Yes.

5         Q.   As I understand it, for the first three actions the

6    source was a Kyle Inabnit, a management officer of the Lewis

7    and Clark National Forest.  Is that correct?

8         A.   He was one of the people, yes.

9         Q.   Well, just to be clear, the first three treatments

10   in the treatment column show that the source of the pricing

11   for those first three treatments is, number one, in Mr.

12   Inabnit, if that's how you pronounce his name, is the first

13   source.  Correct?

14        A.   That's correct.

15        Q.   All right.  And he's from the Lewis and Clark

16   National Forest, correct?

17        A.   Yes.

18        Q.   Did you personally speak with him?

19        A.   No.  Cliff Sunda spoke with him, a person I work

20   with.

21        Q.   Okay.  Who is Cliff Sunda?

22        A.   He's a forester in Texas, and he has a consulting

23   firm.  And he was working with me on this project.

24        Q.   So, is Mr. Sunda's resume or is any biographical

25   information about Mr. Sunda contained in your report?

1    A.    No, I don't believe it is, no.

2    Q.    So, is it true that it was Mr. Sunda who spoke with

3    all four of these sources, sir?

4    A.    We spoke with him and I listened in on three of

5    them.

6    Q.    Why didn't you speak with him directly?

7    A.    Because Mr. Sunda was making the phone calls and I

8    was sitting there listening.  If there was something for me

9    to say, I would say it.  He was just collecting the prices.

10   Q.    Okay.  The information in Table 5 simply identifies

11   the action, the cost or range of costs and the source.

12   Correct?

13   A.    Correct.

14   Q.    There's no information about the difficulty, the

15   topography, or any other aspect of the work that would be --

16   that's being described here in the treatment section.

17   Correct?

18   A.    Well, there is really.  If you look at the first

19   two items, for instance, and you see the range of price,

20   that's because the -- in many cases the topological

21   conditions, the ecological conditions, conditions about the

22   stand, that's why we have a range of costs.

23   Q.    Okay.  Other than the range of costs, there's no

24   information here about where these treatment actions were

25   taking place.  Isn't that correct, sir?

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1       A.   Well, we primarily asked for the east sides of the

2   range, and we started off our conversation saying that we

3   were talking about the area that pertained to the Blackfeet

4   Reservation.

5       Q.   That information is not contained in your report,

6   though, is it?

7       A.   You misunderstand what I said.  I said that when we

8   started the conversation with these gentlemen that we told

9   them what area we were interested in.  And so in their

10  thinking, they were thinking about this area, also.  They

11  weren't thinking about Western Montana or Oregon or

12  Washington State.  They were thinking about the area in

13  question that we told them that we were interested in.

14      Q.   I don't think you understood my question.  My

15  question, sir, was is the information about location of these

16  treatments contained in your report?

17      A.   No.  I'm telling you where we asked for the

18  information.  This is where it came from.  Just like all the

19  information in my report pertained to the area in question,

20  meaning the area of the fire.

21      Q.   One of your criticisms of Dr. Duffield is that he

22  didn't use information from the Blackfeet Reservation in

23  determining some of his variables.

24      A.   Sure.  He's using data from --

25      Q.   Sir, I haven't finished my question.

Trial
Blackfeet Tribe v. USA                                    8/25/2016

1      A.    Ah, I'm sorry.

2      Q.    Please let me finish my question before you answer.

3      A.    I thought you were finished.  Sorry.

4      Q.    So, sir, you here have decided not to use Blackfeet

5  Reservation information, but instead have gone to information

6  from the Lewis and Clark Forest -- National Forest.  Why did

7  you do that as opposed to using Blackfeet information about

8  costs of these hazardous fuel reduction treatments?

9      A.    Because these are the other items that need to be

10  done, and we didn't have costs from the Blackfeet on them.

11  And if you look at the next page, page 71, you'll see all of

12  the items that the Blackfeet said that they were going to do

13  but there weren't costs for those.  So, if they were going to

14  do those, we had to -- we had to gather costs for these

15  items.

16      Q.    Okay.  And you chose to gather the costs from a

17  forest that was not on the Blackfeet Reservation.  Correct?

18      A.    We talked to the gentleman who worked on the Clark,

19  but we told them what information we were looking for and

20  what area we were looking for.  Now, this person, along with

21  the other three, are experts in this area.  That's why we

22  contacted them -- experts in these types of silvicultural

23  procedures.

24      Q.    The BIA operates or manages the forest in the

25  Blackfeet Reservation.  You're an expert for the United

Trial

Blackfeet Tribe v. USA                                           8/25/2016

1   States.  Why is it that you didn't obtain cost information

2   from the Blackfeet Reservation hazardous fuel reduction

3   projects?

4        A.   You mean from the BIA foresters?

5        Q.   Yeah.

6        A.   No.  We talked with BIA foresters and a site visit,

7   and they didn't seem to have any good information for what

8   these costs would be.  And when we told them that we were

9   seeking out information from these other experts, they told

10  us that would be good information because they had a vast

11  knowledge -- the people that we mentioned had a knowledge of

12  actually getting the work done and getting the work done on

13  the ground.  So, the BIA foresters deferred to our gathering

14  of the data.

15       Q.   So, just to be clear, your testimony here in Court

16  today is that the BIA did not have cost information for

17  hazardous fuel reductions for the Blackfeet Reservation?  Is

18  that your testimony?

19       A.   They had it -- they only had it for the data that

20  -- the precommercial thinning.

21       Q.   They didn't have any other hazardous fuel --

22       A.   No.

23       Q.   -- reduction --

24       A.   No, no.  They could not provide it to us.

25       Q.   Do you remember who you talked to?

Trial
Blackfeet Tribe v. USA                                          8/25/2016

1      A.    I talked to two foresters, I'll have to get their

2    names.  The names slip me.  Two of the foresters who work for

3    BIA.

4      Q.    Okay.  When did you talk to them?

5      A.    A month ago.

6      Q.    You mean you talked to them after your report was

7    written?

8      A.    That's right.

9      Q.    So, before you wrote you report --

10     A.    Mm-hmm.

11     Q.    -- and before your report was served on the

12   Plaintiff in this case, you did not go to the Blackfeet -- or

13   to the BIA managers of the Blackfeet Forest to obtain cost

14   information relevant to the Blackfeet Forest with regard to

15   hazardous fuel reduction?

16     A.    That's right.  We --

17     Q.    Okay.  So, you understand that Dr. Duffield's

18   specific restoration action is thinning trees, handpiling

19   trees, the thin trees and forest debris, and then pile

20   burning.  You understand that's his specific treatment

21   prescription for his restoration resource?

22     A.    Yes.

23     Q.    Okay.  So, what you did, as I understand it, is you

24   chose a number of other kinds of treatments that didn't

25   include the actual thinning.  So, for example, if we look at

Trial

1    Figure 5 and we take the slash and handpiling, which is the

2    second line item -- let me just say -- let me just ask this

3    preliminarily.  By the word -- using the word "slash," does

4    that mean thin?

5         A.   No.

6         Q.   What does "slash" mean?

7         A.   Slash is debris that's on the ground.

8         Q.   So, is it your testimony that the cost per acre of

9    handpiling slash on the ground is $259 to $550?

10        A.   This is gathering the slash, moving it by hand in

11   tight stands, handpiling it and then coming back -- covering

12   it, and then coming back and burning it later on in the

13   wintertime.

14        Q.   Okay.  So, where, then, in your treatment column in

15   Figure 5, where is the -- where is the thinning?  Where is

16   the thinning action where you actually remove trees?

17        A.   Pre-commercial thinning?  It's the third from the

18   bottom.

19        Q.   Well, sir, you have a forestry background so let me

20   ask you, do you understand that there is a difference between

21   a hazard fuel reduction project that calls to thin trees and

22   precommercial thinning that is done prior to harvest?

23        A.   I don't understand your question.

24        Q.   Do you understand whether there is a difference

25   between going into the forest and performing hazard fuel

Trial

1   reduction by removing trees and going into a section that

2   you're about to harvest or that you plan to harvest years

3   later where the trees are coming up too densely and thinning

4   those trees?

5          A.   What do you mean removing the trees?

6          Q.   Sir, do you understand my question?

7          A.   No, I don't understand your question because it

8   doesn't make any sense to me.  I don't understand what your

9   term "removing the trees" means.

10         Q.   You don't know what it means to remove a tree from

11  forest, sir?

12         A.   Are you talking about taking it offsite?

13         Q.   Sir, I'm talking about removing a tree from a

14  forest and then piling it and ultimately burning it as slash.

15  It's a hazardous fuel reduction treatment, sir?

16              Let me ask this.  Let me -- maybe we can step back.

17  What do you understand "hazardous fuel reduction" to mean?

18         A.   There's many situations and there's a whole list of

19  them here in this table of what it might be.  You're talking

20  -- you spoke about two of them, but basically it could be

21  identical.  There's no difference between what you said about

22  removing trees.

23         Q.   Okay.

24         A.   Removing trees is thinning.

25         Q.   Okay.  Well, that's what I'm asking about.  Where's

Trial

Blackfeet Tribe v. USA                                          8/25/2016

1   the thinning in your treatment other than precommercial

2   thinning?  Where's the thinning in your treatment column?

3        A.   Well, precommercial thinning is going to be the

4   thinning.  But are you talking about a commercial thin?

5        Q.   Sir --

6        A.   Sir, you don't understand forestry --

7        Q.   Sir, wait for my question.

8        A.   Mm-hmm.  The problem is you don't understand

9   forestry.

10            MR. GRAYBILL:  Your Honor --

11            THE COURT:  Let's be sure to take this one at a

12   time if we can.

13            THE WITNESS:  Yes, Your Honor.

14            THE COURT:  We can't record statements by two

15   people at once.

16            THE WITNESS:  Yes, sorry.

17            MR. GRAYBILL:  Let me just ask the question, sir.

18            THE WITNESS:  Okay.

19            BY MR. GRAYBILL:

20        Q.   Okay.  So, you just indicated a few minutes ago

21   with regard to the second line item in Table 5, slash and

22   handpiling --

23        A.   Yes.

24        Q.   -- that that hazardous fuel reduction action does

25   not include thinning.  Correct?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

1        A.    Not necessarily, no, no.

2        Q.    Well, when you say not necessarily, does it or

3    doesn't it?  I mean, in some circumstances does slash and

4    handpiling include thinning?

5        A.    No, not the kind that you're thinking about, like

6    precommercial thinning or commercial thinning.  No, it's not

7    that.

8        Q.    So, it's your testimony that handpiling slash on

9    the ground costs $259 to $555, but precommercial thin, actual

10   thinning of trees, going into the forest and cutting trees

11   down to remove them from the forest, is only $145 per acre.

12   Is that correct?

13       A.    Yes, that's right.

14       Q.    Okay.  What does the word "slashing" mean there

15   after precommercial thin?

16       A.    Well, what you're going to do then is you're going

17   to cut the trees up into smaller pieces, you're going to in

18   many cases -- well, slashing means you're going to cut the

19   pieces up into smaller pieces like -- analogous to lopping.

20   It's the same idea as lopping.  You're also going to prune

21   any trees where all the dead branches are very close to the

22   ground.  That acts as a fuel source.  So, you want to prune

23   all the dead branches up to a height, 8 feet, 12 feet off the

24   ground.

25       Q.    Okay.  Well, let me get back on track here.  The

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1    slash handpiling line item, if you take the $555 per acre

2    cost there --

3         A.   Yes.

4         Q.   -- and you add it to the burning, which is -- pile

5    burning, $75, you come up with a $630 per acre hazardous fuel

6    reduction cost.  Isn't that right?

7         A.   No, no.  You're combining things and that's not

8    correct.  It says slash and handpiling.  Well, you already

9    have them piled up.  You just asked whether you include the

10   pile and burn in there.  No, you don't.  That's double

11   counting.  You're piling it twice.  It doesn't need to be

12   piled twice.

13        Q.   Sir, it says pile burning.  You're just -- that

14   just means burning a pile.  It doesn't mean piling and then

15   burning, does it?

16        A.   But you see the slash and handpiling includes the

17   burning cost in there.

18        Q.   The slash and handpiling includes the burning cost,

19   although --

20        A.   That's right.

21        Q.   -- the word --

22        A.   That's the fuel treatment.  It has to be burned.

23        Q.   Okay.  But the word burning is not included in your

24   treatment description.  Is it, sir?

25        A.   No.  But as a forester and other foresters would

Trial

Blackfeet Tribe v. USA                                          8/25/2016

1    know that it does include the burning in there, because these

2    are fuel treatments.

3         Q.   Sir, if burning is included in the line item for

4    slash and handpiling, why is there another line item for pile

5    burning?

6         A.   I -- because we foresters, we have different words

7    for different things.  But we understand that when we're

8    doing a fuel treatment and we say slash and handpiling that

9    we're going to come back later and we're going to burn it.

10   It's just part of it.

11        Q.   Sir, let's just look at the sentence immediately

12   preceding Table 5.  As a result, some of these costs can be

13   added together to estimate costs for specific prescriptions.

14   Do you see that?

15        A.   Yes.

16        Q.   So, that means that some of these different

17   treatments are added together, isn't that right?

18        A.   They may be.  And I can give you an example of

19   which ones would be added together.

20        Q.   Okay.  And I take it that that would not include

21   slash, handpiling and burning?

22        A.   That's right.  That would be included in there.

23        Q.   Okay.  In any event, you determined, as I

24   understand it, that the -- let's go to page 71 of your

25   report.  This is 145.71.  It's Table 6.

Trial

```
 1        A.    Yes.

 2        Q.    You determined that these Montana prices for

 3   hazardous fuel reduction involving hand-thinning, piling and

 4   burning -- you add the burning there.  Do you see that, sir?

 5        A.    What line are you on?

 6        Q.    I'm on Table 6, about six line items down, there

 7   are a series of assumed treatments called hand-thin, pile,

 8   burn.  Do you see that?

 9        A.    Yes.  You mean 41 acre?

10        Q.    Yeah.

11        A.    Where it says --

12        Q.    Forty-one acre.  And when you describe that

13   treatment, you included the word "burning."  Right?

14        A.    Because I'm trying to explain to the nonforester

15   what's really happening there --

16        Q.    Okay.

17        A.    -- meaning right before it it says thinning and

18   handpiling.

19        Q.    Okay.

20        A.    That's the term.  But now I describe what actually

21   has to be done and I say hand-thinning, piling and burning.

22        Q.    Are you combining costs there?

23        A.    No.

24        Q.    Well, sir, you come up with a $607 cost, right?

25        A.    Yes.
```

Trial

1      Q.    Well, if we turn back to Table 5 on page 69 on your
2    second line item, slash, handpiling, where I now understand
3    burning is to be assumed, the top price there is only $555.
4      A.    That's right.  But you're not adding in the cost of
5    the hand-thinning.
6      Q.    Okay.  So, once you add in the hand-thinning, the
7    piling and the burning, we get to $607.  Correct?
8      A.    Yes.
9      Q.    All right.  That's relatively close to Dr.
10   Duffield's prescription.  Correct?
11     A.    Yes.
12     Q.    All right.  So, what you then did is you added
13   additional prescriptions and averaged them.
14     A.    I --
15     Q.    Let me just finish my question.
16     A.    Sorry, sorry.
17     Q.    I'll get to the question mark here.
18     A.    Yes, sorry.
19     Q.    As I understand it, you added other prescriptions
20   that didn't include the thinning, that included only piling
21   and burning, and then averaged altogether in order to get to
22   your $403.  Isn't that correct, sir?
23     A.    No.  I did not add these things.  These things came
24   from -- all these operations came from the Blackfeet Agency
25   fuel management plan.  They said they were going to do it.

Trial

Blackfeet Tribe v. USA                                          8/25/2016

1   Dr. Duffield said that the only thing that would be done on

2   the forest for fuel management would be the thinning and the

3   burning.  But that's not true.  Blackfeet say that they're

4   going to do all of these other operations.

5            Well, if they're going to do all these other

6   operations for fuel management, then I have to price them.

7   Because that's what the actual cost is going to be.  Dr.

8   Duffield's assumption that everything would be thinned and

9   burned is just incorrect for the Blackfeet Reservation.

10       Q.   Well, Dr. Duffield's prescription was specifically

11   thinning trees, handpiling and then burning.  Isn't that

12   right?

13       A.   And that's the only one that he said were going to

14   be done on the Blackfeet Reservation.  And the Blackfeet

15   themselves said, no, that's not the only one, here's the big

16   list of all the things that are going to be done.

17       Q.   Okay.  In order to handpile and burn, some thinning

18   has to occur.  Correct?

19       A.   Not necessarily.  You can have trees that die by

20   themselves and fall over, and you want to burn those.  You

21   want to get the fuel up.  So, you're going to go into the

22   stand and you're going to lop those trees.  You're going to

23   move them into piles, and then later you're going to come

24   back and burn them.

25       Q.   The other question I have and then I'm going to

Trial

Blackfeet Tribe v. USA                                      8/25/2016

```
 1    move on with regard to this issue is, at the bottom of your

 2    list here on Table 6, page 71 -- 145.71 for the screen --

 3         A.    Yes.

 4         Q.    -- you have restoration costs.  Do you see that,

 5    sir?

 6         A.    On page 71?

 7         Q.    At the very -- on page 71, Table 6 at the very

 8    bottom, it's up on the screen, too.  You include in this long

 9    list restoration costs.  Do you see that?

10         A.    No.  No, I don't.

11         Q.    You don't see the term -- the word "restoration"

12    there --

13         A.    At the very bottom?

14         Q.    -- at the very bottom under treatment description?

15         A.    No, sir.  I see the word reforestation.

16         Q.    Excuse me.  My mistake.  Reforestation.  When you

17    use the word "reforestation," sir, what are you talking

18    about?

19         A.    Going in there and doing any silvicultural work to

20    bring back a new stand.

21         Q.    Would that include planting?

22         A.    It may.  It depends on the species.  Some species

23    don't need to be replanted, especially after a fire.  They

24    come back by themselves.

25         Q.    Okay.  Planting is not hazardous fuel reduction, is
```

Trial

1    it, sir?

2        A.    You'd have to understand reforestation.    In

3    reforestation operation, you'll come in there and you'll get

4    the site prepared, especially in a planting operation.    And

5    to get the site prepared, one of the techniques that you can

6    use is actually setting up what we call a prescribed burn.

7    Very low intensity, slow burn and proper weather conditions,

8    it will burn off all the debris, which makes the site very

9    clean and you can plant the site.    It also adds nitrogen to

10   the soil.    So, it's one of the operations that foresters

11   routinely do.

12       Q.    Okay.    Let's go to the next variable that you were

13   concerned about.    You touched on it in your direct, and I'm

14   not going to ask you very many questions about it.    But I do

15   have a couple.    And that's the avoided costs -- variable

16   avoided costs due to the fuel treatments.    I think on your

17   chart, if my memory is correct -- and this is -- I'm looking

18   at page 16 of your report now, which is your summary of HEA

19   analysis.

20       A.    Yes.

21       Q.    And on your chart there on the whiteboard, I think

22   that was the first thing you talked about.    And you indicated

23   that you found $2 million, or had $2 million of avoided

24   costs.    And I'm just looking at this summary and down at the

25   bottom, almost to the bottom, there is a total avoided cost

Trial

1   line item.  Do you see that, sir?

2       A.   Yes.

3       Q.   And it's $4 million.  And I just am wondering

4   whether the $2 million figure is correct or the $4 million

5   figure is correct.

6       A.   No.  Both figures are correct.

7       Q.   Okay.  What's the difference, then?

8       A.   On this chart, what I was doing was I was comparing

9   data between Dr. Duffield's report and the work that I did

10  using local data.  And what I found when I held all variables

11  constant between Dr. Duffield and data that I was using, the

12  only variable that I changed was to use local costs for the

13  -- calculating the present value, and Dr. Duffield used story

14  data.  I used local data.  And when I held everything

15  constant, I found that using my data, it increased HEA $2

16  million.

17          Now, what I was looking at here on this whole chart

18  was what's the difference between Dr. Duffield's data and my

19  data.  So, the $2 million is a difference between mine and

20  his, but it's not the bottom line of avoided cost.  There's

21  more calculations that need to be done, like the discount

22  rate, all the different things that happen, and that leads to

23  the total avoided cost of $4 million.

24      Q.   Okay.  Dr. Duffield estimated total avoided costs

25  of $8 million.  Are you aware of that, sir?

Trial

1    A.   Yes.

2    Q.   And, so, in fact, Dr. Duffield's HEA analysis is

3    far more conservative than yours when it comes to avoided

4    costs.  He's reducing his gross HEA damages by more than you

5    reduced your gross HEA damages.  Isn't that true?

6    A.   No.  You have to understand that this is a long

7    calculation that includes many variables.

8    Q.   I'm only talking about avoided cost.

9    A.   I know.  But one of the avoided costs, for

10   instance, has to do with the interest rate.  And Dr. Duffield

11   uses, for instance, to do the avoided costs -- is 3 percent

12   and I use 3.28 percent.  All the variables change the avoided

13   cost.  It's not a simple calculation.  It's a very

14   complicated calculation that has many steps in it.

15   Q.   Okay.  Let's move on.  Dr. Kronrad, your HEA damage

16   estimate for the over 12,000 burned acres on the Blackfeet

17   Forest lands is a little over $2.7 million.  Is that correct?

18   A.   Yes, sir.

19   Q.   And that's the amount that you claim compensates

20   the Blackfeet Tribe for all nontimber ecosystem services,

21   including recreation, aesthetic values, cultural values,

22   religious values, habitat loss, fisheries loss, impact on

23   endangered species and other such services for the full 100-

24   year recovery period.  Is that correct?

25   A.   I wouldn't put it that way because I'm not making a

1   judgment call on whether HEA is a correct analysis to use.

2   All that I did was took the methodology that HEA says you

3   should use and I incorporated the correct variables in there

4   for the area in question.

5       Q.   And would you agree with me, sir, that if you are

6   wrong on your variables, if the variables that you calculated

7   are incorrect, then your estimate of HEA damages isn't

8   correct.

9       A.   That's correct.

10      Q.   Let's move on to your comments about Dr. Jackson's

11  report.  I understand that you disagree with Dr. Jackson's

12  stumpage price.  And this is at page 145.17, so I am thinking

13  it's page 17 of your report, sir.

14      A.   Yes, I have it in front of me.

15      Q.   You don't cite any authority there other than Dr.

16  Zhang with regard to your criticisms of the stumpage price.

17  Isn't that true, sir?

18      A.   I cite Dr. Zhang, look at his number, and my

19  criticism of Dr. Jackson comes from what I talked about in

20  direct testimony concerning the fact that Dr. Jackson doesn't

21  really understand or doesn't seem to understand that the

22  Blackfeet have certain limited people that they're going to

23  sell to.  And that's a policy decision that they've made that

24  they're not selling the timber on the free market, on the

25  open market.  They're not taking sealed bid sales and selling

1   it to the highest bidder.  And there's certainly lots of

2   loggers out there who would pay, as Dr. Jackson said, the

3   price that he's talking about.  But the Blackfeet don't allow

4   that.

5       Q.   So, if I may ask, sir, is your testimony that if,

6   in fact, there was an open bid system, if a timber sale was

7   let based on an open bid system, you think the timber could

8   command Dr. Jackson's price.

9       A.   In an open market situation, that's possible that

10  it would command the higher price, that's right, than

11  Blackfeet have been receiving all these years.

12      Q.   Do you understand, sir, that there are a limited

13  number of loggers on the Blackfeet Reservation -- tribal

14  loggers?

15      A.   Yes.

16      Q.   So, for large sales, do you understand that the BIA

17  does open up the sales in an open bid system?

18      A.   They did that for the salvage because they had to

19  get the material off of there.  But I've seen no other sales

20  besides the salvage cut, and that was an emergency that they

21  had to get the wood off of there.

22      Q.   Were you here for Mr. Gladstone's testimony, sir?

23      A.   No, sir.

24      Q.   Okay.  You complain, also, about Dr. Jackson's

25  discount rate.  Correct?

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1      A.    Yes.

2      Q.    And you cite a source Rhinhart.  Do you see that,

3   sir?  It starts at the bottom of page 17 --

4      A.    Yes.

5      Q.    -- Rhinhart 2010.

6      A.    Yes.

7      Q.    Was the Rhinhart source that you cited a peer-

8   reviewed, scholarly economic report?

9      A.    The Rhinhart was just put in as an example of

10  others -- of other interest rates.  I'm not criticizing Dr.

11  Jackson about relative to anything that Rhinhart said.  I

12  know what interest rate that I used, the bond rate, and Dr.

13  Jackson got this from a source.  And I read that yesterday

14  about the Office of Management and Budget and the warning

15  that Office of Management and Budget said.  You don't use a 3

16  percent interest rate except for government analyses of

17  regulatory questions.

18         Dr. Jackson took that 3 percent interest rate.  It

19  has no basis in anything -- in reality concerning forestry

20  and forestry investments.

21     Q.    Okay.  Rhinhart was not a peer-reviewed article,

22  correct?

23     A.    You know, I don't even know.  But it really doesn't

24  matter to my analysis.

25     Q.    So, let's move on then to reforestation costs.  You

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1    complain that Dr. Jackson's estimated reforestation would

2    cost $409, and that that is far more than -- well, not far

3    more, more than what you estimated at $371 per acre.

4    Correct?

5         A.   That's correct.

6         Q.   And Dr. Jackson estimated his reforestation costs

7    based on Blackfeet tribal cost data.  Correct?

8         A.   Yes.

9         Q.   You based yours on the Montana Department of

10   Natural Resource and Conservation data?

11        A.   Yes.

12        Q.   You also stated that the Blackfeet Tribe plants

13   only 100 acres annually, and so Dr. Jackson's estimate of

14   replanting is too high.  That's on page 18 of your report,

15   sir.

16        A.   Yes.

17        Q.   Do you understand that there was an inventory done

18   in this case that indicated that as a result of the Red Eagle

19   Fire over 4,800 acres needed replanting because of the

20   severity of the fire?

21        A.   It need revegetation.

22        Q.   Meaning?

23        A.   That doesn't necessarily call for planting.

24   Because, as I said, as foresters know, many of these stands

25   would reproduce themselves, especially after a fire.

Trial

1   Lodgepole pine needs a fire to regenerate.  It has what's

2   called serotinous cones.  Their pine cones don't open up

3   unless they're subjected to a fire.  All the lodgepole pine

4   stands are coming back by themselves.

5         Q.   Are you here to offer expert testimony, Mr. Kronrad

6   -- Dr. Kronrad, I'm sorry -- regarding forest ecology or the

7   need for replanting after a fire?

8         A.   This is -- as a forester, somebody who has a

9   master's degree in forestry, yeah, certainly.  This is one of

10   the basics that you learn in the first semester of being a

11   forester, or first semester in school as a forester.

12         Q.   In your review of the Blackfeet forest management

13   plans, do you understand that there is a program for planting

14   on the Blackfeet Reservation, planting lodgepole pine?

15         A.   Planting I've seen.

16         Q.   Let's go on to -- strike that.

17              Just to be clear, you do have -- you did determine

18   planting costs, and yours were $371 per acre.  Correct?

19         A.   That's correct.

20         Q.   Let's go on to precommercial thinning costs.  You

21   were critical of Dr. Jackson's $368 per acre cost, correct?

22         A.   Yes.

23         Q.   And your costs per acre for precommercial thinning

24   is the $145.55 that we looked at on Figure or Table 5.

25   Correct?

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1        A.    Yes.

2        Q.    And, again, that's a source from the Lewis and

3   Clark National Forest?

4        A.    From all those sources, I believe.  No, maybe it

5   was from Lewis and Clark, meaning the gentleman who works for

6   the Lewis and Clark.

7        Q.    All right.  Who spoke to Mr. Sunda?

8        A.    Yes.

9        Q.    Who then relayed the information to you?

10       A.    Yes.

11       Q.    Okay.  And, again, there are no locations given for

12   that price?

13       A.    We asked him about the area in question, and we

14   said focus on that.  He got these prices from contractors.

15   You have to understand how forestry works with contractors to

16   do work.  All they do is, for instance, plant.  They have

17   planting crews and they're contracted to plant large areas of

18   land.  And that's the data that's used because it's so

19   accurate because that's what you can pay contractors to do

20   the work for.

21       Q.    Okay.

22       A.    Just one more sentence.

23       Q.    Sure, please, sir, go ahead.

24       A.    And in this case, this situation, where the

25   Blackfeet have all these acres to plant and they want to get

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1   it done quickly, they're going to have to bring in

2   contractors to do that.

3       Q.   But I'm not talking about planting, sir.   I'm

4   talking about precommercial thinning costs.

5       A.   Same there.   It's the same idea that if you want it

6   done on large areas, you're going to have to bring in these

7   contractors to do it.

8       Q.   Okay.   And in order to do the precommercial

9   thinning, as I understand it, you have to go in and actually

10  thin, remove trees, correct?

11      A.   Either remove them offsite or just drop them on the

12  ground.

13      Q.   And then you have to pile them at some point,

14  correct?

15      A.   You have to lop them and pile them.

16      Q.   Okay.   So, let's turn to page 81 of your report.

17  This is a table, but it's not identified as a particular

18  table.   It doesn't have a number.   It's 145-81.   And so what

19  we see here is the information from Mr. Pursell about costs

20  per acre for particular precommercial thinning actions.

21  Correct?

22      A.   Yes.

23      Q.   And so if we just look at the second line item, we

24  see machine piling is an action at $186.99 per acre.

25  Correct?

1809

Trial

1       A.    Yes.

2       Q.    And below that we see precommercial thinning,

3    PCT/slashing.  Correct?

4       A.    Yes.

5       Q.    So, those are two elements of the same forest

6    action with regard to precommercial thinning.  They're both

7    necessary in precommercial thinning, isn't that right?

8       A.    No.  That's not right.

9       Q.    Well, you can't pile unless you actually go in and

10   do the thinning.  Isn't that right, sir?

11      A.    You don't need to pile.  When you do a

12   precommercial thinning, you don't necessarily need to pile if

13   you're going to lop the slash.

14      Q.    Well, why do you have piling there as a line item?

15      A.    Piling is one thing that you can do.

16      Q.    Okay.  So --

17      A.    But it's not necessary to do it in a precommercial

18   thinning.

19      Q.    Okay.  Well, if it is necessary -- you say it is

20   necessary in certain circumstances, correct?

21      A.    I guess under certain conditions where you're not

22   going to lop the slash, although lopping the slash is

23   required by the State of Montana.

24      Q.    Well, if you didn't want the slash that is created

25   to become a fire hazard, you'd pile it, wouldn't you?

Trial

1    A.   No, not necessarily.  That's why you're lopping it.

2  That's why the State requires you to lop the slash.

3    Q.   In any event, sir, if you add the machine piling

4  and the precommercial thinning/slashing, if you add those two

5  line items, you end up at $365 an acre.  Isn't that right?

6    A.   You would if you wanted to add two numbers

7  together.

8    Q.   Okay.  And it's your testimony that these two

9  actions don't go together when you engage in precommercial

10  thinning.  Is that your testimony?

11    A.   When you engage in precommercial thinning and

12  slashing.

13         MR. GRAYBILL:  That's all I have, Your Honor.

14         THE COURT:  All right.  Thank you, Mr. Graybill.

15  Redirect?

16         MS. PIROPATO:  Yes, Your Honor.  And it's not very

17  long, which is good because today is supposed to be a

18  beautiful day.

19         I would like to do a housekeeping matter.  I took

20  with my .pdf maker a picture of both Dr. Kronrad's notes and

21  the HEA presentation up there.  So, we've marked them as DDX

22  7 and DDX 8, and we'd like to officially move them as

23  evidence into this proceeding.  Any objections?

24         MR. GRAYBILL:  What are they?

25         MS. PIROPATO:  It's a copy of Dr. Kronrad's notes,

Trial

1    which he had at the stand, and it's just a copy of the --

2              MR. GRAYBILL:  Oh, okay.

3              THE WITNESS:  That's my note.

4              THE COURT:  All right.  DDX 7 and 8 are admitted.

5              (Defendant Demonstrative Exhibit Numbers 7 and 8

6    were admitted into evidence.)

7                       REDIRECT EXAMINATION

8              BY MS. PIROPATO:

9         Q.   Good morning, Dr. Kronrad.

10        A.   Good morning.  So, let's first turn to some

11   questions Mr. Graybill asked you about Dr. Duffield.  You

12   were asked about simplifying the damages analysis by only

13   including three age classes in the HEA calculation.  Do you

14   remember that line of inquiry?

15        A.   Yes.

16        Q.   So, to clarify the record, why isn't three age

17   classes as accurate as 71 age classes, even if we accept that

18   HEA is a simplification of the valuation problem?

19        A.   Well, I accept that -- what you're saying that it's

20   a simplification.  But that doesn't mean that you should lump

21   all data together.  Under that hypothesis, why not call

22   everything 100 years, then?  Look, if you know how old stands

23   are, then it's proper to put down their age and calculate all

24   the data based on the age of the different stands and the

25   acreage in each of the stands.  I'm sure HEA and the people

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1   who put it together originally would say use the proper data

2   that you have.  And a forester would say having all of these

3   stands, the 71 stands, is a simplification.

4       Q.   So, you were also asked by Mr. Graybill about

5   clearcuts.  Do you remember that line of inquiry?

6       A.   Yes.

7       Q.   And you stated that Mr. Nelstead was being

8   conservative, correct?  Do you remember that?

9       A.   Yeah.

10      Q.   And by that, do you mean that Mr. Nelstead tells

11  you the oldest a clearcut stand could be?

12      A.   He's looking at when a stand had been removed based

13  on the photography.

14      Q.   Okay.  So -- and are you a GIS expert?

15      A.   No, I'm not.

16      Q.   And are you offering an opinion here about the

17  appropriate use of GIS?

18      A.   No, I'm not.

19      Q.   Okay.  And does Dr. Duffield, in his expert report,

20  discuss suppression resources in the context of his burn

21  probability calculation?

22      A.   I'm not -- I'm not sure I understand the question.

23      Q.   You were asked a bunch of questions about burn

24  probability and suppression resources and how after a certain

25  period of time suppression resources became more prevalent on

Trial

1   the Blackfeet Forest.  Do you remember that --

2        A.   Yes.

3        Q.   -- or in Montana generally.

4        A.   Sure.

5        Q.   To your recollection, do you know if Dr. Duffield's

6   analysis of burn probability specifically has a discussion of

7   suppression resources and how that might affect burn

8   probability?

9        A.   No.

10       Q.   Okay.  And could you discern a reason why Dr.

11  Duffield used 25 years of burn probability data from his

12  initial report?

13       A.   I'm not sure.  And I'd like to turn back to that

14  page because there's some things that Duffield used -- Dr.

15  Duffield used.  He -- one of the problems that I have with it

16  is he just looked at the time period 1986 to 2011, this

17  period of time -- this 25-year period of time.  And he got

18  the data from a state organization that's supposed to keep

19  the data.  But the data that they get for this time -- for

20  part of this time period is just telephone calls.  It's not

21  official from any official body.

22            And even the organization themselves said that they

23  -- they can't find this data.  They don't know where this

24  data came from because we told them exactly what the numbers

25  were, and they said that they really couldn't reproduce it or

Trial

1  us because we wanted to see the actual data.  And they didn't

2  know if these were forest fires.  They could have been brush

3  fires or grassland fires.

4       The other thing is that Dr. Duffield's picks and

5  chooses 1986 to 2011, when, in fact, in 2012 in the state,

6  1,220,646 acres burned.  And, in fact, 19,000 -- almost

7  19,100 acres of that were on the Blackfeet Reservation.  He

8  left out that piece of data that was available to him.  If he

9  included that piece of data that was available to him, his

10  burn probability would have been drastically different than

11  his .49.

12       I object to people picking and choosing data when

13  you have a large data source.

14       Q.    And what do you mean by a large data source?

15       A.    Well, like I said, when I looked at Treasury bonds,

16  if I knew the rate of Treasury bonds I could look at every

17  Treasury bond that was ever sold and I used all of that data.

18  A statistician, if I wanted to know the average income of

19  everybody in here, I wouldn't just ask two or three people.

20  I'd have the ability to ask everybody what their income was

21  and then get the average.

22       As a statistician, as somebody who's taken, like,

23  statistics, that's how statistics is supposed to be carried

24  out, have the biggest sample size that you can.

25       Q.    So, Dr. Kronrad, are you familiar with the Fox

Trial

 1    Creek fire?

 2         A.    The one that came after?

 3         Q.    Yeah.  And did the Red Eagle fire -- no, the Fox

 4    Creek fire of 2002.

 5         A.    Ah, yes.

 6         Q.    And did the Red Eagle Fire burn through an area

 7    already burned by the Fox Creek Fire, if you recall?

 8         A.    Yes, it did.

 9         Q.    So, let's turn -- let's go to Collins at

10    Plaintiff's Exhibit 134.  Remember, it's this article, Dr.

11    Kronrad.  It's Plaintiff's Exhibit 134.  If you don't have it

12    on the stand, please let me know.

13         A.    This is the February 2010 article?

14         Q.    Yes.  Challenges and Approaches in Planning Fuel

15    Treatments across Fire-Excluded Forested Landscapes by

16    Brandon M. Collins, Scott Stevens, Jason Moghaddas -- I

17    apologize for that -- and John Battles.

18         A.    Yes.

19         Q.    So, let's turn specifically to page 26.

20         A.    Yes.

21         Q.    Do you remember you were asked questions about the

22    section entitled Treatment Proportions/Rates?  Do you

23    remember that, Dr. Kronrad?

24         A.    Yes, I do.

25         Q.    Specifically let's turn to .2, which is in the

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1    first paragraph.  Do you see that, Dr. Kronrad?

2         A.    Yes.

3         Q.    Can you read that for the record?

4         A.    "Increasing the proportion of area treated

5    generally resulted in further reductions in fire sized and

6    behavior, however, the rate of reduction diminishes more

7    rapidly beyond 20% of the landscape treated."

8         Q.    Can you explain how that statement affected your

9    analysis?

10        A.    Yes.  Taken with the first statement that 20

11   percent treatment level appeared to have the most consistent

12   reduction in model, fire, size, and behavior across multiple

13   landscapes and scenarios.  So, he's talking about 20 percent

14   being the rate, and then he's saying if you do more than 20

15   percent it doesn't seem to -- it doesn't seem to be worth it

16   in layperson's terms.

17        Q.    So, let's look at this in sort of an extreme

18   scenario.  Would treating 100 percent of the landscape lead

19   to less fires?

20        A.    Yes.

21        Q.    But why wouldn't you use 100 percent?

22        A.    Well, because it's not necessary and you're really

23   not getting -- as an economist would say, a bang for your

24   buck by treating all those acres.  Twenty percent -- and we

25   didn't read anything here, but 20 percent, if it's laid out

Trial

Blackfeet Tribe v. USA                                      8/25/2016

1   properly and it uses for fire breaks and to slow down the

2   forest -- slow down the fire, roads, topography, rivers,

3   streams, lakes, if you lay it out properly and you lay it out

4   quickly so that it's in place when the next fire season

5   comes, two fire seasons, if you lay it out quickly he's

6   saying that 20 percent is going to give you the best

7   response.

8          Q.   So, let's turn to another subject you were asked

9   about by Mr. Graybill.  You were asked whether you used data

10  from the tribal forest for hazardous fuel reduction.  Do you

11  remember that line of inquiry?

12         A.   Yes.

13         Q.   And you used the Lewis and Clark Forest Data.  Is

14  that correct?

15         A.   Yes.

16         Q.   Where is the Lewis and Clark Forest in proportion

17  to the Blackfeet Tribal Forest?

18         A.   I believe it's very close.  I don't know if it --

19  I'm not positive whether it exactly borders on it, but it may

20  because there are four national forests there.

21         Q.   And if you know, did Dr. Duffield use numbers from

22  the Lewis and Clark Forest?

23         A.   No, no.

24         Q.   Okay.  You don't know.  Okay.

25         A.   No, he didn't.

Trial

1        Q.    Okay.  And if you know, is all of Dr. Duffield's

2    restoration only on the tribal forest?

3        A.    Well, he said if the money is available, the

4    Blackfeet don't have enough land to implement it.  They're

5    going to have to go outside of the forest -- I mean, outside

6    the Blackfeet Reservation and start implementing it on tens

7    of thousands of acres.  It's kind of odd that -- odd in my

8    mind as to how you're going to go to private landowners and

9    ask them to implement something on their private lands in

10   tremendous acreage numbers.

11       Q.    Okay.  Why don't we go to Table 5 of your report.

12   And, again, for the record --

13       A.    What page is that?

14       Q.    Table 5 -- she's going to bring it up -- I don't

15   have the exact page number.  It's at the end.  It might be

16   71.

17       A.    Yes, okay.  I'm there.

18       Q.    I'm just going by my memory, though.

19       A.    Yes.

20       Q.    Sixty-nine, okay.  So, Dr. Kronrad, you testified

21   that the Bureau of Indian Affairs did not have data for you

22   for every aspect of hazardous fuel treatment.  By that, do

23   you mean that the BIA did not necessarily have a breakdown

24   for the different actions listed in Table 5 of your report?

25       A.    That's right.  They didn't know what it would be.

Trial

Blackfeet Tribe v. USA                                    8/25/2016

1      Q.    Okay.  And you would agree that thinning is done as

2  part of fuel treatments on the Blackfeet Forest.  Correct?

3      A.    It's one of the methods that can be used yes.

4      Q.    And just so I understand, is this the same kind of

5  thinning that is done in precommercial thinning?

6      A.    And extending.  You're removing some trees, yes.

7      Q.    Okay.  And so let's be clear for the record.  How

8  are your fuel treatment costs different than those used by

9  Dr. Duffield?

10     A.    Well, Dr. Duffield just used one fuel treatment

11 cost to do his analysis, and he got that data from the

12 Storrie Fire.  What I did was I looked at all of the

13 operations that the Blackfeet said that they needed to do for

14 fuel treatment, and I used the Blackfeet data for what needed

15 to be done and the number of acres that needed to be done.

16     Q.    Okay.  So, why don't we go to page 10 of your

17 report.  And this is just a small housekeeping matter.

18     A.    Yes.

19     Q.    Specifically I think it's on the first paragraph

20 under cost per acre.

21     A.    Yes.

22     Q.    And you were asked about a site that says see page

23 31 of Sawyer and --

24     A.    Talnagi.

25     Q.    -- Talnagi, yes.  Thank you for saving me there,

Trial

1   Doctor.  That's 2007.  Could that possibly be the forest

2   management plan?

3        A.   I believe it is.

4        Q.   So, was the 2007 a typo, perhaps, or not a full

5   listing of the forest management plan?

6        A.   I think it could have been.  I remember that the

7   authors were these gentlemen.

8        Q.   Okay.  So, let's talk quickly about Dr. Jackson and

9   your rebuttal to Dr. Jackson's analysis.  So, Dr. Kronrad --

10       A.   Yes.

11       Q.   -- in your report, did you reach a specific opinion

12  as to the price that the Blackfeet could get in an open

13  market?

14       A.   No.

15       Q.   Okay.  And in your report or today, are you

16  rendering an opinion on whether replanting is necessary in

17  this case.

18       A.   No, I am not.

19            MS. PIROPATO:  Your Honor, we have nothing further.

20  Thank you.

21            THE COURT:  All right.  Any recross?

22            MR. GRAYBILL:  Just a couple of questions.

23                      RECROSS EXAMINATION

24            BY MR. GRAYBILL:

25       Q.   Just to clear up for the record, Dr. Kronrad, you

1821

Trial

1    just answered some questions regarding the size of Dr.

2    Duffield's restoration resource, the 55 acres.  Do you

3    remember that?

4         A.   Yes.

5         Q.   If we could go to Plaintiff's Exhibit 65.  This is

6    the forest inventory analysis that was done by Pete Sawyer in

7    June of 2007.

8         A.   Yes.

9         Q.   Is this a document that you've seen and read?

10        A.   Yes.

11        Q.   Did you rely on it to prepare your report?

12        A.   I believe I read this, yes.

13        Q.   Okay.  So, if we could go to the executive summary,

14   which is 65-6.  I don't know if you have this in your -- or

15   in that bundle.  So, you might want to look at the screen,

16   Doctor.  And there's a chart there.  We can just focus on the

17   chart.  And it's -- the chart is a pie chart that Mr. Sawyer

18   included in this inventory of all trust forestland.  Do you

19   see that, sir?

20        A.   Yes.  Can I look at the text above this, please?

21        Q.   Do you have it?  I can get it for you if you don't

22   have it there.

23        A.   Yeah, I don't.

24        Q.   I don't have it here.  There you are.

25        A.   That's different from this.  Thanks.

Trial

1      Q.    I'm sorry.

2      A.    That's okay.  Do you know what page it's on?

3      Q.    Yeah.  It's on page -- at the bottom you should see

4    a little Bates stamp that says Plaintiff's Exhibit 65-6.

5    It's actually page 1 of the forest inventory.  So, we'd start

6    at the beginning there.

7      A.    Okay.  Sixty-five dash five?

8      Q.    Go to the next page, 65-6.

9      A.    Sixty-five dash seven.  I don't have a 65-6.

10     Q.    All right.  Well, we're going to find it for you,

11   sir.

12     A.    Thanks.

13     Q.    Why don't you give me that one.

14     A.    Yes.  Thank you.

15     Q.    Okay.  Now do you have it, sir?

16     A.    Yes.

17     Q.    And do you see there there's this pie chart that

18   indicates there's 174,963 acres of forest trust land?

19     A.    Yes.

20     Q.    And the pie chart indicates that there are

21   different components to the forest, including woodland and

22   reserve timberland, noncommercial timberland and commercial

23   timberland.  Do you see that?

24     A.    Yes.

25     Q.    And so the noncommercial timberland and the

1823

Trial

1      commercial timberland make up about 60 -- a little more than

2      60 percent of the forest based on the pie chart.  Isn't that

3      correct, sir?

4          A.   The noncommercial timberland and the commercial

5      timberland --

6          Q.   Make up a little more than 60 percent of the

7      174,963 acres.  Correct?

8          A.   Yes.

9          Q.   Okay.  And that would be roughly -- you would be

10     better at this than me -- about 110,000 acres of timberland?

11         A.   I'm trying to do it in my head.  I'll take your

12     word for it and say it's --

13         Q.   Okay.  I just did it on my phone calculator.  It

14     was 110,000 acres.

15         A.   Okay.

16         Q.   And so Dr. Duffield's 55,000 acres of restoration

17     resource in timberland on the Blackfeet Reservation would fit

18     within this 110,000 acres.  Wouldn't it, sir?

19         A.   Yes.  Is this all land?  Is this the land all in

20     Montana?

21         Q.   Yes.  This is all the Blackfeet Indian Reservation.

22              Those are all the questions I have, Your Honor.

23         A.   Thank you.

24              THE COURT:  All right.  Dr. Kronrad, thank you very

25     much for your testimony.  You may step down.

Trial

1          THE WITNESS:  May I be excused?

2          THE COURT:  You may also be excused.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  All right.

5          THE WITNESS:  Thanks.

6          THE COURT:  Mr. Bair?

7          MR. BAIR:  The United States has no more witnesses,

8    Your Honor.  But before resting, we would like to make one

9    motion.  May I approach?

10         THE COURT:  Sure.

11         MR. BAIR:  I have just handed the Court packets

12   containing two documents.  The first is a list of 21 exhibits

13   from the United States exhibit list to which the Plaintiff

14   objected primarily on the grounds of relevance.  And we've

15   reordered them rather than in chronological order in

16   categories of how we believe they're relevant to the case.

17   The second document is the parties' joint stipulations and

18   objections.

19         Of these 21 documents from our exhibit list, 17 of

20   them the Plaintiff has exhibited -- excuse me, has objected

21   to solely on the basis of relevance.  We believe that the

22   facts presented at trial demonstrate how these three

23   categories of documents -- first, documents related to the

24   Blackfeet Tribal Forest Management; second, documents related

25   to the management of Glacier National Park; and, third,

1   documents related to funding for DOI programs -- are

2   relevant.  And so we would ask the Court to admit these

3   documents.

4           We recognize that the Court's pretrial order notes

5   that documents not referred to during trial will be given

6   little, if any, weight.  However, we think it would be most

7   appropriate for the Court to consider the relevance of these

8   documents during its decision-making process on their own

9   merits.

10          The final two categories consist of one document to

11  which the Plaintiff objected based on relevance, hearsay, and

12  authenticity.  We've looked into that document and determined

13  that it is a chapter from a publicly available book governing

14  public lands wildland fire incident management.  The footnote

15  at the bottom is ours demonstrating where that document is

16  publicly available.  It contains useful glossaries about

17  wildland firefighting terms that we'd like to refer to in

18  post-trial briefing.

19          The final category of documents contains the

20  underlying data relied on by Mr. Nelstead and Dr. Wente.

21  Although they didn't refer to that data directly during their

22  testimony, for the completion of the record we would like to

23  have those three documents admitted as exhibits, also.

24          THE COURT:  I see the objection for that last

25  category is that Plaintiff stated it was unable to open the

Trial

1    files.  Do we still have that problem?

2              MR. BAIR:  We conferred with the Plaintiff prior to

3    trial, and I was under the impression that we may have

4    resolved that.  But I'll let the Plaintiff's counsel speak to

5    it for themselves on that issue.

6              THE COURT:  All right.

7              MR. BAIR:  Thank you, Your Honor.

8              THE COURT:  Very well.

9              Mr. Graybill or Mr. Anderson, would you like to

10   respond?

11             MR. ANDERSON:  Your Honor, these matters -- these

12   documents were not referred to in any of the witnesses'

13   examinations.  And so based on the Court's order, we think

14   there's a problem now with admitting them because there's no

15   context to sort them out now.

16             And, two, if that were important to the Defendant's

17   case, they should have been offered in the context of the

18   various witnesses' examinations so that we could have taken

19   them up in that context.  We can't take that context up now.

20             With respect to Wente, I think we've been able to

21   assess those documents.  So, we would withdraw that

22   objection.            THE COURT:  All right.  Well, let me just

23   go through these by category and I'll give you my thoughts

24   about these exhibits.

25             As to the first category, documents related to the

Trial

Blackfeet Tribe v. USA                                      8/25/2016

1    Blackfeet Tribal Forest Management, I think that even though

2    these exhibits may not have been referenced individually, we

3    have heard testimony from probably three or four witnesses

4    about Blackfeet Nation resolutions and the way that they go

5    about balancing priorities, including a priority for fire

6    prevention versus the other priorities they have about beauty

7    and aesthetics and so forth.  And just looking at these

8    resolutions, I think that they most likely fall within that

9    category.  And so I will accept these exhibits.

10          And let me just say what they are for the record.

11   These are Defendant's Exhibits 4, 5, 12, 15, 30, 36, 37, 50,

12   100 and 103.  Those exhibits are admitted.

13          (Defendant's Exhibit Numbers 4, 5, 12, 15,30, 36,

14   37, 50, 100 and 103 were admitted into evidence.)

15          THE COURT:  I have pretty much the same viewpoints

16   about the documents related to GNP management, and I would be

17   willing to accept them into evidence.  Those are Defendant's

18   Exhibits 17, 44 and 81.

19          (Defendant's Exhibits 17, 44 and 81 were admitted

20   into evidence.)

21          THE COURT:  The four exhibits related to Department

22   of Interior funding, I'm going to exclude those from the

23   record.  I don't -- I don't think that funding has a great

24   deal to do with this case, quite frankly.  I heard one of the

25   early witnesses say or agree that the Department of Interior

Trial

1    and the Bureau of Indian Affairs has these responsibilities

2    regardless of what the funding may be.  So, I'm going to

3    decline the admission of Defendant's Exhibit 22, 23, 49 and

4    177.

5            The Defendant's Exhibit 82 related to wildland

6    firefighting analysis, I will accept that document into

7    evidence.

8            (Defendant's Exhibit 82 was admitted into

9    evidence.)

10           THE COURT:  And then the last three -- well, I

11   guess it's just Wente, you have agreed to, right, Mr.

12   Anderson?

13           MR. ANDERSON:  I think we have -- we have -- we've

14   been able to open all three of these, Your Honor.

15           THE COURT:  All right.  Well, I will admit

16   Defendant's Exhibits 180, 181 and 182.

17           (Defendant's Exhibits 180, 181 and 182 were

18   admitted into evidence.)

19           MR. BAIR:  Thank you for your ruling, Your Honor.

20   With that, the United States rests.

21           THE COURT:  All right.  Is there any rebuttal case

22   from the Plaintiff?

23           MR. ANDERSON:  Your Honor, there is no rebuttal.

24           THE COURT:  Okay.  I think we've reached the end of

25   our trial.  I want to talk briefly with you all about a -- no

Trial
Blackfeet Tribe v. USA                                          8/25/2016

1  pun intended -- post-trial briefing schedule.  As you know,
2  my practice is that after the transcript becomes available,
3  which should be within about two weeks or so, I then invite
4  the parties to submit proposed findings of fact and
5  conclusions of law, which is your opportunity to assist me in
6  the drafting of a decision.
7          But the findings of fact are particularly important
8  because each proposed finding of fact will have a reference
9  to evidence that we have admitted in trial, either a document
10  or testimony, and I will provide instructions on how to do
11  that.  But it's a fairly tedious exercise, shall I say, but
12  it's of immense importance to the Court and it will enable me
13  to get a decision for you much more efficiently than if I had
14  to do all this myself.
15          So, there will be that opportunity, and those
16  briefs will be submitted simultaneously.  And for the legal
17  part of it, I will ask you in the briefing schedule to be
18  sure to put an asterisk next to your principal authorities
19  that you rely upon.  Often the table of authorities that I
20  get from parties might have eight or ten pages of cases that
21  I'm supposed to read.  And while I certainly am able to do
22  that, it's always helpful to have a reference to the leading
23  authorities that you rely upon.  So, my order will also
24  include an instruction to that effect.
25          The post-trial briefs will come in concurrently,

Trial

1    but then each of you will have an opportunity to respond to

2    the other side's opening brief.  And the time intervals that

3    I think are reasonable would be 45 days after receipt of

4    transcript for the opening post-trial briefs, and then an

5    additional 30 days after that for a response brief.

6              Given your schedules that I'm sure you're aware for

7    the fall, does that -- is that a reasonable schedule as far

8    as you all are concerned?

9              MR. BAIR:  Speaking for us, Your Honor, I will be

10   out of the country for the first week of November, which I

11   believe would roughly fall shortly before the first brief

12   would be due.  And so we'd request slightly more time for

13   that brief.  Otherwise, I think this is perfectly fine for

14   the United States.

15             THE COURT:  Do you want to do 60 and 30, perhaps?

16             MR. BAIR:  That would be absolutely great for us,

17   Your Honor.  Thank you.

18             THE COURT:  All right.  How about from the

19   Plaintiff's side?

20             MR. ANDERSON:  I think 60 and 30 would be fine for

21   us, Your Honor.

22             THE COURT:  All right.  So, what I will do is that

23   upon receiving the transcript of the trial, I will issue a

24   briefing scheduling order which will contain the 60 and 30-

25   day time periods that we discussed.

Trial

Blackfeet Tribe v. USA                                        8/25/2016

1          Are there any other matters before we close?

2          MR. BAIR:  Nothing further from the United States,

3     Your Honor.

4          THE COURT:  All right.

5          MR. GRAYBILL:  Only to express our gratitude to the

6     Court and the clerk and the reporter coming to Montana.

7          THE COURT:  Thank you.  Well, your presentations

8     were excellent, I thought.  And the record is now closed and

9     we'll go off the record.  Then I'll come down and shake hands

10    with you all.

11         (Trial concluded at 10:50 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1832

Trial

Blackfeet Tribe v. USA                                                8/25/2016

1              CERTIFICATE OF TRANSCRIBER

2

3         I, George L. Quade, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-titled matter.

7

8

9

10   DATE:  9/20/16              s/George L. Quade

11                              GEORGE L. QUADE, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1833

Trial

Blackfeet Tribe v. USA                                                    8/25/2016

| | | | |
|---|---|---|---|
| 1 | | | ADMITTED EXHIBITS |
| 2 | | | |
| 3 | DX | PAGE | DESCRIPTION |
| 4 | 4 | 1827 | Blackfeet Nation Resolution No. 66-92 |
| 5 | 5 | 1827 | Blackfeet Nation Resolution No. 125-92 |
| 6 | 12 | 1827 | Blackfeet Nation Resolution No. 111-97 |
| 7 | 15 | 1827 | Blackfeet Nation Resolution No. 81-99 |
| 8 | 17 | 1827 | Director's Order No. 41: Wilderness |
| 9 | | | Preservation & Management |
| 10 | 30 | 1827 | Blackfeet Resolution 203-2001 (w/ |
| 11 | | | attachments) |
| 12 | 36 | 1827 | Blackfeet Nation Resolution No. 160-2002 |
| 13 | 37 | 1827 | Blackfeet Nation Resolution No. 161-2002 |
| 14 | 44 | 1827 | Final General Management Plan & EIS |
| 15 | | | Volume 1 - Glacier National Park |
| 16 | 50 | 1827 | Blackfeet Nation Resolution No. 5-2004 |
| 17 | 81 | 1827 | National Park Service Management Policies |
| 18 | | | 2006 |
| 19 | 82 | 1828 | Interagency Standards for Fire & Aviation |
| 20 | | | Operations, Chapter 11 - Incident |
| 21 | | | Management |
| 22 | 100 | 1827 | Two Medicine Developed Area Hazard Fuels |
| 23 | | | Reduction Scope of Work 2007 |
| 24 | 103 | 1827 | Blackfeet Agency Fuels Monitoring Plan |
| 25 | | | |

1834

Trial

Blackfeet Tribe v. USA                                          8/25/2016

| 1 | 180 | 1828 | Red Eagle Fire - Aerial Photographs & |
| 2 | | | Slope Data |
| 3 | 181 | 1828 | Nelstead GIS Data (provided on flash |
| 4 | | | drive) |
| 5 | 182 | 1828 | Wente Supporting Data |
| 6 | | | |
| 7 | DDX | PAGE | DESCRIPTION |
| 8 | 7 | 1811 | Dr. Kronrad's notes |
| 9 | 8 | 1811 | HEA presentation |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |